# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **PATRICIA A. CAMPBELL,** | ) | |
| **An Individual,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 2:05cv615-F** |
| | ) | |
| **GANNETT CO., INC., d/b/a THE** | ) | |
| **MONTGOMERY ADVERTISER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF
## <u>ITS MOTION FOR SUMMARY JUDGMENT</u>

John W. Sheffield
Lynlee Wells Palmer
Attorneys for Defendant
The Advertiser Company
d/b/a The Montgomery Advertiser
**JOHNSTON BARTON**
**PROCTOR & POWELL LLP**
2900 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2618
Telephone: (205) 458-9400

**<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION ............................................................................1

II.     SUMMARY OF FACTS ..................................................................1

        A.     The Parties ...........................................................................1

        B.     Campbell's Alleged Complaints ...........................................3

        C.     Campbell's Disciplinary History...........................................7

        D.     Campbell's Termination.......................................................12

        E.     Campbell's Post-Advertiser Employment Search...............13

        F.     Campbell's Pursuit of Legal Action....................................13

III.    ARGUMENT..................................................................................14

        A.     Summary Judgment Standard...............................................14

        B.     Some of the Plaintiff's Allegations of Race and Gender
               Discrimination Are Time-Barred Under Title VII..............14

        C.     The Plaintiff's Title VII and § 1981 Race Discrimination Claims and
               Title VII Gender Discrimination Claims Are Meritless....................17

               1.     Title VII and Section 1981 Analytical Framework .................17

               2.     The Plaintiff Cannot Establish a *Prima Facie* Case ................18

               3.     Campbell Was Not Treated Differently Than Similarly Situated
                      Non-Black or Male Employees.................................................18

               4.     Campbell Was Not Qualified For Her Job At the Time of Her
                      Termination ...............................................................................21

ii

5.  The Advertiser Had Legitimate, Non-Discriminatory Reasons For Its Decisions ....................................................................23

6.  The Plaintiff Offers No Valid Evidence of Pretext and There Is None .............................................................................24

D.  The Plaintiff's Retaliation Claim Fails ...............................................29

1.  The Timing of the Alleged Retaliation Negates Any Causal Nexus...........................................................................................29

2.  The Advertiser Had Legitimate, Non-Retaliatory Reasons For the Alleged Retaliatory Acts and There Is No Evidence Of Pretext ......................................................................................31

E.  Campbell's Use of the Term "Harassment" Does Not State a Claim for a Racially Hostile Work Environment ...........................................32

IV.  CONCLUSION................................................................................................34

## I.    INTRODUCTION

This is a case brought by a plaintiff who, while excessively critical of others, refused to accept criticism for her own deficiencies.  Following her termination for billing errors after having received five warnings, she self-servingly concluded that the real reason must have been race and gender discrimination and retaliation, not her repeated errors.  Equally self-serving is her attempt to prove her case by selectively choosing supposed comparators, using them only when convenient. Other evidence indicates that she complained that people of her own race and gender were treated more favorably than she was.  However self-serving the plaintiff's paucity of proof may be, it neither supports her claims nor reaches the level of a *prima facie* case.  Additionally, there is no genuine issue but that The Advertiser's proffered reasons for termination are legitimate, non-discriminatory and not pretextual.  Accordingly, The Advertiser Company d/b/a The Montgomery Advertiser is entitled to summary judgment as a matter of law.

## II.    SUMMARY OF FACTS

### A.    The Parties

Patricia Campbell ("Campbell" or "the plaintiff") worked at The Montgomery Advertiser ("The Advertiser"), a daily newspaper in Montgomery,

Alabama from July 1988 to September 27, 2004.  (Campbell 43, ll. 6-8[1], 205, l. 9)[2].

The Advertiser is an equal opportunity employer.  (Campbell Ex. 4)[3].

Campbell is an African-American female.  (Complaint ¶ 5).  For the majority of her time at The Advertiser, Campbell worked as a Contract Sales Representative, where she was "[r]esponsible for servicing and developing classified advertising accounts and non-accounts."  (Campbell 56, ll. 17-20; Ex. 5 p. 1).

On her last day of work, Campbell's supervisors were Jennifer Jensen ("Jensen"), the Classified Department's Inside Sales Supervisor, and Kathryn Mount ("Mount"), the Classified Manager.  (Campbell 61, l. 2, 62 ll. 9-13).  Jensen reported to Mount.  (Campbell 62, ll. 19-20).  Both Jensen and Mount are Caucasian females.  (Campbell 61, ll. 1-2, 62 ll. 14-15, 192, ll. 20-22).  At that time, the other Contract Sales Representatives were Brenda Jackson (black female), Cornelius Jones (black male), Thomas Taylor (black male), Margie Jean Robinson-Smith (black female) and Ed Smith (black male).  (Campbell 64, ll. 12-23, 65, ll. 1-7, 204, ll. 1-9).  Joe Howard (black male) had worked with Campbell, but had left prior to Campbell's last day of work.  (Campbell 65, ll. 9-15).

---

[1] References to the plaintiff's deposition are cited as "Campbell Page#, Line #."  References to the plaintiff's deposition exhibits are cited as "Campbell Ex. #."
[2] Specific line number(s) are referenced unless citing to an entire page of plaintiff's deposition.
[3] Specific page number(s) within an exhibit are referenced unless citing to an entire exhibit of plaintiff's deposition.

**B.    Campbell's Alleged Complaints**

Throughout her employment at The Advertiser, Campbell complained about how various things were done, as evidenced by a thick packet of information she submitted to Advertising Director Ron Davidson ("Davidson") and Human Resources Director Linda Browder ("Browder") on September 14, 2003. (Campbell 183, ll. 11-13, 184, ll. 8-10; Exs. 32, 33).  Campbell indicated that the packet "started as her written response to her evaluation and write-up," but "instead turned into a 'purging' of things [she had] wanted to say for some time." (Campbell Ex. 33, p. 1).

In the packet was a July 2000 complaint about her disagreement with how goals were derived, about the commission structure, about vacation time, about filling vacant positions and about the way that free ads are distributed.  (Campbell Ex. 33, pp. 31-32).   A June 2002 document was also included containing complaints about vacation, holiday and seniority issues.  (Campbell Ex. 33, pp. 50-52).  The packet also contained an April 2003 complaint about morale.  (Campbell Ex. 33, p. 59).

Additionally, although it was not included in her September 2003 packet, Campbell complained via memorandum to Mount in January 2002.  (Campbell Ex. 31).   In that memorandum, Campbell complained about morale and accused Mount, her supervisor, of being "the largest part of that discontent."   (Campbell

Ex. 31, p. 1). She further stated to Mount that "[y]ou are not greatly liked nor respected" and said that Mount took her job "too seriously." (Campbell Ex. 31, pp. 1-2). She accused Mount of being "in the clouds" and told her that she needed "to take a good long look at things and try some different approaches lest we all become consumed by the prevailing gloom and bitterness that colors our every day." (Campbell Ex. 31, p. 2).

Among the many complaints of unfairness that Campbell raised in her September 2003 packet were several non-specific references to race discrimination. (Campbell Ex. 33, pp. 10, 16, 23, 37). In one instance, Campbell stated that she "refuse[s] to reside in the 'place' that some want blacks to stay in, a place that is comfortable for them. Numerous of those (people) are relics of the past who suffer from what I term WPS (white privilege syndrome) and choose to call my demand for respect as a person 'confrontational.'" (Campbell Ex. 33, p. 10). In another instance, Campbell stated that "[a]s far back as that [February 2003], I have had problems with the way Kathryn was abusing her authority. At that time most of the instances of questionable behavior came along racial lines." (Campbell Ex. 33, p. 23). Campbell did not specify in her September 2003 packet the individuals whom she believed suffered from "WPS," any justification for her belief that some people wanted her to stay in her "place," or any examples of "instances of questionable behavior." (Campbell Ex. 33, pp. 10, 23).

Although Campbell generally complained about race discrimination, she did not attribute the specific instances cited in her September 2003 packet to discriminatory disparate treatment. For instance, Campbell complained that co-worker Cornelius Jones (black male) had advantages over other people in the inside sales department, but she did not mention that those advantages were on the basis of his race or gender. (Campbell 64, ll. 19-22; Ex. 33, pp. 28, 30). She complained that Mount violated the vacation policy with respect to vacation days for Shalawn Williams (black female), but she did not specify that such favoritism toward Williams was based on race or gender. (Campbell 271, ll. 3-4; Ex. 33, pp. 36, 44-49). She complained that Mount changed goals for co-worker Brenda Jackson (black female) "on at least 3 or 4 occasions," but she did not indicate that these goals were reduced on account of Jackson's race or gender. (Campbell 64, ll. 15-17; Ex. 33, pp. 18-20, 37-38). She complained on more than one occasion that Margie Jean Robinson-Smith (black female) received a vacation day when she (Campbell) did not, but she did not assert that Robinson-Smith received preferential treatment on the basis of her race or her gender. (Campbell 64, ll. 22-23; Ex. 33, p. 48). She also complained about a change of goals for Jonathan Villacampa (Hispanic male), but she did not contend that Villacampa's goal change was related to his race or gender. (Campbell Ex. 33, p. 17).

In addition to her generalized allegations of discrimination and numerous complaints about how things were done at The Advertiser, Campbell also addressed in the packet her perceptions of her own performance. (Campbell Ex. 33, pp. 9-11, 33-34). For instance, she stated that "[m]y suggestions for improvements are taken as personal attacks and I am deemed 'difficult to work with' when I suggest things that aren't being done that need to be. My feeling is that I bring what I need to bring to this job and more. Others don't bring enough and the fact that I am so keenly aware of what they don't bring seems troublesome to them." (Campbell Ex. 33, p. 11). She also contended that she was "stellar" and "exemplary" and deserved to be rewarded for her work. (Campbell Ex. 33, p. 34). She further stated that she "get[s] along fine with everybody but" Mount. (Campbell Ex. 33, p. 9).

During her deposition, Campbell raised some additional issues. (Campbell 117-119, 122-123). She claimed that there was going to be a new position at The Advertiser, and she had expressed interest in it. (Campbell 122, ll. 13-20). She claims that other people who expressed an interest in the position were called in to discuss the job, while she was not. (Campbell 122, ll. 21-23, 123, ll. 1-2). Specifically, she claims that Joe Howard (black male), Brenda Jackson (black female) and possibly Thomas Taylor (black male) were all called in to discuss the position. (Campbell 123, ll. 3-9). At the time of Campbell's termination, no one

had been selected for the position. (Campbell 124, ll. 14-17). Additionally, Campbell asserted that the formula that Mount had given co-worker Brenda Jackson (black female) for calculating sales goals did not generate the same goal that she (Campbell) had been given. (Campbell 117, ll. 17-23, 118, 119, ll. 1-9).

### C.    Campbell's Disciplinary History

On February 29, 2000, two and a half years *before* her September 2003 generalized allegations of race discrimination, Campbell received a written warning after Mount learned of multiple complaints about Campbell that had been lodged over the preceding five months. (Campbell Ex. 18). Among those incidents were three calls from different customers complaining that Campbell had been rude to them, an outburst on the floor with a co-worker and a call from a customer who complained that Campbell was pushy and uncooperative. (Campbell Ex. 18). Campbell refused to sign the written warning because she felt it was inaccurate. (Campbell 88, ll. 4-8, Ex. 18, p. 2). Although Campbell does not recall any of these customers, she admits that she "had words" with her co-worker. (Campbell 83, ll. 9-22, 84, ll. 10-13, 85, ll. 4-9, 86, l. 17, 87, ll. 5-7).

On November 11, 2000, two years *before* her September 2003 generalized allegations of race discrimination, Campbell received another note in her personnel file regarding her failure to meet certain sales expectations. (Campbell Ex. 19). Again, Campbell did not sign the document. (Campbell Ex. 19).

In May 2003, four months *before* her September 2003 generalized allegations of race discrimination, Campbell received a verbal warning regarding a loud, confrontational exchange with co-worker Shalawn Williams. (Campbell Ex. 20, p. 1). Campbell admits that the two had a verbal exchange, but denies its characterization as "confrontational." (Campbell 93, ll. 3-13).

In June 2003, three months *before* her September 2003 generalized allegations of race discrimination, Jensen verbally reprimanded Campbell for making derogatory comments to co-worker Cornelius Jones. (Campbell 94, ll. 16-23, 95, 96, ll. 1-7; Ex. 20, p. 1). Campbell admits that she criticized Jones and his manner of speaking, saying to him, "You can't even say your name right." (Campbell 95, ll. 7-8).

On July 9, 2003, two months *before* her generalized allegations of race discrimination, co-worker Joe Howard complained to Jensen that Campbell had violated a department policy regarding assigned accounts; Campbell had placed an ad for a customer that was not assigned to her. (Campbell Ex. 20, p. 1). Jensen e-mailed Campbell, reminding her of department policy and informing her that the revenue for this ad would be deducted from her June revenue. (Campbell Ex. 20, p. 1).

On July 10, 2003, two months *before* her generalized allegations of race discrimination, Campbell received a written warning for placing an ad for a retail

account, which was outside of her own department and in violation of company policy. (Campbell Ex. 20). Campbell admitted to placing the ad without permission. (Campbell 97, ll. 2-9, 99, ll. 18-21). Jensen counseled Campbell about this incident and her repeated problems with disruptive and confrontational behavior. (Campbell 104, ll. 5-11; Ex. 20).

Beth Hatchett, the retail representative who handled the client for whom Campbell placed the ad, called Campbell to discuss the situation. (Campbell 100, ll. 14-23). Hatchett contends that Campbell hung up on her. (Campbell 105, ll. 3-4). Campbell does not recall whether she said good-bye to Hatchett before she hung up the telephone. (Campbell 105, ll. 4-5). Hatchett later called to report that she felt threatened by the conversation. (Campbell 105, ll. 10-12; Ex. 20). Campbell states that she does not know why Hatchett felt threatened, but admits that it could have been because it was common knowledge at The Advertiser that Campbell had been incarcerated for murder. (Campbell 105, ll. 13-17).

On November 5, 2003, two months after her generalized allegations of race discrimination, Jensen had individual discussions with Campbell and all other Contract Sales Representatives, in which she explained that splitting ads across billing periods was not optional and that further failures in this area would result in disciplinary action. (Campbell 120, ll. 2-12; Ex. 22, pp. 1-2). Classified ads were required to run on Sundays and Mondays, and could not run on Sundays alone.

(Campbell 121, ll. 7-12). The billing period ended on Sundays. (Campbell 121, ll. 16-17). If, for example, Campbell placed a $500 ad to run on Sunday and Monday, she was supposed to attribute $250 to the billing period ending on Sunday and the remaining $250 to the billing period beginning on Monday. (Campbell 121, ll. 13-17). Jensen documented this conversation in an e-mail to Campbell on November 11, 2003. (Campbell Ex. 22, p. 1).

On March 2, 2004, six months after her allegations of race discrimination, Campbell was again issued a written warning for failing to split ads across billing periods. (Campbell Ex. 23). For the period of February 2004, Campbell had multiple ads that she failed to split across billing periods. (Campbell Ex. 23, pp. 3-5). Campbell admits that she failed to split ads across billing periods in February 2004. (Campbell 135, ll. 4-6). Campbell signed a performance notice on March 2, 2004, acknowledging that further violations of this or any other company policy would result in disciplinary action up to and including termination. (Campbell Ex. 23, p. 1).

On June 4, 2004, nine months after her generalized allegations of race discrimination, Campbell was issued a final warning for failing to split ads across billing periods. (Campbell Ex. 24). Although Campbell has no specific recollection regarding whether she actually failed to split the ads listed on Exhibit 24 to her deposition, she admits that the report attached to the performance notice

reflects that there were ads listed under her name that had not been split across billing periods.  (Campbell 137, ll. 6-9; Ex. 24).

On June 7, 2004, nine months after her generalized allegations of race discrimination, Campbell was issued another written warning regarding a rude exchange with a customer.  (Campbell Ex. 25).  Both Mount and Jensen witnessed a June 4, 2004 conversation that Campbell had with a customer and considered her tone to be "rude and abrupt."  (Campbell Ex. 25, p. 1).  Campbell disagreed and, thus, refused to sign the performance notice.  (Campbell 143, ll. 3-9; Ex. 25, p. 2).

On July 13, 2004, ten months after her generalized allegations of race discrimination, Campbell was given a performance appraisal for the previous year. (Campbell Ex. 26).  In the appraisal, it was noted that Campbell had violated the "cross billing" policy on several occasions and that she should continue to check her ads to ensure that they did not cross the billing period.  (Campbell Ex. 26, p. 3). Campbell admits that it was department policy to split ads across billing periods. (Campbell 121, ll. 7-23, 122, ll. 1-5).  In addition to the cross-billing problem, several instances of rudeness were noted, as well as problems with online selling. (Campbell Ex. 26, p. 3).  As a result of these deficiencies, Campbell was placed on a 60-day Performance Improvement Plan ("PIP") "to help Pat achieve success." (Campbell Ex. 26, p. 6).  Jensen drafted the written PIP and provided it to Campbell on July 26, 2004.  (Campbell Ex. 27).  The PIP stated, *inter alia*, that

Campbell "must not have more than (2) ads (considered acceptable) that cross the billing period in the next sixty days." (Campbell Ex. 27, p. 2). The PIP noted that she had improved her cross-billing problems in June and that she "should continue to check her ads ensuring that they do not cross the billing period." (Campbell 153, ll. 18-23, 154, ll. 1-4; Ex. 27, p. 2).

### D.    Campbell's Termination

After Jensen had discussed splitting ads across billing periods with Campbell on at least five (5) occasions, Campbell failed to split four (4) recruitment ads across billing periods in August 2004, which was within the sixty (60) day PIP. (Campbell Exs. 22, 23, 24, 26, 27, 38). Accordingly, Jensen and Advertising Director Ron Davidson met with Campbell on the afternoon of September 27, 2004, more than one year after her generalized allegations of race discrimination, and terminated her employment. (Campbell 205, ll. 1-12; Ex. 38, p. 1). As reflected on Campbell's termination form, she was terminated for failure to complete the PIP, most significantly violating the ad splitting policy. (Campbell Ex. 38, p. 1). No one told Campbell any reasons for her termination other than those set forth on her termination form. (Campbell 206, ll. 11-14; Ex. 38). Campbell does not know who made the decision to terminate her employment. (Campbell 205, ll. 21-23).

### E.     Campbell's Post-Advertiser Employment Search

Following her termination from The Advertiser on September 27, 2004, Campbell did not apply for any employment for several months. (Campbell 39, ll. 1-5). Her job search consisted of sending approximately 15 resumes in response to newspaper ads. (Campbell 38, ll.14-23). The only applications Campbell could identify by name were those she submitted for sales positions to Robinson Brothers Lincoln Mercury and Rhodes Furniture in Mobile in April or May 2005, approximately seven to eight months after her termination from The Advertiser. (Campbell 37, ll. 4-23). As of November 9, 2005, the date of Campbell's deposition, she remained unemployed. (Campbell 37, ll. 2-3).

### F.     Campbell's Pursuit of Legal Action

On December 14, 2004, Campbell filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging discrimination on the basis of race, sex and retaliation. (Complaint Ex. A). On March 31, 2005, the EEOC issued Campbell a Dismissal and Notice of Rights, stating that the Commission was "unable to conclude that the information obtained establishes violations of the statutes." (Complaint Ex. B).

On June 29, 2005, Campbell filed suit in this Court raising allegations under Title VII and 42 U.S.C. § 1981 of disparate treatment on the basis of her race, disparate treatment on the basis of her gender and retaliation (Complaint).

## III.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is proper under Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317 (1986). While all reasonable doubts must be resolved in the non-movant's favor, the trial court is not required to "resolve all doubts in such a manner." Barnes v. Southwest Forest Indus., Inc., 814 F.2d 607, 609 (11th Cir. 1987). Summary judgment is proper unless there is sufficient evidence favoring the non-movant for the finder of fact to find for that party. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990).

Although the movant has the initial responsibility of informing the court of the basis for its motion and identifying the evidence that demonstrates the absence of any genuine issue of material fact, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322-23.

### B.    Some of the Plaintiff's Allegations of Race and Gender Discrimination Are Time-Barred Under Title VII

In her Complaint, the plaintiff alleges, *inter alia*:

1.      "Over the course of 2002 and 2003, **MS. CAMPBELL** accomplished her sales goals sixteen months in a row, yet she never received the award for 'Salesperson of the Month' which would have entailed a $200 bonus." (Complaint ¶ 14).

2.      "In 2003, Mr. Howard was given the award for 'Salesperson of the Year,' but, upon information and belief, **MS. CAMPBELL** had more points toward this award than Mr. Howard." (Complaint ¶ 17).

3.      "In March 2003, **MS. CAMPBELL** had asked regularly of defendant's supervisory personnel if there was a formula for determining the goal for "Salesperson of the Year," but she was never informed of this formula.  **MS. CAMPBELL** used the formula given to other employees, and she calculated her own goal, which came out lower than other similarly-situated employees." (Complaint ¶ 18).

4.      "During her employment, **MS. CAMPBELL** ran an advertisement for one of her classified customers, Alabama Orthopedic, and she was given a write-up for this and for exchanging words with an employee in retail sales, Ms. Beth Hatcher." (Complaint ¶ 19).  "Mr. Thomas Taylor ran an advertisement for one of his classified customers, AirFlow Awning Co., Inc., doing the same thing as **MS. CAMPBELL**, yet he was not given a write-up." (Complaint ¶ 20).  Campbell's write-up for placement of a retail ad took place on July 11, 2003, and Taylor's

alleged running of a retail ad took place daily.  (Campbell 98, ll. 4-23; Ex. 20, p. 2).

5.     "While Kathryn Mount was supposed to give each employee an evaluation each year on their anniversary month, Ms. Mount did not do this for **MS. CAMPBELL** in 2000."  (Complaint ¶ 21).

Although not mentioned in her Complaint, the plaintiff submitted, as a part of her September 2003 packet, handwritten notes dated in 1998 and 1999 mentioning the possibility of race discrimination.  (Campbell Ex. 33, pp. 16-17, 53-54).  She did not submit those notes to anyone at The Advertiser prior to September 2003.  (Campbell 165, ll. 16-20, 172, ll. 21-23, 173, ll. 1-4).

To the extent that the plaintiff raises these allegations as instances of disparate treatment, they are time-barred under Title VII because each cited incident occurred more than 180 days prior to December 14, 2004, the date that the plaintiff filed her EEOC charge.[4]  (Complaint, Ex. A).  As a condition precedent, a plaintiff must file a charge of discrimination with the EEOC within 180 days of the alleged discriminating act.  See 42 U.S.C. § 2000e-5(e)(1)("A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred."); see also National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002)(stating that "[t]he operative terms [of 42 U.S.C.

---

[4] Although the plaintiff alleges both race and gender discrimination, all of her comparators are of the same race, thereby defeating any allegations of race discrimination that might make her claims timely under § 1981.

§ 2000e-5(e)(1) are 'shall,' 'after . . . occurred,' and 'unlawful employment practice.' '[S]hall' makes the act of filing a charge within the specified time period mandatory."); Shields v. Fort James Corp., 305 F.3d 1280, 1281 (11th Cir. 2002)(same).

Each of the instances cited constitutes a discrete act that is time-barred for Campbell's failure to file an EEOC charge within 180-days of that alleged act's occurrence. See Morgan, 536 U.S. at 113. The fact that these alleged acts may be related to timely allegations is of no consequence. Id. ("discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges").

### C. The Plaintiff's Title VII and § 1981 Race Discrimination Claims and Title VII Gender Discrimination Claims Are Meritless

#### 1. Title VII and Section 1981 Analytical Framework

The plaintiff's race and gender discrimination claims are governed by the burden-shifting framework established by the United States Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), and St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993). See Grigsby v. Reynolds Metals Co., 821 F.2d 590, 594 (11th Cir. 1997); see also, Lincoln v. Board of Regents, 697 F.2d 928, 935 n.6 (11th Cir. 1983)(holding that the elements of a discrimination claim under section 1981 and Title VII are identical).

### 2.    The Plaintiff Cannot Establish a *Prima Facie* Case

Where there is no direct evidence of discrimination, as is the case here, a plaintiff must create an inference of discrimination by proving a *prima facie* case. See Williams v. Motorola, Inc., 303 F.3d 1284, 1293 (11th Cir. 2002).    Here, Campbell cannot make out the minimal requirements of a *prima facie* case, for which she must demonstrate: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated, non-protected individuals more favorably; and (4) she was qualified to do the job.    Id.    Although Campbell is in two protected classes and was terminated, she is unable to establish the third and fourth prongs of her *prima facie* case. Campbell was not treated differently than similarly situated non-black and/or male employees, and, at the time of her termination, she was no longer qualified to do her job.

### 3.    Campbell Was Not Treated Differently Than Similarly Situated Non-Black or Male Employees

In attempting to prove that she was treated differently than non-protected employees, Campbell must initially identify similarly situated employees who were guilty of the same or similar misconduct or performance issues, but who were treated more leniently or disciplined in a different fashion.    See Lathem v. Department of Children and Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999)(holding that comparators must be similarly situated to plaintiff); Holifield v.

Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)("to make a comparison of the Plaintiff's treatment to that of non-minority employees, the plaintiff must show that [s]he and the employees are similarly situated in all relevant respects"); Wright v. Sanders Lead Co., No. 2:05cv371-ID, 2006 U.S. Dist. LEXIS 17806, * 26 (M.D. Ala. Apr. 7, 2006)("'The quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'")(quoting Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999)).

The only "comparators" named in Campbell's Complaint are Joe Howard (black male) and Thomas Taylor (black male). While Campbell's allegations regarding both men are time-barred, her citation of them as comparators is instructive regarding Campbell's race discrimination claim. When other members of the same race are treated more favorably, the plaintiff obviously cannot demonstrate discrimination. In fact, it is impossible for Campbell to point to a similarly situated individual of a different race who was treated more favorably than she, because, by her own admission, all of the Contract Sales Representatives, those similarly situated to her, were black. (Campbell 64, ll. 12-23, 65, ll. 1-15).

During her deposition and in her September 2003 packet, Campbell named several other potential comparators. Notably, Campbell's September 2003 packet did not state that these alleged comparators were treated more favorably on the

basis of either their race or their gender. (Campbell Exs. 32, 33). Her packet is

devoid of any allegations of gender discrimination, and her allegations of race

discrimination are vague and non-specific. (Campbell Exs. 32, 33). While

Campbell maintains that Joe Howard (black male)[5] and Cornelius Jones (black

male) were the "pets" of Mount and Jensen and, thus, allegedly received favorable

treatment, she also notes that Shalawn Williams (black female) and Margie Jean

Robinson-Smith (black female) received vacation days when she (Campbell) did

not, that Brenda Jackson (black female) had received a favorable goal reduction

when she (Campbell) did not, that Joe Howard (black male), Brenda Jackson

(black female) and possibly Thomas Taylor (black male) were all called in to

discuss a potential new job[6] while she was not, and that the formula for calculating

goals that was given to Brenda Jackson did not work for Campbell's prior year

numbers. (Campbell 118, ll. 5-23, 122, 123, ll. 1-2, 124, ll. 14-17; Ex. 33, pp. 18-

20, 28, 30, 36-38, 44-49). It is clear that Campbell is picking and choosing

comparators where it seems most convenient, but such selective highlighting

cannot demonstrate discrimination. See Simpson v. Kay Jewelers, 142 F.3d 639,

646-47 (3d Cir. 1998)(a plaintiff "can not pick and choose a person she perceives

is a valid comparator who was allegedly treated more favorably, but completely

---

[5] Campbell does not even contend that Howard received preferential treatment on the basis of his gender. When asked whether she had an opinion as to why Howard received preferential treatment, Campbell responded, "They [Mount and Jensen] seemed to like him a lot."
[6] The alleged denial of a potential new job does not constitute an adverse employment action, as no one was selected for the job prior to Campbell's termination from The Advertiser.

ignore a significant group of comparators who were treated equally or less favorably than she"); Bush v. Commonwealth Edison Co., 990 F.2d 928, 931 (7th Cir. 1993)("Such a pattern, in which blacks sometimes do better than whites and sometimes do worse, being random with respect to race, is not evidence of racial discrimination."). By stating that she was treated less favorably than other members of her same gender and race, Campbell defeats her own claim.

A more logical explanation for any perceived disparate treatment of Campbell is the undisputed fact that Mount and Campbell were not friends. Campbell admits that she disliked Mount, and her disagreements with Mount's management style and leadership are well-documented. (Campbell Ex. 33, pp. 6, 9-11, 16, 23, 26-28, 32, 35, 37, 51, 53, 55, 59, 76-81). The Eleventh Circuit has held that "personal animosity is not the equivalent of sex discrimination. . . . The plaintiff cannot turn a personal feud into a sex discrimination case." McCollum v. Bolger, 794 F.2d 602, 610 (11th Cir. 1986); see also Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1200-01 (11th Cir. 2001)(plaintiff failed to demonstrate that harassment was based on sex because it was motivated by personal animosity); Succar v. Dade County Sch. Bd., 229 F.3d 1343, 1345 (11th Cir. 2000)(same).

### 4. Campbell Was Not Qualified For Her Job At the Time of Her Termination

Campbell was not qualified for her job at the time of her termination and therefore cannot state a *prima facie* case of discrimination. A plaintiff who does

not meet her employer's legitimate performance expectations cannot establish the "qualified" prong of the *prima facie* case.  See, e.g., Williams v. Motorola, 303 F.3d 1284, 1292-93 (11th Cir. 2002)(ruling that plaintiff was not qualified for her position where record showed that she was unable to work with others, was insubordinate, and even threatened co-workers with violence); Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1433 (11th Cir. 1998)(finding that "summary judgment is appropriate against a plaintiff who fails to demonstrate that he was qualified"), cert. denied, 525 U.S. 962 (1998); Baker v. Sears, Roebuck & Co., 903 F.2d 1515, 1520-21 (11th Cir. 1990)(plaintiff could not establish qualified prong where she was not meeting employer's performance expectations and was consequently terminated); Baas v. Guess?, Inc., 54 F.Supp. 2d 1105, 1115 (S.D. Ala. 1999)(holding that plaintiff could not establish *prima facie* case because her poor work performance evidenced "that she was not qualified for the job from which she was discharged").  Here, the plaintiff's repeated problems with splitting ads across billing periods[7], despite multiple counseling sessions on the subject, indicate that she was not qualified for the job from which she was terminated. Campbell, therefore, cannot establish a *prima facie* case of discrimination and The Advertiser is entitled to judgment as a matter of law.

---

[7] Campbell's ad splitting errors were not her only performance problems.  She was counseled on several occasions for being rude and/or confrontational to customers and co-workers.  (Campbell Ex. 18, 20, 25, 26, 27).

**5.    The Advertiser Had Legitimate, Non-Discriminatory Reasons For Its Decisions**

Even if Campbell can somehow establish a *prima facie* case by circumstantial evidence, The Advertiser is nonetheless entitled to summary judgment. The presumption arising from the *prima facie* case "alone does not create an inference that a material fact, sufficient to present a jury question, is in issue." Pace v. Southern Railway Sys., 701 F.2d 1383, 1391 (11th Cir.), cert. denied, 464 U.S. 1018 (1983). In Grigsby v. Reynolds Metals Company, 821 F.2d 590 (11th Cir. 1987), the Eleventh Circuit explained that a defendant's overwhelming justification evidence may completely rebut a *prima facie* case: "[Plaintiff cannot] merely rest on the laurels of [her] prima facie case in the face of powerful justification evidence offered by the defendant." Id. at 596; see also Standard v. A.B.E.L. Servs., 161 F.3d 1318, 1334 (11th Cir. 1998)(same).

It is undisputed that Campbell was warned about splitting ads across billing periods on November 5, 2003, March 2, 2004, June 4, 2004, and in both her performance evaluation and PIP in July 2004. (Campbell Exs. 22, 23, 24, 26, 27, 38). It is likewise undisputed that, despite these warnings and continual reminders that further violation of this departmental policy could result in termination, Campbell again failed to split ads across billing periods in August 2004. (Campbell Ex. 38). Consequently, her employment was terminated on September 27, 2004. (Campbell 205, ll. 5-12). This action was based on plainly documented

violations of an employment policy applicable to all employees in Campbell's department.

### 6. The Plaintiff Offers No Valid Evidence of Pretext and There Is None

To avoid summary judgment, Campbell must submit sufficient, nonconclusory evidence that The Advertiser's articulated legitimate reasons were pretextual. See Holifield v. Reno, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997)(a "conclusory assertion[s] . . . in the absence of supporting evidence, [is] insufficient to withstand summary judgment"); Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1471-72 (11th Cir. 1991); Carter v. City of Miami, 870 F.2d 578, 585 (11th Cir. 1989); see also Green v. Pittsburgh Plate and Glass Co., 224 F.Supp. 2d 1348, 1366 (N.D. Ala. 2002).  It must be concrete evidence that casts sufficient doubt on The Advertiser's proffered reasons such that a reasonable fact finder would conclude that those reasons did not actually motivate its decision. See Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997); Earley, 907 F.2d at 1081, 1083-84.  This Campbell cannot do.

Campbell simply cannot meet her pretext burden.  The three types of evidence normally used to prove pretext – (1) comparative evidence, (2) statistical evidence, and (3) direct evidence in the form of discriminatory statements and admissions, Zaben v. Air Prods. & Chems., 129 F.3d 1453, 1457 (11th Cir. 1997) – are not present here.  Campbell offers no direct evidence, nor any statistical

analysis.  To the extent that Campbell attempts to use comparative evidence, her comparisons fail.

There is no evidence that Campbell was disciplined for anything other than legitimate performance problems.  In fact, the undisputed evidence demonstrates a complete lack of discriminatory animus.  See Rojas v. Florida, 285 F.3d 1339, 1344 (11th Cir. 2002)(plaintiff failed to show pretext when "the evidence shows that a new supervisor announced his intention to hold all employees responsible for following workplace rules and procedures.  The evidence also shows that the plaintiff did, in fact, violate some of those rules and procedures.").  Second, there is no evidence that the employees Campbell names as alleged comparators were treated more favorably than Campbell on the basis of their race or gender.  In fact, Campbell names members of her own race and gender who were treated more favorably than she was, thereby belying her allegations of discrimination on those bases.  She also cannot point to any evidence of a non-black or male employee who was not terminated after violating the ad splitting policy on the same number of occasions that she did.

In her Complaint, she identified Joe Howard (black male) as an individual who had failed to split ads across billing periods.  (Complaint ¶ 16).  During her deposition, however, when she was asked how Howard received preferential treatment, she did not mention any failure to discipline Howard because of alleged

infractions of the ad splitting policy.  (Campbell 198-200).  In fact, Campbell has no evidence either that Howard violated the policy as often as she did or whether he was disciplined for such alleged infractions.  She further produced a document indicating that another black female, Pam Portis, was counseled regarding failure to split ads across billing periods.  (Campbell Ex. 36).  Campbell has no information regarding the number of crossovers that Portis had.  (Campbell 203, ll. 8-10).

Campbell attempts to skirt her obvious shortcomings with respect to comparators with the self-serving assertions that her performance was "stellar" and "exemplary" and that she did not do some of the things for which she was disciplined.  Campbell's argument that her performance was acceptable misses the mark.  Even if The Advertiser incorrectly perceived that Campbell failed to split ads over billing periods (or incorrectly perceived that she did any of the things for which she received disciplinary actions), such an error in judgment is insufficient as a matter of law to support an inference of pretext or discrimination.  See Alexander v. Fulton County, 207 F.3d 1303, 1341 (11th Cir. 2000); Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999), cert. denied, 529 U.S. 1109 (2000); Nix v. WLCY Radio/Rahall Communications, Inc., 738 F.2d 1181, 1187 (11th Cir. 1984).  As the Eleventh Circuit has cautioned, courts should not sit as a "'super-personnel department that reexamined an entity's

business decisions.'" Alphin v. Sears, Roebuck & Co., 940 F.2d 1497, 1501 (11th Cir. 1991)(quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986), cert. denied, 479 U.S. 1066)(1987)). Even where an employer's decision seems poor or incorrect to outsiders,

> the relevant question is simply whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason . . . does not have to be a reason the judge or jurors would act on or approve.

Nix, 738 F.2d at 1187. For the Court to hold otherwise would be to impermissibly instruct an employer how to run its business. Additionally, Campbell's mere disagreement with The Advertiser's assessment of her performance is irrelevant.

The Advertiser's belief that it disciplined and terminated Campbell for legitimate reasons, which is not disputed, and the lack of any evidence discrediting that belief, entitles The Advertiser to summary judgment. See Elrod, 939 F.2d at 1470 (employer who disciplined employee for violation of sexual harassment policy entitled to summary judgment where employee produced no evidence discrediting employer's actions or otherwise calling into question the legitimacy of the employer's belief that the employee was guilty of sexual harassment).

Campbell cannot prove pretext because management had a good faith belief that she failed to split the ads at issue. Even if Campbell contends that she did not commit the errors of which she has been accused, she is unable to show that the decision-makers knew that she had not committed the errors but chose to discipline

27

her anyway.  See Holifield, 115 F.3d at 1565 ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's perceptions of his performance"); Elrod, 939 F.2d at 1171 (explaining that a mere denial of a company policy violation was insufficient as long as the employer had a good faith belief that the employee engaged in misconduct); Sweeney v. Alabama Alcoholic Beverage Control Board, 117 F.Supp. 2d 1266, 1272-74 (M.D. Ala. 2000)("Whether or not a plaintiff actually committed the work rule violations is immaterial on the issue of pretext.  Rather, what is material is whether or not the employer believed the allegations to be true, not whether they were in fact true."). Campbell can present no evidence that the decision-makers believed that she did not commit the errors, yet disciplined her anyway.

In short, Campbell offers nothing more than her own speculation that The Advertiser's decision to terminate was discriminatory.  Accordingly, her claim is without merit.  See Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000)(stating that plaintiff "did not offer any evidence sufficient to show that she was similarly situated to any other employee, and absent some other similarly situated but differently disciplined worker, there can be no disparate treatment"); Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1471-72 (11th Cir. 1991).

**D.     The Plaintiff's Retaliation Claim Fails**

The plaintiff's retaliation claim fails because she cannot even establish a *prima facie* case.  To establish a *prima facie* case of retaliation, Campbell must adduce sufficient evidence that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal nexus between her protected activity and the adverse employment action.  See Bass v. Board of County Commissioners, 256 F.3d 1095, 1117 (11th Cir. 2001); Davis v. Town of Lake Park, 245 F.3d 1232 (11th Cir. 2001).  Campbell cannot demonstrate a causal nexus between her complaints of race and gender discrimination and any adverse employment action.

**1.     The Timing of the Alleged Retaliation Negates Any Causal Nexus**

According to Campbell, she made complaints of race discrimination in her September 14, 2003 submission to Davidson and Browder.  (Campbell Exs. 32, p. 2, 33, pp. 10, 16, 23, 27).  It is axiomatic that retaliation can only occur after the plaintiff has participated in protected activity.  See Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1201 (11th Cir. 2001)(no causal connection where alleged retaliation began before the plaintiff's protected expression); Webb v. Cardiothoracic Surgery Assocs., 139 F.3d 532, 540 (5th Cir. 1998)(no causal link and summary judgment affirmed on retaliation claim where rude treatment of the plaintiff began prior to her complaint of sexual harassment).

Here, the plaintiff contends that she experienced adverse treatment as early as 2000, three years *prior to* her allegations of race discrimination. Because The Advertiser could not retaliate against Campbell on the basis of a complaint that had not yet been made, Campbell's allegations of retaliation prior to September 14, 2003 are due to be dismissed.

To the extent that Campbell premises her retaliation claim on her September 14, 2003 submission to Davidson and Browder, her argument is similarly flawed. By the time that she submitted her packet of information, including her vague references to disparate treatment of unidentified individuals at The Advertiser on the basis of race, Campbell had already been disciplined on numerous occasions for rude and/or confrontational behavior toward co-workers and customers, as well as policy violations for improperly placing ads. (Campbell Exs. 18, 20, 25, 26, 27). To contend that continued disciplinary actions after September 14, 2003 were suddenly motivated by her generalized allegations of race discrimination, rather than Campbell's continued poor performance, is contrary to all logic.

Moreover, the temporal proximity of more than one year between Campbell's complaint and her termination is entirely too vast to establish causation for a *prima facie* case of retaliation. See, e.g., Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068 (11th Cir. 1995)(explaining that if the company had wanted to terminate employee hired in November 1983 for her efforts to stop

discrimination, it had ample opportunity to do so long before the summer of 1986);

see also Coons v. Sec'y of the U.S. Dep't of the Treasury, No. 02-15665, 2004

U.S. App. LEXIS 18475 (9th Cir. Sept. 1, 2004)(one year insufficient to infer

causal connection); Meiners v. Univ. of Kansas, 359 F.3d 1222, 1231 (10th Cir.

2004)(three months insufficient); Parks v. City of Chattanooga, 74 Fed. Appx. 432,

438 (6th Cir. 2003), cert. denied, 541 U.S. 963 (2003)(one year is "far too long" to

infer causation); O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir.

2001)(temporal proximity must be "very close" when temporal proximity is

primary basis for concluding causal nexus exists); Richmond v. Oneok, Inc., 120

F.3d 205, 209 (10th Cir. 1999)(three months insufficient); Stanton v. Ella Signal,

Inc., 1997 WL 210810 at 1 (6th Cir. 1997)(eight months insufficient); Hughes v.

Derwinski, 967 F.2d 1168, 1174-75 (7th Cir. 1992)(four months insufficient).

> **2.    The Advertiser Had Legitimate, Non-Retaliatory Reasons For the Alleged Retaliatory Acts and There Is No Evidence Of Pretext**

Even if Campbell can somehow establish a causal nexus, The Advertiser has

legitimate, non-retaliatory reasons for each of the actions about which she

complains, and Campbell cannot demonstrate pretext.    Campbell repeatedly

violated departmental policy regarding the splitting of ads across billing periods

and was warned at least five (5) times that further violations of this policy could

result in additional discipline, including termination. (Campbell Ex. 38). As this Court recently noted:

> [t]he provisions in Title VII against retaliation are designed and intended to prevent employers from improperly punishing employees who have exercised their right to engaged in protected contact. These provisions are not intended to insulate an employee from discipline for violating the employer's rules or disrupting the workplace.

Arnold v. Tuskegee Univ., No. 3:03-cv-515-F, 2006 U.S. Dist. LEXIS 1944, *40-41 (M.D. Ala. Jan. 9, 2006). Campbell's continuing policy violations could not go unaddressed simply because she had asserted a vague complaint of race discrimination one year earlier[8].

Having failed to demonstrate either a *prima facie* case or pretext with respect to her allegations of retaliation, Campbell is unable to maintain a retaliation claim and The Advertiser is entitled to summary judgment as a matter of law.

### E.    Campbell's Use of the Term "Harassment" Does Not State a Claim for a Racially Hostile Work Environment

In her Complaint, Campbell asserts that she "was subjected to continuing discrimination that substantially altered the terms and conditions of her employment. Such harassment was inflicted on Plaintiff by Defendant because of her race, black." (Complaint ¶ 45). Despite the fact that Campbell uses the term

---

[8] It is also important to note that the majority of Campbell's complaints pertained to issues other than discrimination and, therefore, were not protected activity.

"harassment," she has not presented a claim for a racially hostile work environment. Not only does Campbell fail to allege any facts that would arguably constitute conduct severe and pervasive enough to alter the terms and conditions of employment, but she also admits that there were no racially insensitive comments or jokes present at The Advertiser. (Campbell 217-218); see Faragher v. City of Boca Raton, 524 U.S. 775 (1998);[9] Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999)(en banc), cert. denied, 529 U.S. 1068 (2000); Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995). Thus, she cannot establish that her workplace was permeated with "discriminatory intimidation, ridicule, and insult." Harris v. Forklift Sys., 510 U.S. 17, 21 (1993); see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)(stating that Title VII "forbids only behavior so objectively offensive as to alter that 'conditions' of the victim's employment").

Instead of allegations of severe and pervasive conduct permeating her workplace, the plaintiff has asserted nothing more than her meritless allegations of disparate treatment. These disparate treatment contentions cannot be disguised as a hostile work environment. To do so would not only give the plaintiff two bites at the same apple, but also would enable her to bootstrap untimely allegations of disparate treatment into a faux hostile work environment claim.

---

[9] The Faragher standard is applicable to both sexual and racial harassment cases. See Faragher, 524 U.S. at 787 n.1; see Deffenbaugh-Williams v. Wal-Mart, 156 F.3d 581, 593 (5th Cir. 1998), reinstated in part and remanded in part, 182 F.3d 333 (5th Cir. 1999).

## IV.    CONCLUSION

In terminating Campbell's employment, The Advertiser merely enforced a policy that Campbell had been counseled for violating on at least five (5) prior occasions.  This is a legitimate, non-discriminatory, non-retaliatory reason that is not pretextual.  Campbell's allegations demonstrate nothing more than the fact that perfect equality among a group is nearly impossible to achieve.  It is undisputed that some black and female employees were treated more favorably then she, thereby defeating any claim of race or gender discrimination or retaliation.  As there is no genuine issue of material fact with respect to any of her claims, The Advertiser is entitled to summary judgment as a matter of law.


s/John W. Sheffield_____
John W. Sheffield (ASB-7423-D62J)

s/Lynlee Wells Palmer_____
Lynlee Wells Palmer (ASB-4367-T82P)
Attorneys for Defendant
The Advertiser Company
d/b/a The Montgomery Advertiser


**OF COUNSEL:**

**JOHNSTON BARTON PROCTOR & POWELL LLP**
2900 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2618
Telephone:  (205) 458-9400
Facsimile:  (205) 458-9500

34

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

John D. Saxon, Esq.
Stephen J. Austin, Esq.
JOHN D. SAXON P.C.
2119 3rd Avenue North
Birmingham, AL 35203


s/Lynlee Wells Palmer
OF COUNSEL