1   IN THE UNITED STATES DISTRICT COURT FOR THE

2       MIDDLE DISTRICT OF ALABAMA NORTHERN

3                   DIVISION

4

5   PATRICIA A. CAMPBELL, )

6           Plaintiff,      )

7                           )

8   VS.                     ) CIVIL ACTION NO:

9   GANNETT CO., INC.,      )   CV 2:05 615-F

10  et al.,                 ) DEPOSITION OF:

11          Defendants.     )  PATRICIA CAMPBELL

12          S T I P U L A T I O N S

13      IT IS STIPULATED AND AGREED, by and

14  between the parties through their

15  respective counsel, that the deposition of:

16          PATRICIA CAMPBELL,

17  may be taken before Cathy A. DeBardeleben,

18  Commissioner and Notary Public, State at

19  Large, at the offices of Johnston, Barton,

20  Proctor & Powell, 2900 AmSouth/Harbert

21  Plaza, 1901 6th Avenue North, Birmingham,

22  Alabama, on the 9th day of November, 2005,

23  commencing at approximately 9:30 a.m.

**Page 2**

1    IT IS FURTHER STIPULATED AND AGREED
2  that the signature to and reading of the
3  deposition by the witness is waived, the
4  deposition to have the same force and
5  effect as if full compliance had been had
6  with all laws and rules of Court relating
7  to the taking of depositions.
8
9    IT IS FURTHER STIPULATED AND AGREED
10  that it shall not be necessary for any
11  objections to be made by counsel to any
12  questions, except as to form or leading
13  questions, and that counsel for the parties
14  may make objections and assign grounds at
15  the time of the trial, or at the time said
16  deposition is offered in evidence, or prior
17  thereto.
18              ***
19
20
21
22
23

**Page 3**

1       A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFF:
3     STEPHEN J. AUSTIN
4     Attorney at Law
5     John D. Saxon, P.C.
6     2119 3rd Avenue North
7     Birmingham, Alabama 35203
8
9  ON BEHALF OF THE DEFENDANTS:
10     LYNLEE WELLS PALMER
11     Attorney at Law
12     Johnston, Barton, Proctor & Powell
13     2900 AmSouth/Harbert Plaza
14     1901 6th Avenue North
15     Birmingham, Alabama 35203
16
17
18  ALSO PRESENT:
19     JENNIFER JENSEN
20
21
22
23

**Page 4**

1
2              I N D E X
3
4  MS. PALMER:
5
6       E X H I B I T   L I S T
7
8  Defendant's Exhibit No. 1 - 34
9  Defendant's Exhibit No. 2 - 51
10  Defendant's Exhibit No. 3 - 52
11  Defendant's Exhibit No. 4 - 53
12  Defendant's Exhibit No. 5 - 61
13  Defendant's Exhibit No. 6 - 66
14  Defendant's Exhibit No. 7 - 69
15  Defendant's Exhibit No. 8 - 70
16  Defendant's Exhibit No. 9 - 71
17  Defendant's Exhibit No. 10 - 72
18  Defendant's Exhibit No. 11 - 73
19  Defendant's Exhibit No. 12 - 74
20  Defendant's Exhibit No. 13 - 75
21  Defendant's Exhibit No. 14 - 76
22  Defendant's Exhibit No. 15 - 77
23  Defendant's Exhibit No. 16 - 78

**Page 5**

1     E X H I B I T   L I S T (Cont'd)
2
3  Defendant's Exhibit No. 17 - 78
4  Defendant's Exhibit No. 18 - 80
5  Defendant's Exhibit No. 19 - 89
6  Defendant's Exhibit No. 20 - 91
7  Defendant's Exhibit No. 21 - 112
8  Defendant's Exhibit No. 22 - 119
9  Defendant's Exhibit No. 23 - 130
10  Defendant's Exhibit No. 24 - 135
11  Defendant's Exhibit No. 25 - 137
12  Defendant's Exhibit No. 26 - 143
13  Defendant's Exhibit No. 27 - 153
14  Defendant's Exhibit No. 28 - 165
15  Defendant's Exhibit No. 29 - 169
16  Defendant's Exhibit No. 30 - 171
17  Defendant's Exhibit No. 31 - 173
18  Defendant's Exhibit No. 32 - 178
19  Defendant's Exhibit No. 33 - 183
20  Defendant's Exhibit No. 34 - 192
21  Defendant's Exhibit No. 35 - 196
22  Defendant's Exhibit No. 36 - 201
23  Defendant's Exhibit No. 37 - 203

**Page 6**

1  E X H I B I T   L I S T (Cont'd)
2
3  Defendant's Exhibit No. 38 - 204
4  Defendant's Exhibit No. 39 - 206
5  Defendant's Exhibit No. 40 - 227
6  Defendant's Exhibit No. 41 - 252
7  Defendant's Exhibit No. 42 - 254
8
9  Plaintiff's Exhibit No. 1 - 266
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**Page 7**

1       I, Cathy A. DeBardeleben, a Court
2  Reporter of Birmingham, Alabama, and a
3  Notary Public for the State of Alabama at
4  Large, acting as Commissioner, certify that
5  on this date, pursuant to Rule 30 of the
6  Alabama Rules of Civil Procedure and the
7  foregoing stipulation of counsel, there
8  came before me on the 9th day of November,
9  2005, at the offices of Johnston, Barton,
10  Proctor & Powell, 2900 AmSouth/Harbert
11  Plaza, 1901 6th Avenue North, Birmingham,
12  Alabama, commencing at approximately
13  9:30 a.m., PATRICIA CAMPBELL, witness in
14  the above cause, for oral examination,
15  whereupon the following proceedings were
16  had:
17       PATRICIA CAMPBELL,
18  being first duly sworn, was examined and
19  testified as follows:
20       MS. PALMER:  Before we get started,
21  I would like to note on the record that I
22  would like to keep the deposition open.
23  Yesterday I received the plaintiff's

**Page 8**

1  discovery responses.  And I have not yet
2  had an opportunity to determine if there
3  are documents that should have been
4  produced at that time that have not been
5  produced.  Off the top of my head, I don't
6  remember seeing any tax records or anything
7  like that in there.  So, I would like to
8  reserve the opportunity to ask questions
9  about those documents at a later date.  And
10  also to any documents pursuant to a
11  third-party subpoena.
12  EXAMINATION BY MS. PALMER:
13  **Q      Please state your full name.**
14  A      Patricia Ann Campbell.
15  **Q      Do you have a nickname, Ms.**
16  **Campbell?**
17  A      Pat.
18  **Q      Have you ever gone by any other**
19  **name?**
20  A      No.
21  **Q      Have you ever been married?**
22  A      No.
23  **Q      Ms. Campbell, my name is Lynnlee**

**Page 9**

1  **Wells Palmer and I am one of the attorneys**
2  **for The Montgomery Advertiser in the case**
3  **that you have filed against them.**
4       **Have you ever given a deposition**
5  **before?**
6  A      I have not.
7  **Q      Our court reporter, Cathy, is going**
8  **to be writing down or typing down**
9  **everything that we say here today.**
10  A      Uh-huh.
11  **Q      So, there are a couple of guidelines**
12  **that I want to give you so that we make**
13  **sure that everything is clear on the**
14  **written transcript.**
15  A      Okay.
16  **Q      Allow me to finish my entire**
17  **question before you answer it.  Sometimes**
18  **you might be able to figure out where I'm**
19  **going with it, but just for clarity of the**
20  **written record it's important that you wait**
21  **until I finish asking my entire question.**
22  A      Okay.
23  **Q      Answer all of my questions with**

Page 10

1 complete words. "Unh-unh" or "uh-huh" look
2 very much alike when you write them down.
3 A    Okay.
4 Q    It's better to say yes or no.
5 A    Okay.
6 Q    Answer all questions out loud. If
7 you nod your head or shake your head, it's
8 not going to show up on the written
9 transcript.
10 A    Okay.
11 Q    If you don't understand my question
12 for any reason, please ask me to rephrase
13 it or state it a different way. I'll be
14 glad to do that.
15 A    Okay.
16 Q    If you answer a question without
17 asking for clarification, I'm going to
18 assume that you understood the question,
19 okay?
20 A    Okay.
21 Q    If at any time you need a break, let
22 me know and we'll do that as soon as
23 possible.

Page 11

1 A    Okay.
2 Q    Do you think that you can follow
3 these guidelines?
4 A    Sure, yes.
5 Q    Have you taken any medications
6 today?
7 A    No.
8 Q    Do you currently take any
9 medications?
10 A    I do.
11 Q    What are those medications?
12 A    Do you want the names or for what
13 conditions or what?
14 Q    Both.
15 A    Okay. For diabetes I take insulin,
16 Novolog 70/30. And I also take Evandimat.
17 For hypertension, I take Lotrel and Lasik.
18 And I take Synthroid for a thyroid
19 condition. And I think that's it, I
20 believe.
21 Q    How often do you take your insulin?
22 A    One to two times a day depending on
23 how I test.

Page 12

1 Q    How often do you take Novolog?
2 A    That is the insulin.
3 Q    Oh, that is insulin?
4 A    Yeah.
5 Q    Okay. Is Evandimat a different
6 thing?
7 A    It's a pill.
8 Q    How often do you take Evandimat?
9 A    Twice a day.
10 Q    How often do you take Lotrel?
11 A    Daily, once.
12 Q    And Lasik?
13 A    Probably every other day.
14 Q    And Synthroid?
15 A    Daily.
16 Q    Do any of your medications affect
17 your ability to tell the truth?
18 A    No.
19 Q    Do any of your medications affect
20 your ability to remember?
21 A    No.
22 Q    What did you do to prepare for this
23 deposition today?

Page 13

1 A    Nothing. Basically just looked over
2 some documents briefly, a brief perusal of
3 some documents.
4 Q    Which documents did you look over?
5 A    Basically some of the -- what do you
6 call it?
7     MR. AUSTIN: The complaint.
8 A    The complaint, yeah. I don't know
9 the legal terms.
10 Q    Did you look over anything else
11 besides the legal documents in this case?
12 A    No.
13 Q    Did you go over those documents with
14 your attorney? Did you meet with your
15 attorney?
16 A    Well, we spoke briefly.
17 Q    Okay. I don't want to know what you
18 talked about. I just wanted to know if you
19 met with him. Did you talk with anyone
20 else about the deposition?
21 A    No.
22 Q    Did you get a good night's sleep
23 last night?

Page 14

1   A    Fairly good, yeah.
2   Q    How many hours?
3   A    Probably six, five or six
4   thereabouts.
5   Q    Is that the normal amount of sleep
6   that you typically get a night?
7   A    Pretty much around six or
8   thereabouts.
9   Q    Do you normally have any difficulty
10  sleeping?
11  A    Mostly not.
12  Q    Did you eat breakfast this morning?
13  A    I did.
14  Q    Do you normally eat breakfast?
15  A    Most times.
16  Q    Do you normally have any difficulty
17  eating?
18  A    No.
19  Q    Have you experienced any anxiety or
20  nervousness in anticipation of this
21  deposition?
22  A    Maybe just a small amount because
23  it's something new, but not anything huge.

Page 16

1   disorder?
2   A    No.
3   Q    Did you appeal the jury's finding of
4   guilty?
5   A    Yes.
6   Q    To the court of criminal appeals?
7   A    Yes.
8   Q    Do you know what they did with it?
9   A    Well, it was rejected.
10  Q    Your appeal was rejected?
11  A    Yes.
12  Q    Did you appeal it any further?
13  A    I did not.
14  Q    And the person that you were
15  convicted of murdering was Marion Green,
16  correct?
17  A    Correct.
18  Q    Did you know Ms. Green?
19  A    I did.
20  Q    How did you know her?
21  A    We were co-workers and friends.
22  Q    How long had you known her?
23  A    Probably -- maybe 10 or so years.

Page 15

1   Q    Do you think that that anxiety or
2   nervousness would impact your ability to
3   tell the truth here?
4   A    No.
5   Q    You were convicted of murder in
6   1981, correct?
7   A    Correct.
8   Q    What was your plea with respect to
9   that charge?
10  A    Not guilty.
11  Q    Did your plea ever change?
12  A    No.
13  Q    Did you ever enter a plea of not
14  guilty due to mental disease or defect?
15  A    Yes, as I recall.
16  Q    What mental disease or defect were
17  you claiming?
18       MR. AUSTIN: I'll object to the
19  form. To the extent you know, you can
20  answer.
21  A    Basically just the personality
22  disorder as best I can recall.
23  Q    Do you know what form of personality

Page 17

1   She was -- I knew her prior to our working
2   together, so somewhere thereabouts.
3   Q    Where did you work together?
4   A    At the high school in Mobile.
5   Q    Which high school was that?
6   A    Shaw High School.
7   Q    Did you have anything against
8   Ms. Green?
9        MR. AUSTIN: Object to this line of
10  questioning. Ms. Campbell did not testify
11  in her prior lawsuit.
12       MS. PALMER: I'm still entitled to
13  ask the question.
14       MR. AUSTIN: I will object to the
15  line of questions.
16  Q    You can answer the question. Did
17  you have anything against Ms. Green?
18  A    Well, that's difficult. Yes and
19  no. That's not a good answer.
20  Q    Could you explain it a little
21  further?
22  A    Well, our friendship had just some
23  issues that impacted it greatly. That's

Page 18

1  the best way I know to answer that.
2  Q    What kind of issues impacted your
3  friendship?
4  A    Something as I recall having to do
5  with coaching of an athletics team.
6  Q    That you were coaching or that she
7  was coaching?
8  A    That I was coaching initially, and
9  she thereafter.
10  Q    Do you know how this murder took
11  place?
12       MR. AUSTIN: I'm going to object and
13  I'm going to instruct you not to answer
14  that question.
15       THE WITNESS: Okay.
16  Q    What was your sentence for this
17  murder?
18  A    30 years.
19  Q    How long did you actually serve?
20  A    Do you mean total time including
21  incarceration and other programs or just in
22  prison actually?
23  Q    What was your total incarceration

Page 19

1  time?
2  A    30 years.
3  Q    Were you in prison for 30 years?
4  A    No. I was in prison for six and
5  three quarter years. And then a work
6  release facility for probably three and a
7  half or thereabouts.
8  Q    And what was the rest of that time,
9  the rest of the 30 years? I guess it would
10  have been about 20 more years. If you were
11  in prison for six and three quarter
12  years —
13  A    Well, I made parole at that point.
14  Q    What were the terms of your parole,
15  if you recall?
16  A    Basically to just stay out of
17  trouble.
18  Q    Did you have to check in
19  periodically?
20  A    Oh, yeah. For a while I had to
21  check in. Let me just think for a minute.
22  It's been a while. Monthly. Monthly.
23  Q    Do you consider yourself emotionally

Page 20

1  stable?
2  A    Yes.
3  Q    Did you receive a psychological
4  evaluation prior to your conviction for
5  murder?
6  A    Prior to -- yes.
7  Q    Do you know what the result of that
8  psychological evaluation was?
9  A    I don't recall.
10  Q    Do you recall who conducted that
11  psychological evaluation?
12  A    No, ma'am. It's been 25 years. I
13  don't recollect at this time.
14  Q    Do you remember where it was
15  conducted?
16  A    I just remember -- give me a minute,
17  please. Let me just try and think. It was
18  at a, you know, hospital. And they have, I
19  guess, a mental unit or something. That's
20  for lack of a better term or use of words
21  there.
22  Q    In what city was it?
23  A    In Mobile.

Page 21

1  Q    Have you ever seen any other
2  psychologists?
3  A    There was a woman after -- during
4  the interim from this incident to the time
5  before trial there was a brief period that
6  I saw a psychologist.
7  Q    Do you remember who that was?
8  A    Her name was Betty. That's all that
9  I can recall. I'm sorry. It's been a long
10  time.
11  Q    Okay.
12  A    I don't remember her last name right
13  off.
14  Q    Did you go to her on your own or did
15  someone direct you to see her?
16  A    My attorney directed that I see her.
17  Q    Have you ever seen a psychiatrist?
18  A    Other than the gentleman at that
19  hospital, that doctor, I don't recall his
20  name, but I spoke with him, you know, on a
21  couple of occasions. I was, you know,
22  so -- you know, just in the room there for
23  a couple of times, yes.

Page 22

1  Q    Did you speak with him after your
2  conviction at any time?
3  A    No.
4  Q    Have you ever seen any kind of
5  mental health counselor?
6  A    No.
7  Q    What is your current address?
8  A    1263 Pecan Street.
9  Q    Where is that?
10  A    Mobile, Alabama.
11  Q    What's your zip code?
12  A    36603.
13  Q    How long have you lived at that
14  residence?
15  A    Since March of this year.
16  Q    Where did you live prior to that
17  residence?
18  A    In Montgomery.
19  Q    Where in Montgomery?
20  A    2231 Bonaparte Boulevard.
21  Q    How long did you live on Bonaparte
22  Boulevard?
23  A    Probably -- maybe 12 years or

Page 23

1  thereabouts.
2  Q    What is your current telephone
3  number?
4  A    (251) 438-4264.
5  Q    What is your Social Security number?
6  A    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.
7  Q    And your date of birth?
8  A    10/2/1950.
9  Q    Do you know your driver's license
10  number?
11  A    Absolutely not.  I can give that to
12  you if you need it.
13  Q    Please.  I have to look at mine,
14  too.
15  A    I couldn't tell you the first
16  number.  It's 9322585.
17  Q    Just for the record, what is your
18  race?
19  A    Black.
20  Q    What is your highest level of
21  education?
22  A    Bachelor of science.
23  Q    Where did you obtain that degree?

Page 24

1  A    Alabama State University.
2  Q    When did you obtain that degree?
3  A    1972.
4  Q    What is your bachelor of science in?
5  A    Physical education major.
6  Q    Do you recall your grade point
7  average?
8  A    Three -- well, probably 3.0 as best
9  I can recall or thereabouts.
10  Q    Do you have any children?
11  A    No.
12  Q    Do you have any relatives in central
13  Alabama?
14  A    Mother.
15  Q    What's your mother's name?
16  A    Mary Campbell.
17  Q    Where does she live?
18  A    The same address.  Would you like
19  for me to repeat it?
20  Q    No, that's okay.  She lives with you
21  in Mobile?
22  A    Yes.
23  Q    Any other relatives in Alabama?

Page 25

1  A    John Campbell.
2  Q    Who is that?
3  A    My brother.
4  Q    Where does he live?
5  A    He lives -- you said where?  He
6  lives in Mobile on Adler Avenue.
7  Q    Does he have any children?
8  A    No.
9  Q    Any other relatives?
10  A    In Alabama?
11  Q    Yes.
12  A    Cousins, a couple of cousins.  You
13  know, no direct --
14  Q    Where do they live?
15  A    I'm sorry?
16  Q    Where do your cousins live?
17  A    I have two in Mobile.
18  Q    Anyone in The Montgomery area?
19  A    No.
20  Q    Other than the doctors that we
21  talked about earlier -- strike that.
22      Have you ever seen any doctors in
23  the last five years?

Page 26

```
1   A    Yes.
2   Q    Who are those doctors?
3   A    Dr. Harold Cox.
4   Q    What do you see Dr. Cox for?
5   A    He was my primary care physician in
6   Montgomery.
7   Q    How long did you see him?
8   A    I would like to say maybe seven or
9   eight years, somewhere thereabouts.
10  Q    Did he prescribe you medication?
11  A    He did.
12  Q    What medication did he prescribe
13  you?
14  A    Several along the way.  Some of
15  those -- most of those that I mentioned
16  earlier.  And he also prescribed Diazepam.
17  Q    What is that for?
18  A    It's Valium, so whatever that is.  I
19  guess -- however you want to class it.  I
20  don't know if it's a tranquilizer or
21  antidepressant.  I'm not sure how it is
22  classed.
23  Q    When did he prescribe the Diazepam?
```

Page 27

```
1   A    Within the last three years as best
2   I can, you know, recall that.
3   Q    Do you recall if it was before or
4   after your termination from The Montgomery
5   Advertiser?
6   A    It was before.
7   Q    Did he prescribe you any other
8   medications?
9   A    Just the ones that I listed earlier
10  if you would like for me to repeat those.
11  Q    Did he prescribe all of those
12  medications to you?
13  A    At one time or another pretty much,
14  yes.
15  Q    Other than Dr. Cox, are there any
16  other doctors that you have seen in the
17  last five years?
18  A    Larry Epperson.
19  Q    What did he treat you for?
20  A    Carpal tunnel syndrome.
21  Q    When was that?
22  A    There were two occasions because I
23  had two surgeries.  So, once would have
```

Page 28

```
1   been -- this is -- I have to -- let me get
2   my years together.  I think it would have
3   been around December of '03 was the last
4   one.  And as I recall, the other one was
5   probably three years prior.  So, maybe 2000
6   or thereabouts.
7   Q    You mentioned that you had surgery
8   twice?
9   A    Right, yes.  Yes, I'm sorry.  No
10  uh-huh's.
11  Q    Did you see Dr. Epperson on any
12  other occasion?
13  A    No, just -- no.
14  Q    Any other doctors in the last five
15  years besides Dr. Cox and Dr. Epperson?
16  A    Dr. Bruce Tripp.
17  Q    What did Dr. Tripp treat you for?
18  A    The thyroid condition and
19  occasionally the diabetes as well.
20  Q    When did you see him?
21  A    I don't understand the question.
22  Q    Do you recall what year it was?
23  A    It was over several years.
```

Page 29

```
1   Probably -- approximately five years I
2   would say.
3   Q    Is Dr. Tripp in Montgomery?
4   A    Yes.
5   Q    Is Dr. Epperson in Montgomery?
6   A    Yes.
7   Q    Did Dr. Tripp treat you for anything
8   other than your thyroid condition and your
9   diabetes?
10  A    No.
11  Q    Did he prescribe you with any
12  medication, other than the medications
13  we've already discussed?
14  A    Hormone patch.
15  Q    Do you recall when that was?
16  A    Yeah, I forgot that.  It was --
17  well, through the last -- probably '01 to
18  '04, during that period.
19  Q    Anything other than your thyroid
20  medication, your diabetes medication and
21  the hormone patch?
22  A    No.
23  Q    Any other doctors besides Dr. Cox,
```

Page 30

1   Dr. Epperson and Dr. Tripp in the last five
2   years?
3   A    Let me think for just a moment. I
4   went to a pain clinic some time in 2004,
5   but I don't recall the doctor's name. It
6   was for lower back treatment. I went to
7   him once or twice. But I honestly don't
8   remember his name. It wasn't anyone I had
9   a long relationship with.
10  Q    Was that in Montgomery?
11  A    Yes.
12  Q    Do you remember the name of the pain
13  clinic or where it was located?
14  A    East Montgomery is all I can say.
15  Q    Who is Dr. Roland Hester?
16  A    Hester is the doctor who performed
17  the carpal tunnel surgeries.
18  Q    So, Dr. Epperson did not perform
19  those surgeries?
20  A    He referred me to Dr. Hester.
21  Q    What pharmacy did you use in
22  Montgomery to fill prescriptions?
23  A    CVS. And at one point Rite Aid.

Page 31

1   May I go back to something?
2   Q    Sure.
3   A    I just want to make note that I did
4   see a Dr. Berlin, but I don't know if it
5   was within the five-year time frame or
6   not. But I don't want to leave him out. I
7   can't recall exactly what that time frame
8   was.
9   Q    What did Dr. Berlin treat you for?
10  A    Dr. Berlin performed a thyroid
11  surgery on me.
12  Q    When was that?
13  A    It may have been -- that's when I
14  don't remember exactly. But it would have
15  been around '98 -- '99, somewhere
16  thereabouts.
17  Q    Okay. You mentioned that you used
18  CVS and Rite Aid in Montgomery to fill
19  prescriptions?
20  A    Uh-huh.
21  Q    Do you recall which Rite Aid and
22  which CVS you used?
23  A    CVS was on Narrow Lane Road.

Page 32

1   Q    And the Rite Aid?
2   A    East South Boulevard.
3   Q    Did you use any other pharmacies in
4   Montgomery?
5   A    Not in Montgomery, no.
6   Q    Do you use pharmacies in Mobile?
7   A    No.
8   Q    How do you fill your prescriptions
9   in Mobile?
10  A    I don't.
11  Q    How do you obtain the medications
12  that we discussed earlier?
13  A    A couple of them I have gotten
14  through the -- I guess the primary care
15  facility in Montgomery prior to moving, a
16  state agency in other words.
17  Q    But nowhere in Mobile?
18  A    No.
19  Q    You have you ever sued anyone, other
20  than The Montgomery Advertiser?
21  A    No.
22  Q    Have you ever been sued by anyone?
23  A    No.

Page 33

1   Q    Have you ever filed an EEOC against
2   anyone other than The Montgomery
3   Advertiser?
4   A    No.
5   Q    Have you ever testified at a trial?
6   A    No.
7   Q    Have you ever testified at any type
8   of hearing?
9   A    No, not that I can recall, no.
10  Q    Have you ever filed for bankruptcy?
11  A    Once in -- probably would have been
12  '79 or '80.
13  Q    Was that discharged?
14  A    Yes.
15  Q    Do you recall when it was
16  discharged?
17  A    I don't.
18  Q    Have you ever applied for disability
19  benefits?
20  A    No.
21  Q    Other than the one time that we've
22  talked about, have you ever been arrested?
23  A    No.

Page 34

1  Q    I'm going to show you a document
2  that I am marking as Defendant's Exhibit
3  1. Do you recognize that document?
4         (Defendant's Exhibit No.
5              1 was marked for
6              identification).
7  A    It looks like -- yes, I do.
8  Q    What is it?
9  A    It looks like my application for
10 work at The Advertiser, I believe.
11 Q    Is that your handwriting on that
12 document?
13 A    Yes.
14 Q    And on the third page at the bottom,
15 is that your signature?
16 A    Yes.
17 Q    Did you read the entire application
18 before you submitted it?
19 A    I couldn't say. I don't recall at
20 this point.
21 Q    If you could, review the application
22 for me right now and make sure that
23 everything on it is 100 percent correct,

Page 35

1  please.
2  A    (Witness complies.) okay.
3  Q    Is there anything on this document
4  that you feel is inaccurate or incomplete?
5  A    Not that I can see right off.
6  Q    Under the education section on the
7  first page --
8  A    Uh-huh.
9  Q    Is that a "yes"?
10 A    I'm sorry. I'm sorry.
11 Q    That's okay. Under high school or
12 prep school you listed Central High School
13 in Mobile?
14 A    Yes.
15 Q    You did not list whether a degree
16 had been granted. I assume you received a
17 degree from Central High School?
18 A    A high school diploma, yes.
19 Q    To whom did you submit this
20 application?
21 A    Sally Reynolds.
22 Q    Who was Sally Reynolds?
23 A    She was the HR person at that time.

Page 36

1  Q    What is Ms. Reynolds' race?
2  A    White female.
3  Q    After you submitted this application
4  for employment, did somebody from The
5  Montgomery Advertiser contact you about an
6  interview?
7  A    Yes.
8  Q    Was that Ms. Reynolds as well?
9  A    Yes, uh-huh.
10 Q    Did you actually go in for an
11 interview?
12 A    Uh-huh.
13 Q    Do you recall who you interviewed
14 with?
15 A    Sally Reynolds.
16 Q    Anyone other than Ms. Reynolds?
17 A    I don't recall anyone else.
18 Q    Do you remember if anyone else was
19 present in the room when you interviewed
20 with Ms. Reynolds?
21 A    I don't recall.
22 Q    Do you know who made the actual
23 decision to hire you?

Page 37

1  A    No.
2  Q    Are you currently employed?
3  A    No.
4  Q    After your termination from The
5  Montgomery Advertiser, did you apply for
6  work elsewhere?
7  A    I have.
8  Q    Where?
9  A    I applied at Robinson Brothers
10 Lincoln Mercury in Mobile.
11 Q    When was that?
12 A    April or May thereabouts.
13 Q    Of this year?
14 A    Yes.
15 Q    Is there anywhere else that you
16 applied?
17 A    I'm trying to think of -- oh, I
18 applied at Rhode's Furniture.
19 Q    Is that in Mobile?
20 A    Yes.
21 Q    Do you remember when that
22 application was submitted?
23 A    May or June.

Page 38

1  Q    Of this year?
2  A    Yes.
3  Q    Anywhere else?
4  A    There is one other that I can't
5  recall the name of. And then there were a
6  couple of places that I sent resumes to,
7  but you don't really know who -- they don't
8  list the companies. They just list a
9  contact person to send a resume to. So, I
10 couldn't tell you who -- it may have been
11 someone looking for a salesman or send your
12 resume to so and so, but the company
13 wouldn't be named in the ad necessarily.
14 Q    Were these newspaper ads that you
15 were answering?
16 A    Yes.
17 Q    Do you recall how many resumes you
18 sent to these different people who had
19 advertised in the newspaper?
20 A    I don't recall right off.
21 Q    Do you have a ballpark?
22 A    Let's say maybe 15, somewhere
23 thereabouts.

Page 39

1  Q    When did you begin sending resumes
2  after your termination from The Montgomery
3  Advertiser?
4  A    Probably several months is the best
5  that I can say.
6  Q    Do you recall whether it was before
7  or after you moved to Mobile?
8  A    For the most part after, but a
9  couple of -- you know, I made some phone
10 calls here, you know, did a couple of phone
11 interviews for sales things and sent a
12 couple of resumes. But they would have
13 been, as I said, those non-descriptive
14 places that I wouldn't necessarily have a
15 name for.
16 Q    The phone calls that you made and
17 the resumes that you sent prior to moving
18 to Mobile, were those in Montgomery?
19 A    Some were and some were to dial 800
20 numbers. So, I wouldn't necessarily know
21 where they were, you know, based.
22 Q    Were you trying to limit your job
23 search to a particular geographic location

Page 40

1  or area?
2  A    Yes.
3  Q    And what area was that?
4  A    Well, just somewhere near where my
5  mother was because she is elderly and I
6  wanted to, you know, maybe be where I
7  could -- you know, just a few hours drive
8  if something -- if I needed to be near her
9  or something. So, I wanted to stay in
10 fairly close proximity to where she lived.
11 Q    What types of jobs were you applying
12 for at Robinson Brothers and Rhodes
13 Furniture?
14 A    Sales.
15 Q    Did you ever get an interview?
16 A    At Robinson Brothers, yes.
17 Q    When did you interview at Robinson
18 Brothers?
19 A    It would have been whenever I listed
20 that earlier. Whatever time frame.
21 Because when I turned in the application, I
22 had an on-site interview.
23 Q    So, you believe that would have been

Page 41

1  April or May of 2005?
2  A    Thereabouts, yes.
3  Q    Did they offer you a job?
4  A    No.
5  Q    Have you received any offers of
6  employment since your termination at The
7  Montgomery Advertiser?
8  A    No.
9  Q    On your application at Robinson
10 Brothers, did you list The Montgomery
11 Advertiser as your prior employer?
12 A    Yes.
13 Q    Did you list that you had been
14 terminated from The Montgomery Advertiser?
15 A    Yes.
16 Q    What did you list as your reason for
17 termination?
18 A    I can't remember right off at how I
19 might have phrased it. I don't recall.
20 Q    Have you held any job since your
21 termination from The Montgomery Advertiser?
22 A    No.
23 Q    Prior to your employment with The

Page 42

1  Montgomery Advertiser, who was your last
2  employer?
3  A    Mobile County School System.
4  Q    When was that?
5  A    1972 through 1980.
6  Q    Were you a teacher there?
7  A    Correct.
8  Q    Do you recall who your supervisor
9  was?
10 A    Well, we didn't really have
11 supervisors per se.  We had department
12 heads.
13 Q    Who was your department head?
14 A    The department head at that time was
15 Sidney Leak.  I believe he is now deceased.
16 Q    Who was the principal of the school?
17 A    James Funderberg, who is also
18 deceased.
19 Q    Were you ever verbally disciplined
20 when you were working for the Mobile County
21 School System?
22 A    No.
23 Q    Did you ever receive a written

Page 43

1  disciplinary action?
2  A    No.
3  Q    Were you terminated from that job as
4  a result of your felony conviction?
5  A    Yes.
6  Q    When were you hired at The
7  Montgomery Advertiser?
8  A    July of 1988, I believe, yeah.
9  Q    What prompted you to apply for a job
10 there?
11 A    At the work release facility that I
12 was in, they -- The Montgomery Advertiser
13 hired several people from the work release
14 facility and someone suggested I go and
15 apply there.
16 Q    Do you remember who suggested that?
17 A    Not right off.  Just another person
18 who -- several people who worked there.
19 Q    Do you remember any of the people
20 who worked there that you knew at the time
21 that you submitted your application?
22 A    I mostly would just remember first
23 names because these were just people that I

Page 44

1  knew, but they weren't, you know, just
2  close friends.  I can remember a couple of
3  first names, but I don't remember whole
4  names necessarily.
5  Q    What were those first names?
6  A    There was a Hattie, one guy named
7  Henry.  There was a Geraldine.  There was a
8  Cheryl.  That's all I can remember right
9  off.
10 Q    Do you know if any of those people
11 are still employed at The Montgomery
12 Advertiser?
13 A    I don't know.
14 Q    Do you know if any of those people
15 were still employed at The Montgomery
16 Advertiser at the time of your termination?
17 A    There was one named Hattie, who was
18 still there when I left, I believe.
19 Q    What was your initial rate of pay at
20 The Montgomery Advertiser?
21 A    I really don't recall right off.  It
22 may have been five -- four something or
23 five something with commission.  But I

Page 45

1  don't remember exactly.
2  Q    What was your final rate of pay at
3  The Montgomery Advertiser?
4  A    I believe it was $10.63 or $10.64
5  per hour, plus commission.
6  Q    Did you receive periodic pay raises
7  throughout your employment there?
8  A    Periodic, yes.
9  Q    Were those pay raises associated
10 with your evaluations?
11 A    Were they associated with my
12 evaluations?  I would think that they
13 should have been, but I don't think they
14 were.  The raises that I was given for the
15 most part sort of belied my actual work
16 production.  So I think they were in many
17 instances less than they should have been
18 or that -- perhaps less than others whose
19 records probably were not as exemplary as
20 my own.
21 Q    Let me rephrase the question.
22 A    Perhaps.  I went off on that.  I
23 don't know.

Page 46

1  Q     Were you given raises at the same
2  time as your evaluation?
3  A     Yes.
4  Q     Was there ever a time when you were
5  given a raise that was not during an
6  evaluation period?
7  A     No, not that I can recall.
8  Q     You mentioned that you received a
9  certain amount per hour, plus commission?
10  A     Uh-huh.
11  Q     What were your commissions based on?
12  A     Sales objectives.
13  Q     Did you receive bonuses during the
14  time that you worked at The Montgomery
15  Advertiser?
16  A     Yes.
17  Q     What types of bonuses did you
18  receive? For what did you receive bonuses?
19  A     Well, for making your -- we had a
20  dollar amount goal for each given month.
21  And there were also sales incentives as
22  well. And the commission was comprised of
23  those things.

Page 47

1  Q     Is a bonus and commission the same
2  thing?
3  A     Yeah.
4  Q     Okay. So, these commissions, if you
5  made the goals that were set for you, they
6  were mandatory?
7  A     Yes. Well, yeah -- yes.
8  Q     Did you ever work overtime at The
9  Montgomery Advertiser?
10  A     When the need arose, yes. And
11  sometimes I -- occasionally I volunteered
12  for obit weekends when -- there might have
13  been periods along the way that there were
14  staff shortages or whatever.
15  Q     When you say "obit weekends" does
16  that mean work for the obituary?
17  A     Yeah. Because they were generally
18  rotating weekends. And at one point I
19  believe the staff was short and I
20  volunteered to go in a few times or put
21  myself there, as needed I would volunteer
22  because I didn't have family commitments.
23  And if something came up for someone, I was

Page 48

1  happy to go in.
2  Q     Do you recall how often you worked
3  overtime?
4  A     Occasionally some Fridays for an
5  hour or so. Because that was our busiest
6  workday of the week.
7  Q     Can you give me an estimate of how
8  many hours of overtime you worked in a
9  normal month?
10  A     Not many. Maybe -- and it wasn't
11  always. There were times that I didn't,
12  but it would not have been over maybe -- in
13  a month? Five to six or thereabouts. And
14  sometimes there were -- you know, it just
15  varied. But it was not an inordinate
16  amount.
17  Q     Did overtime have to be approved
18  before it was worked?
19  A     Early on it didn't. And there came
20  a point where -- I believe where you needed
21  to indicate if you were going to be running
22  over some, yes.
23  Q     Did you always seek such approval if

Page 49

1  you were going to be working overtime?
2  A     Well, for the most part. And then
3  on occasion one or both of the supervisors
4  might be milling around and they would ask,
5  you know, how long are you going to be or
6  something like that. So, if you saw you
7  were going to run past the time, you would,
8  you know, indicate to one of them that you
9  were going to be running a little over.
10  Q     Did you receive benefits at The
11  Montgomery Advertiser?
12  A     Yes.
13  Q     What benefits did you receive?
14  A     Health care, retirement, I guess.
15  That's a benefit. That's all that I can
16  think of right off.
17  Q     Do you know whether you had dental
18  insurance?
19  A     Yeah. Well, I kind of encompass
20  that in the health insurance. But yes, I
21  did.
22  Q     Did you have life insurance through
23  them?

Page 50

1  A    I believe that it was incorporated
2  into -- I think there was a benefit if you
3  died while on the job. I believe there was
4  a benefit if you died, you know, there, in
5  service there, as I recall. Not 100
6  percent sure on that.
7  Q    Do you know whether you had
8  disability benefits there?
9  A    When I had surgical leaves, yes.
10  Q    Did you have to pay anything out of
11  pocket for your health insurance benefits?
12  A    If they were in-patient, you had to
13  pay a deductible, I believe.
14  Q    Did you have to pay anything, other
15  than your deductible?
16  A    I don't believe so.
17  Q    Did you have any out-of-pocket
18  expenses for your retirement benefits?
19  A    You may want to rephrase that
20  question. I'm not sure I understand.
21  Q    Do you know whether you had to pay
22  anything to receive retirement?
23  A    I'm not sure how that works to be

Page 51

1  honest. I don't think so, but I'm not
2  certain.
3  Q    During your employment at The
4  Montgomery Advertiser, did you receive an
5  employee handbook?
6  A    At some point, yes. I don't know if
7  that was before Gannett, but I believe at
8  some point, yes.
9  Q    I'm going to show you what I have
10  marked as Defendant's Exhibit 2. Do you
11  recognize this document?
12         (Defendant's Exhibit No.
13          2 was marked for
14          identification).
15  A    No, because as I recall the handbook
16  I got likely would have been when we were
17  owned by Multi-Media. I don't recall this
18  one that has the -- I see Gannett overview
19  here. I don't recall this one.
20         So, I don't know if they took parts
21  of the old one or -- I have no idea. But I
22  couldn't just say that I have had a copy of
23  this one that was from Gannett.

Page 52

1  Q    Okay. Were you aware that the
2  company had an open door policy?
3  A    No.
4  Q    Did you ever make any complaints
5  during your employment at The Montgomery
6  Advertiser?
7  A    Yes.
8  Q    Were you aware that the company had
9  a discipline policy?
10  A    Yes.
11  Q    Were you aware that the company had
12  a performance improvement plan policy?
13  A    Not until I was put on one. Let me
14  just think that out. Let me just think for
15  a moment. I want to answer correctly.
16  Just a moment. I can't say that I was
17  aware of that, no.
18         (Defendant's Exhibit No.
19          3 was marked for
20          identification).
21  Q    I'm showing you what I've marked as
22  Defendant's Exhibit 3. Is that your
23  signature on the first page of that

Page 53

1  document?
2  A    It is.
3  Q    Do you recall receiving a copy of
4  the company's rules and regulations?
5  A    What is the question regarding this
6  once again, please?
7  Q    Do you recall receiving a copy of
8  the company's rules and regulations?
9  A    I don't have a direct recollection
10  of this.
11         (Defendant's Exhibit No.
12          4 was marked for
13          identification).
14  Q    I marked this document as
15  Defendant's Exhibit 4. Do you recognize
16  that document?
17  A    I've seen this document posted
18  before, yes.
19  Q    Did you receive a copy of this
20  document?
21  A    My recollection is that I can
22  remember seeing it posted on the employee
23  bulletin board. I don't have a direct

Page 54

1  recollection of just seeing it, but I have
2  seen it before.
3  **Q      The top of the document says The**
4  **Advertiser Company. Just for**
5  **clarification, is The Advertiser Company**
6  **the company that owns The Montgomery**
7  **Advertiser?**
8  A      I thought that Gannett owned The
9  Montgomery Advertiser.
10 **Q      Do you know who The Advertiser**
11 **Company is?**
12 A      I assumed -- I know that Gannett
13 owns -- well, let me just -- my
14 understanding is that Gannett has, you
15 know, newspapers all over the -- probably
16 all over the world. And my understanding
17 is that I guess each of them has names in
18 whatever group. But I just assumed that --
19 my understanding was that Gannett owned The
20 Advertiser and other such companies that
21 may have had, you know, different names
22 depending on where they were or whatever.
23 **Q      What position did you apply for at**

Page 55

1  **The Montgomery Advertiser?**
2  A      Sales rep. At that time it was
3  called a transient sales rep.
4  **Q      Is that the position that you were**
5  **hired to do?**
6  A      Yes, uh-huh.
7  **Q      What were your job duties in that**
8  **position?**
9  A      Basically to take incoming ads and
10 to -- initially I'm not sure if -- I'm
11 thinking back because it's been a while.
12 To take incoming ads over the telephone and
13 to sell on sales specials.
14 **Q      What types of sales specials?**
15 A      We might have a Halloween page or a
16 Christmas page and we would seek
17 sponsorships from area businesses to put on
18 the page. It might have Halloween safety
19 tips, et cetera for children. And it was a
20 way to give some visibility to businesses
21 to, you know, list them as supporting a
22 page.
23 **Q      Were the ads that you took as a**

Page 56

1  **transient sales rep for the classified**
2  **section?**
3  A      Yes.
4  **Q      Did you hold the position of**
5  **transient sales rep the entire time at The**
6  **Montgomery Advertiser?**
7  A      No. It was for approximately one
8  year.
9  **Q      What did you do after you were a**
10 **transient sales rep?**
11 A      At that time they called it contract
12 sales. But it remains the last position,
13 you know, that I had. But at the time --
14 we've had several name changes along the
15 way. But at the time, it was called a
16 contract sales representative.
17 **Q      Did you request to be transferred to**
18 **a contract sales representative?**
19 A      A vacancy became available and I
20 believe I requested that as I recall.
21 **Q      What were your job duties as a**
22 **contract sales representative?**
23 A      While you were assigned a set of

Page 57

1  customers that you handled exclusively and
2  you would -- I would take their incoming ad
3  orders, you know, any line or display ads,
4  do some customer service. We would call
5  back -- do callbacks for ad renewals. We
6  would also sell the same special section
7  pages that were -- I referred to earlier.
8  And basically service your customer if
9  there were account issues or money issues.
10 We sometimes made calls regarding that as
11 well. We would apprise the customer of any
12 specials we may have had at a given time.
13 Sometimes there were sales blitzes where we
14 could sell pages cheaply near the end of a
15 month, so we made those calls. So
16 basically servicing a set group of
17 customers.
18 **Q      What was the difference between**
19 **being a transient sales rep and a contract**
20 **sales rep?**
21 A      A little more money as I recall.
22 And the duties were expanded some. But
23 basically, as I said, in transient you

Page 58

1  didn't have an assigned group of
2  customers.  And in the contract area you
3  did have assigned customers.
4  Q    Did you hold the contract sales rep
5  position continuously until the end of your
6  employment?
7  A    There was a period of, I believe,
8  one year where I did not.
9  Q    What position did you hold during
10 that one year?
11 A    Back to transient advertising again.
12 Q    Why did you become a transient sales
13 rep for that one year?
14 A    I was demoted.
15 Q    Who demoted you?
16 A    Mark Logsdon via Sudie Buchanaan.
17 Q    What was Mark Logsdon's job title?
18 A    Ad director.
19 Q    And his race?
20 A    White male.
21 Q    What was Sudie Buchanaan's position?
22 A    Classified manager.
23 Q    And her race?

Page 59

1  A    White female.
2  Q    At what point -- during what year
3  did you serve as a transient sales rep?
4  A    I believe -- '99, I believe.
5  Q    Who was your supervisor as a
6  transient sales rep in 1999?
7  A    Sudie Buchanaan was the advertising
8  director, and there was a Robin Cafron who
9  was a floor supervisor.
10 Q    After 1999, did you transfer back to
11 the contract sales rep position?
12 A    Yes.
13 Q    Who was your supervisor in the
14 contract sales rep position?
15 A    Initially there was a person named
16 Maria Henderson, I believe.  She was a
17 floor supervisor.
18 Q    Anyone else that you would have
19 considered your supervisor?
20 A    You mean ensuing times after that?
21 Q    At that time with Maria Henderson.
22 A    No, we only had one at a time.
23 Q    Did Maria Henderson have any other

Page 60

1  job title besides floor supervisor?
2  A    Not to my knowledge.
3  Q    After Maria Henderson, who was your
4  supervisor?
5  A    I think I can't -- let me think.
6  Janene Spencer may have come after Maria,
7  but I may have to think about that.  The
8  time frames I just have to -- because there
9  were a lot of them along the way.  So, as
10 best I recall, that's who it was.
11 Q    Was Ms. Spencer's job title also
12 floor supervisor?
13 A    Yes.
14 Q    Who was your supervisor after Janene
15 Spencer?
16 A    Jennifer Jensen.
17 Q    Is Ms. Jensen's job title also floor
18 supervisor?
19 A    As best I know, yes.
20 Q    What is Ms. Henderson's race?
21 A    She is a white female.
22 Q    What is Ms. Spencer's race?
23 A    White female.

Page 61

1  Q    And Ms. Jensen's race?
2  A    White female.
3        (Defendant's Exhibit No.
4        5 was marked for
5        identification.)
6  Q    I'll show you what I have marked as
7  Defendant's Exhibit 5. Do you recognize
8  that document?
9  A    Yes.
10 Q    Did this job description apply to
11 your position as contract sales rep?
12 A    Yes.
13 Q    Does this job description accurately
14 describe the duties that you were asked to
15 perform?
16 A    Yes.
17 Q    At the top of this document it says
18 the contract sales representative reports
19 to the inside sales supervisor.  Who was
20 the inside sales supervisor that you
21 reported to?
22 A    During that -- before I was
23 terminated?

Page 62

```
1   Q      Yes.
2   A      That would be Jennifer Jensen.
3   Q      So, are inside sales supervisor
4   and floor supervisor --
5   A      The same thing, yes.
6   Q      When Maria Henderson was the inside
7   sales supervisor, who did she report to?
8   A      Kathryn Mount.
9   Q      And what is Kathryn Mount's position
10  or what was her position at that time?
11  A      She was classified manager.  At one
12  point, she was interim early on and then
13  she became classified manager.
14  Q      What is Ms. Mount's race?
15  A      White female.
16  Q      Did Ms. Spencer report to Ms. Mount
17  as well?
18  A      Yes.
19  Q      Did Ms. Jensen report to Ms. Mount?
20  A      Yes.
21  Q      Who was Ms. Mount's boss or
22  supervisor?
23  A      During which period or which time?
```

Page 63

```
1   Q      Okay.  During the time that Maria
2   Henderson was the inside sales supervisor,
3   who did Kathryn Mount report to?
4   A      I believe it was Mark Logsdon.
5   Q      What is his race?
6   A      White male.
7   Q      Who did Kathryn Mount report to
8   after Mark Logsdon?
9   A      Terry Sullivan.
10  Q      Is that a male or female?
11  A      White male.
12  Q      Who did she report to after Mr.
13  Sullivan?
14  A      Ron Davidson, white male.
15  Q      Do you know if she reported to
16  anyone after Mr. Davidson?
17  A      No.
18  Q      How many other people worked as
19  contract sales reps?
20  A      Six.
21  Q      And that was at any given time?
22  A      I'm trying to think back to the
23  early years if there were four or six.  I
```

Page 64

```
1   believe initially there were just four, and
2   then it went to six.
3   Q      Six total or six plus you?
4   A      Six total.
5   Q      Did all six contract sales reps do
6   essentially the same job that you were
7   doing?
8   A      Except for one who did national
9   advertising, but the mechanics of the job
10  were the same.  She just dealt with
11  out-of-state clients.
12  Q      At the time that you were
13  terminated, who were the contract sales
14  reps?
15  A      Billie Jackson.
16  Q      And her race?
17  A      Black female.
18  Q      Who else?
19  A      Cornelius Jones.
20  Q      And his race?
21  A      Black female -- I'm sorry.  Black
22  male.  Thomas Taylor, black male.  Margie
23  Robinson, black female.  And -- well, there
```

Page 65

```
1   was another guy who was serving in the war
2   at the time.  I don't know if you would
3   want me to list him or not.
4   Q      Who was that?
5   A      Ed Smith.
6   Q      What is his race?
7   A      Black male.
8   Q      He was --
9   A      There was a Joe Howard who was
10  there, but he was not there when I left.  I
11  believe -- just a moment.  Let me think for
12  a moment.  I believe he left before I was
13  terminated.
14  Q      What is Mr. Howard's race?
15  A      Black male.
16  Q      Were there other people besides
17  contract sales reps in your department?
18  A      Yes.  Well, we had an inside sales
19  group and an outside sales group.
20  Q      What's the difference between an
21  inside sales group and an outside sales
22  group?
23  A      They went out to see the customers
```

Page 66

1  physically.  You know, they went out in
2  their cars to service them at their
3  businesses.  And we serviced them via
4  telephone, fax and e-mail.  That was the
5  basic difference.
6  Q       How many outside sales reps were
7  there at any given time?
8  A      Approximately four to five.
9  Q       Who did they report to?
10  A      I believe they had a -- but I'm not
11  absolutely certain about this.  I think
12  they had one among them who was a team
13  leader or something.  But I believe -- as
14  far as I know, they reported to Kathryn
15  Mount.  I don't know that I ever recall
16  anyone being in an actual supervisory
17  position, you know, as such.
18              (Defendant's Exhibit No.
19              6 was marked for
20              identification).
21  Q      I marked this document as
22  Defendant's Exhibit 6.  Do you recognize
23  that document?

Page 67

1  A      I don't know that I can recall --
2  let me look.  Let me just look through the
3  whole thing for a moment.  Some of this is
4  familiar, but not in its entirety.
5  Q       Is it the content that's familiar or
6  the document itself?
7  A      Most of the content, but not -- I'm
8  just not aware of -- because some of this
9  part seems -- I don't know if this was for
10  the entire staff, you know, inside and
11  outside or classified in retail.
12  Q       Are you referring to the first page
13  of the document?
14  A      Wait just a minute.  Let me see
15  which page.  One moment please.  You know,
16  these changed at various points so I'm
17  not -- let me see what the one thing is.
18  There was something here about I think
19  proposals or something.  Let me just find
20  it if I can again.  Minimum four
21  pre-approved presentations to be given
22  monthly.  That doesn't ring a bell to me on
23  page 1.

Page 68

1  Q       Okay.  Do you believe that you have
2  not seen the document that is on page 1
3  before?
4  A      I don't know that I've seen it in
5  this form.  I don't recall every aspect of
6  it.
7  Q       Okay.  Do you know if you have seen
8  pages 2 and 3 of this exhibit?
9  A      I have.  Under the account executive
10  of the month, I'm not familiar with the
11  sentence that reads, "Points awarded for
12  revenue over goals starts at 26."
13          So, I just can't say with 100
14  percent accuracy that I'm familiar with
15  that phraseology.  I likely have seen it or
16  parts of it, but I couldn't just swear to
17  that.
18  Q       Okay.  Apart from the one sentence
19  that you just read out, does Defendant's
20  Exhibit 6 reflect your understanding of
21  sales standards in the inside sales
22  department?
23  A      I would say yes, but I would also

Page 69

1  say that, you know, this was probably
2  changed at different junctures.
3              (Defendant's Exhibit No.
4              7 was marked for
5              identification).
6  Q      I marked this document as
7  Defendant's Exhibit 7.  Is this a
8  performance review that you were given?
9  A      Okay.  And what was the question
10  regarding this again?
11  Q       Was this a performance review that
12  you were given?
13  A      I suppose.  I don't -- I don't have
14  it in any records that I have, but it seems
15  it may be.
16  Q       Do you have any recollection of this
17  performance evaluation being discussed with
18  you?
19  A      Not really.
20  Q       Do you recall whether you agreed
21  with this evaluation at the time that it
22  was given?
23  A      I don't recall.

Page 70

1  Q    I'll show you what I have marked as
2  Defendant's Exhibit 8. Is this a
3  performance appraisal that you were given
4  during your employment with The Montgomery
5  Advertiser?
6          (Defendant's Exhibit No.
7           8 was marked for
8           identification).
9  A    Okay.  Now, again, what was the
10 question regarding this?
11 Q    Is this a performance evaluation
12 that was given to you during your
13 employment with The Montgomery Advertiser?
14 A    Yes, but I never saw this.  Of
15 course, it was not addressed to me.  This
16 is the first time that I have seen that.
17 Q    You're referring to page 4 of the
18 exhibit, which looks like an e-mail?
19 A    Well, a memo to somebody else, to
20 the department head and HR.  So I don't
21 recall.
22 Q    Okay.
23 A    I mean, I have not seen that.

Page 71

1  Q    The first three pages of this
2  exhibit though, have you seen those three
3  pages?
4  A    Yes.
5  Q    On page 3 of this exhibit, it
6  indicates that you were being moved to the
7  call center team?
8  A    Uh-huh.
9  Q    Is this what you were referring to
10 earlier about --
11 A    Right.
12 Q    The one year you moved to the
13 transient?
14 A    Correct.
15 Q    So, that would have occurred in
16 November of 1998?
17 A    If that's what this reflects, yes.
18         (Defendant's Exhibit No.
19          9 was marked for
20          identification).
21 Q    Let me show you what I have marked
22 as Exhibit 9. This document on the front of
23 it says "self."  Is this an evaluation that

Page 72

1  you performed on yourself?
2  A    Question again.
3  Q    Is this an evaluation that you
4  performed on yourself?
5  A    Yes.
6  Q    Do you recall when this evaluation
7  was completed or when you completed this
8  evaluation?
9  A    Not the exact date.
10 Q    The front of this document says,
11 "For 11/99 review."
12 A    I would assume that's correct.
13         (Defendant's Exhibit No.
14          10 was marked for
15          identification).
16 Q    I'll show you what's been marked as
17 Defendant's Exhibit 10.  Is this a
18 performance review that you received during
19 your employment at The Montgomery
20 Advertiser?  Is this a performance
21 appraisal that you received during your
22 employment at The Montgomery Advertiser?
23 A    Yes.

Page 73

1  Q    Do you recall this evaluation being
2  covered with you?
3  A    I believe so, yes.
4  Q    Do you recall whether you agreed
5  with this evaluation at the time that it
6  was given?
7  A    I probably did not agree with the
8  areas that the transitional marks were
9  given in.
10 Q    Is that your signature on page 4 of
11 this exhibit?
12 A    Yes.
13         (Defendant's Exhibit No.
14          11 was marked for
15          identification).
16 Q    I'll show you what's been marked as
17 Defendant's Exhibit 11.  The front of this
18 document also says "self."  Is this a
19 performance evaluation that you did of
20 yourself?
21 A    Okay.
22 Q    Is this an evaluation that you did
23 of yourself?

Page 74

1   A    Yes.
2   Q    Pages 5 and 6 of that exhibit appear
3   to be something other than the performance
4   evaluation form. Did you type what's on
5   pages 5 and 6 of this exhibit?
6   A    Yes.
7   Q    Did you submit it with your self
8   evaluation?
9   A    Yes.
10  Q    And that was in 2001?
11  A    Yes. As is stated by this date, so
12  I would assume, yes.
13          (Defendant's Exhibit No.
14          12 was marked for
15          identification).
16  Q    I'll show you what I have marked as
17  Defendant's Exhibit 12. Is that an
18  evaluation that you received with The
19  Montgomery Advertiser?
20  A    Yes.
21  Q    Do you recall that evaluation being
22  covered with you?
23  A    I believe so, yes.

Page 75

1   Q    Do you recall who covered it with
2   you?
3   A    Kathryn Mount.
4   Q    Do you recall if you agreed with
5   that evaluation at the time that it was
6   given?
7   A    Yes.
8   Q    Is that your signature on page 4 of
9   this exhibit?
10  A    Yes.
11  Q    And this was done in 2001?
12  A    It's dated thusly, so I would assume
13  so.
14          (Defendant's Exhibit No.
15          13 was marked for
16          identification).
17  Q    I'll show you what I have marked as
18  Defendant's Exhibit 13. Is this a self
19  evaluation that you completed?
20  A    Yes.
21  Q    The front page of this exhibit says
22  10/15/02. Does that sound like the right
23  date or thereabouts?

Page 76

1   A    Perhaps. I can't say with
2   certainty, but perhaps. It likely is.
3          (Defendant's Exhibit No.
4          14 was marked for
5          identification).
6   Q    I'll show you what's been marked as
7   Defendant's Exhibit 14.
8   A    Okay. The question again?
9   Q    Is this a performance appraisal that
10  you received during your employment with
11  The Montgomery Advertiser?
12  A    Yes, I believe so.
13  Q    Do you recall this appraisal being
14  covered with you?
15  A    Yes.
16  Q    Do you recall who covered it with
17  you?
18  A    Kathryn Mount.
19  Q    Look at page 4 of that exhibit.
20  A    (Witness complies).
21  Q    Under "employee comments"; is that
22  your handwriting?
23  A    No.

Page 77

1   Q    No? It says, "Will respond in
2   writing at a later date." Is that
3   something that you informed Ms. Mount at
4   the time?
5   A    Yes, because I didn't agree with the
6   evaluation.
7   Q    Do you recall whether you did
8   respond in writing at a later date?
9   A    I'm sure I did. Probably so.
10  Q    This is dated October 21st 2002.
11  Does that seem accurate to you?
12  A    It seems accurate, I believe so.
13          (Defendant's Exhibit No.
14          15 was marked for
15          Identification).
16  Q    I'll show you what I have marked as
17  Defendant's Exhibit 15. Is this a self
18  evaluation that you completed?
19  A    Yes.
20  Q    The date on the front of the self
21  evaluation is July 7th 2003. Does that
22  sound accurate to you?
23  A    I believe so.

Page 78

1   Q   Just two more evaluations, I
2   promise.  This document has been marked as
3   Defendant's Exhibit 16.  Is this a self
4   evaluation that you completed?
5         (Defendant's Exhibit No.
6         16 was marked for
7         identification).
8   A   Yes.
9   Q   On page 2 where it says, "Date of
10  this review" it says July 13, 2004.  Does
11  that sound accurate to you?
12  A   I believe so.
13  Q   The last page of that exhibit is not
14  on the review form.  Is this something that
15  you typed?
16  A   Yes.
17        (Defendant's Exhibit No.
18        17 was marked for
19        identification).
20  Q   I'll show you what I have marked as
21  Defendant's Exhibit 17.  Is this a
22  performance appraisal that you received
23  during your employment at The Montgomery

Page 79

1   Advertiser?
2   A   Yes.
3   Q   Do you recall this appraisal being
4   covered with you?
5   A   Yes.
6   Q   Do you recall who covered it with
7   you?
8   A   Kathryn Mount.
9   Q   On page 2 where it says, "Date of
10  this review" it says July 28, 2003.  Does
11  that sound accurate to you?
12  A   I couldn't say.  It likely was.
13  Reviews were not often done in a timely
14  fashion, so I would assume so.  I've seen
15  this, but I would assume the date is
16  correct, yes.
17  Q   On page 4 of that exhibit where it
18  says, "Employees signature/date," there is
19  written there, "Pat refuses to sign and
20  will be submitting a rebuttal."
21  A   Uh-huh.
22  Q   Do you recall whether you submitted
23  a rebuttal?

Page 80

1   A   I'm sure I likely did.
2   Q   Do you recall when you submitted the
3   rebuttal?
4   A   I'm sure it would have been not long
5   after that.  Because as I recall, I
6   vehemently disagreed with this appraisal
7   and did not feel it was an accurate
8   assessment.
9         (Defendant's Exhibit
10        No. 18 was marked
11        for identification).
12  Q   I'll show you what's marked as
13  Defendant's Exhibit 18.  Do you recognize
14  this document?
15  A   I do.
16  Q   Do you recall having a meeting with
17  Ms. Mount and Fred Villacampfa in February
18  of 2000?
19  A   I do.
20  Q   Who is Fred Villacamfa?
21  A   He was the HR director at that time.
22  Q   Were they discussing with you
23  complaints that had been lodged against

Page 81

1   you?
2   A   They were.  There was something that
3   preceded this action.
4   Q   When you say "there was something
5   that preceded this action," what do you
6   mean?
7   A   Prior to receiving this, I had asked
8   to have a meeting with Kathryn Mount,
9   classified manager, and it was basically
10  concerning issues on the floor that had to
11  do with what I deemed being racist at the
12  time.  I brought several things to her
13  attention.  And I guess, in effect, made
14  accusations.
15        And this happened -- and I remember
16  it distinctly.  This happened on a
17  Thursday.  I actually initiated the meeting
18  because there were just things that were
19  happening and they were continuing to
20  happen.  So, I asked to meet with her
21  regarding them.
22        This was on a Thursday.  She was out
23  the next -- that Friday and then on Monday

Page 82

1  came this. And a couple of the things on
2  here were just taken totally out of
3  context. And at the time, I actually
4  assumed that, you know, this was -- you
5  know, she was getting back because I had
6  dared to make those accusations to her.
7      And I considered it to be a -- you
8  know, retribution for my having been honest
9  with what I perceived as happenings on the
10 floor.
11 Q    When you say that you had asked to
12 have a meeting with Kathryn about issues on
13 the floor --
14 A    Uh-huh.
15 Q    -- what type of issues had you
16 raised to her or had you just told her that
17 you wanted to meet about issues in general?
18 A    Well, there were black/white issues
19 where there seemed to be separate
20 standards.
21 Q    Did you tell Kathryn that there
22 seemed to be separate standards for blacks
23 and whites?

Page 83

1  A    I did.
2  Q    Did she have a response at that
3  time?
4  A    I don't recall. I just indicated to
5  her and gave her examples of things that I
6  had concerns with at the time. She wasn't
7  happy. I could perceive that she wasn't
8  happy with the things that I said.
9  Q    The first bullet point on this memo
10 mentions Mr. Tommy Goggins. Who is
11 Mr. Tommy Goggins?
12 A    I have no idea.
13 Q    The second bullet point mentions a
14 Ms. Adams. Do you know who that is?
15 A    I wouldn't have known. It was just
16 a call-in customer. I wouldn't have known
17 who she was. I can recall -- I can recall
18 that it was, you know, an elderly woman
19 who -- well, I perceived her to be elderly
20 over the phone. And I spent a good time on
21 the line with her trying to answer her
22 questions.
23 Q    At this point in time, do you

Page 84

1  remember if you were working as a contract
2  sales rep or as a transient sales rep?
3  A    I can't say because it was right --
4  I don't recall exactly when that year was.
5  In some of the things we refer to, I may be
6  able to hone right on in if it was '99 or
7  2000. But I don't recall exactly. I think
8  it may have been transient at that time, I
9  believe.
10 Q    Okay. The third bullet point
11 mentions a Mr. James Martin. Do you know
12 who that is?
13 A    I had no recollection of this.
14 Actually, when these things were brought up
15 and this was one of the reasons and I
16 felt -- none of these things had happened
17 or at least through bullet point three
18 where we were, none of these were issues
19 that had, you know, been brought to my
20 attention prior to my having initiated the
21 discussion with Kathryn Mount where I
22 stated, you know, a lot of my
23 dissatisfaction with what was going on on

Page 85

1  the floor, and how there seemed to be two
2  sets of rules that were not applied across
3  the board.
4  Q    The fourth bullet point mentions
5  Sherry Herring?
6  A    Uh-huh.
7  Q    Who was that?
8  A    Sherry Herring was one of my
9  co-workers.
10 Q    Was she a contract sales rep?
11 A    I'm trying to remember the
12 outburst. It's coming into focus now. As
13 I can recall -- if this is what occurred --
14 so this may have been the point when I was
15 demoted to the transient staff. I'm not
16 certain.
17     But I can recall when -- that Sherry
18 Herring was the person who was to replace
19 me, I believe, in the contract sales, if
20 this was, in fact -- this is what I
21 recall. That when I came in that morning
22 on time that she had come in early and had
23 already begun to clean off my desk, pulling

Page 86

1   sticky notes off my phone and my computer
2   and whatever.
3        And I was a little bit aggravated
4   about that because I felt like that should
5   have been my own personal responsibility to
6   clean my desk. So, I don't -- I remember
7   saying words to her to the effect that she
8   could have at least waited until I got
9   there. But we didn't have -- on many of
10  these occasions where -- well, you'll find
11  probably in the next thing that you're
12  bringing up that they called outburst, they
13  liked to use that word with me as if it
14  was, I guess, something totally big or loud
15  or earth shattering. But that was at all
16  not the case.
17       So as I recall, we had words. But
18  it wasn't -- there was no profanity or
19  raised voices. And I asked her couldn't
20  she have at least waited until I got there
21  to clean my own desk.
22  Q    That fourth bullet point mentions
23  that Marie Henderson had talked to you

Page 87

1   about this incident. Do you recall that?
2   A    Vaguely, just vaguely.
3   Q    Do you recall what was said?
4   A    Not really.
5   Q    That last bullet point references a
6   Ms. Davenport. Do you know who that is?
7   A    No, I don't. And as I told Kathryn
8   at the time, that would have never been a
9   reason to hang up on a customer. The only
10  time that we -- which were very rare
11  times. And we were told that if a customer
12  got totally belligerent or used profanity
13  on the phone with you, you could say, I'm
14  about to hang up now, or something and just
15  courteously hang up. But I wouldn't have
16  just hung the phone up on anybody. I had
17  no recollection of that at the time and
18  told them that.
19  Q    Did you refuse to sign this
20  document?
21  A    Probably, yes.
22  Q    Do you recall whether you gave a
23  written explanation or a written response?

Page 88

1   A    I don't recall.
2   Q    Do you recall why you refused to
3   sign this document?
4   A    Because it did not reflect truth.
5   It did not reflect the truth and because I
6   felt that it was in retribution. And I was
7   not going to sign it because it was not
8   accurate.
9   Q    Do you know whether Kathryn Mount
10  has any input into the people who are hired
11  for the inside sales department?
12  A    I'm sure she does, yes. I often
13  have seen her interviewing potential new
14  hires, yes.
15  Q    Do you know whether Jennifer Jensen
16  has any input into the people that are
17  hired into the inside sales department?
18  A    I don't know that to be a -- I don't
19  know that to be the case. I would imagine,
20  but I don't know for certain. Generally
21  Kathryn Mount had to make all final
22  decisions on most of everything.
23  Q    I'll show you what I have marked as

Page 89

1   Defendant's Exhibit 19. Do you recognize
2   this document?
3             (Defendant's Exhibit No.
4             19 was marked for
5             identification).
6   A    Let me look. Now, what was the
7   question again? Because this one -- what
8   is the question again.
9   Q    Do you recognize this document?
10  A    No.
11  Q    Do you recall having a conversation
12  with Terry Regan about on-line
13  expectations?
14  A    No.
15  Q    Who is Terry Regan?
16  A    He is a former inside sales
17  supervisor. I think we decided on that
18  term.
19  Q    I don't know that we discussed him
20  earlier. Where did he fall in the
21  progression? I think the first person --
22  A    I forgot him. Let me just think. I
23  believe he came after Maria Henderson and

Page 90

1  before Jenene Spencer. I believe that's
2  where he fell. I'm reading one more thing
3  here before we close this. Just a second,
4  please. I'm just not familiar with having
5  been put on a performance plan before. So,
6  this -- I don't recognize this document.
7  **Q    The third paragraph of that memo**
8  **references your position as the recruitment**
9  **representative. What does that mean?**
10 A    At some point during the course
11 of -- you know, things changed. We
12 basically went from servicing -- there was
13 a time we were servicing all kinds of
14 business people. You know, they were your
15 accounts. And I believe at a later time we
16 were focusing mostly on just job
17 advertising or recruitment.
18 **Q    What is Mr. Regan's race?**
19 A    White male.
20       MS. PALMER: Why don't we go ahead
21 and take a lunch break?
22       (LUNCH RECESS TAKEN).
23 **Q    I'll show you what I have marked as**

Page 91

1  **Defendant's Exhibit 20. Do you recognize**
2  **this document?**
3       **(Defendant's Exhibit No.**
4       **20 was marked for**
5       **identification).**
6  A    I'm reading over it.
7  **Q    Okay.**
8  A    Okay. I recognize the document.
9  **Q    Is this a performance notice that**
10 **you were given during your employment at**
11 **The Montgomery Advertiser?**
12 A    Yes.
13 **Q    The date at the top says July 11,**
14 **2003. Does that sound accurate to you?**
15 A    As best I know.
16 **Q    Was this document covered with you?**
17 A    Yes.
18 **Q    And who went over it with you?**
19 A    I'm not sure if it was Jennifer
20 Jensen and Kathryn Mount or just Jennifer
21 Jensen. I don't have any direct memory,
22 but I do know it was gone over.
23 **Q    Did you dispute that you had a loud**

Page 92

1  **exchange with Shalawn Williams in May of**
2  **2003?**
3  A    I did.
4  **Q    Tell me what happened there.**
5  A    We were having a sales contest just
6  for that day. There were some -- there was
7  some little prize. I believe it may have
8  been tickets to the zoo, circus, some local
9  event. And when they were explaining how
10 the tickets would be disbursed, I believe
11 they had -- they had "X" number of tickets
12 that were to be given out.
13       And I believe I suggested -- I'm
14 trying to remember the number, but I
15 can't. Anyway, there was "X" number of
16 tickets to be given out. And I suggested
17 that they disburse them in a different
18 manner so more people would have an
19 opportunity to win, or you would win one
20 ticket as opposed to two or something like
21 that.
22       And Shalawn Williams, one of my
23 co-workers said, "Why don't you just go

Page 93

1  back up there and sit down?" And I
2  responded, "Why don't you stop being so
3  selfish?" And that was classified as a
4  loud, verbal confrontation. And I strongly
5  objected to the wording because that's not
6  what I consider a confrontation. I mean,
7  there was no profanity, there were no
8  raised voices. That was just an exchange.
9  And so that's what I recall about that.
10 And I vehemently disagreed that it was a
11 loud, verbal confrontation because it was
12 not. A confrontation means something a lot
13 more severe than what happened that day.
14 **Q    Were you verbally reprimanded after**
15 **that exchange with Ms. Williams?**
16 A    I believe the next day Jennifer
17 Jensen called -- I believe the next day
18 Jennifer Jensen called us in. And I
19 explained to her at that time that I
20 disagreed with her characterization of what
21 had gone on.
22       And I also told her that, you know,
23 we on the floor were like -- we had worked

Page 94

1 together, most of us, for a number of
2 years. And we had a certain rapport with
3 each other that was similar to a spat that
4 you might have with a sibling. And it was
5 hardly thought anymore of probably 10
6 minutes after that, and certainly not any
7 time after that.
8        So, those were -- I think in my
9 estimation things that happened
10 periodically because, you know, teeth and
11 tongue fall out sometimes. But it was just
12 a -- it was nothing near as major as what
13 is characterized here. But it just seemed
14 that because I was involved it made it
15 major.
16 Q      Do you dispute that you had another
17 exchange with Cornelius Jones?
18 A      I do not.
19 Q      What happened with the conversation
20 with Cornelius?
21 A      On that day Jennifer Jensen was
22 sitting in near proximity to Cornelius and
23 myself. We were sitting across from each

Page 95

1 other in booths. And Cornelius made the
2 comment that "I could do wonders with your
3 book," as if to suggest that he could do a
4 better job than I was doing with my book.
5        And, you know, I reminded him
6 because I thought I was doing a pretty good
7 job with my book. And I said to him, "You
8 can't even say your name right." Again,
9 no -- even tone. No whatever. We thought
10 nothing more of it. Because he had -- he
11 didn't have a speech impediment. He was
12 just lazy about talking and enunciating
13 well.
14        And I -- quite differently than my
15 managers and what have you, I always have
16 put a high premium on, you know, just
17 excellence in every aspect of your job.
18 And since we were in the communication
19 business, I thought it well that one might
20 speak and write well because that's what we
21 did.
22        So I often had little pet peeves
23 about that. But his was just basically

Page 96

1 lazy talking and I retorted that to him.
2 Not a loud outburst again. We were sitting
3 right across from each other. I don't
4 think anybody else on the floor was aware
5 that the exchange even took place.
6 Q      Did he react at all to your comment?
7 A      Unh-unh. He laughed. That was it.
8 Q      When you were referring to Cornelius
9 saying that he could do a better job with
10 your book, what does that mean? What is
11 your book?
12 A      My book of accounts. As if to
13 suggest that he could do a better job than
14 I with my book of accounts. And I think at
15 that time I was probably one of the more
16 successful ones of the group who, you know,
17 made goal on a fairly consistent basis.
18 So, I didn't take it in any bad way.
19        I just thought I was doing a pretty
20 good job. I was just thinking -- because I
21 didn't really think he could do anything
22 better. Because he was not an
23 exceptionally polished professional

Page 97

1 necessarily.
2 Q      Under the written section of this
3 performance note where it says "written" by
4 the "X," it states that you placed an ad
5 for or you placed a retail ad in the retail
6 section of the paper.
7 A      Uh-huh.
8 Q      Did you actually do that?
9 A      I did, yes.
10 Q      Who was the customer that you were
11 placing the ad for?
12 A      Alabama Orthopedic.
13 Q      Why did you place a retail ad for
14 Alabama Orthopedic?
15 A      Because I handled that account on
16 the classified side. And I had done so in
17 the past. You know, I had placed one or
18 two retail ads for them in the past. But
19 initially that time, because the personnel
20 guy there, Ron O'Neil, called me and said
21 that he was leaving town and he wanted me
22 to get this ad in the paper for him. And
23 he e-mailed me the information and I

Page 98

1   proceeded to do that.
2   Q      Was it normal for somebody in
3   classified to place a retail ad?
4   A      Well, it depended on who you were
5   and what day it was. And I don't mean that
6   to be flippant. It's just that some people
7   could do so without any problem regarding
8   that. And for me, there seemed to have
9   been a problem.
10      There was another co-worker who ran
11  an ad in the retail section of the paper
12  daily. And as best I can recall how that
13  went, we were not technically supposed to
14  run any ads in retail that were not
15  employment related.
16      And then I guess even so with that,
17  you know, it wasn't generally done. But,
18  you know, I had done it before as had
19  others, you know, in the department. And
20  one guy probably still to this day runs an
21  ad in the retail section.
22  Q      Who is that?
23  A      Thomas Taylor.

Page 99

1   Q      Does he run a retail ad for a
2   particular customer?
3   A      Air Flow Awning.
4   Q      Do you know whether Thomas Taylor
5   has permission to run that retail ad?
6   A      Yes, I'm sure he does.
7   Q      Do you know whether his customer had
8   requested that he work with them on retail
9   ads?
10  A      I don't know. I don't know.
11  Q      When you placed the ad for Alabama
12  Orthopedic, did you have permission to
13  place that retail ad?
14  A      I never thought twice about it
15  because I had done it before in the past.
16  Not on numerous occasions, but
17  periodically.
18  Q      Does that mean that no, you did not
19  have permission?
20  A      Well, yes -- I mean, no, I didn't.
21  I didn't ask, no.
22  Q      Do you know of anyone else in the
23  classified department who placed a retail

Page 100

1   ad and was not disciplined for doing so?
2   A      Brenda Jackson had placed them.
3   Q      Anyone else?
4   A      You have Thomas Taylor. Sherry
5   Herring had placed them, but I believe she
6   had permission to do so.
7   Q      Do you know whether Brenda Jackson
8   had permission?
9   A      I don't know.
10  Q      Is there anyone else that you can
11  think of that placed a retail ad that was
12  not disciplined for it?
13  A      Not that I can recall at this point.
14  Q      Did you have a conversation with
15  Beth Hatchet regarding placement of this
16  retail ad?
17  A      I did.
18  Q      How did that conversation go?
19  A      Beth handled Alabama Orthopedic with
20  the retail side of advertising. As I
21  remember, I got a call from Beth,
22  apparently she had seen the ad on the run
23  sheets. That's where we had a daily

Page 101

1   listing of ads that were going to run on a
2   given day. And she called to inquire about
3   it or ask me if I had placed it. And I
4   indicated that I had per Ron O'Neil's
5   suggestion, you know, to run or a request
6   to run the ad for him.
7   Q      Was there anything else said during
8   that conversation?
9   A      Beth and I -- Beth told me that she
10  handled their account and I agreed to --
11  that I would go ahead -- she could take the
12  ad. In other words, and get credit for it.
13      And I indicated to her and I believe
14  later to Jennifer Jensen that Beth had also
15  sold a couple of my accounts before in a
16  public -- a monthly or either every other
17  month publication that had to do with
18  health services, et cetera. And that there
19  had been no communication with me regarding
20  same.
21      There were not clear parameters
22  drawn on who could run what when and where
23  for the simple reason that they were never

Page 102

1  adhered to across the board. So, that was
2  what I meant earlier about the remark about
3  it depended on who you were. Because some
4  people could and then others, you know,
5  didn't or could not.
6      But there was frequent -- because
7  generally the way you looked at it, if
8  someone from a different area called on
9  your customer, there was a likelihood or a
10 possibility that that customer would in
11 turn spend some of the budget that might
12 have been previously allocated for a
13 classified to move it to another area
14 where, you know, you wouldn't necessarily
15 be getting the credit for the sale.
16     So, there was always, you know, some
17 concern about that. But as I said, the
18 parameters were not ever clearly drawn.
19 **Q    Was it kind of an unwritten rule**
20 **that you weren't supposed to go outside of**
21 **your department though in terms of selling**
22 **ads?**
23 A    Normally we didn't. It was not --

Page 103

1  the only way I know to answer that is what
2  I have said previously. It was never
3  adhered to across the board.
4  **Q    Did you feel that it was okay for**
5  **you to do this because Beth had done it to**
6  **you before?**
7  A    Yeah. And because I had run an ad
8  for Ron before. And for, you know, a
9  couple of other people along the way. It
10 was not anything that never happened, you
11 know. But it just didn't happen, no.
12 **Q    Page 2 of Defendant's Exhibit 20 has**
13 **a note at the bottom that says, "Pat**
14 **refused to sign as she disagreed," is that**
15 **correct?**
16 A    Absolutely.
17 **Q    What specifically did you disagree**
18 **with about this performance notice?**
19 A    The fact that -- I needed to go back
20 to the point about the phone call. I
21 believe the first call from Beth was -- as
22 I recall in the office. And, you know, I
23 shared with her that I didn't have a

Page 104

1  problem turning the ad over to her.
2      And, you know, I thought we had --
3  that was it. I thought that we were done
4  with that. Well, let me just think how the
5  phone call -- I believe somewhere in the
6  interim after that Jennifer Jensen called
7  me in to inquire about having placed the
8  ad. I believe Beth may have shared that
9  with her department manager and they were
10 doing a follow-up.
11     And I talked to Jennifer about it.
12 And, you know, shared with her what had
13 happened. And then after I spoke with
14 Jennifer, I went back and called Beth
15 because she had given me her cell number.
16 I was supposed to get with her later in the
17 day and tell her about a proof or
18 something.
19     And I called Jennifer -- I mean,
20 called Beth back because I was a little
21 surprised to be getting grief from my end
22 because I thought that we had finished the
23 matter. And that was what I said to her.

Page 105

1  I said, "Well, Beth I thought we had worked
2  that out earlier." And then I said, "Well,
3  I guess we didn't." And so it was stated
4  that I hung the phone up on her. I don't
5  recall if I said bye. But I was -- again,
6  I said -- I'm thinking this was a done deal
7  and it had been taken care of. And I was
8  wondering why I was even hearing anything
9  further about it.
10     And then later that afternoon
11 apparently Beth called in to say that she
12 felt threatened by our phone conversation.
13 Which I didn't understand why she would
14 have felt threatened, other than it may
15 have been common knowledge -- I'm sure it
16 was because people talk, you know -- that I
17 had been incarcerated before.
18     So, maybe that made her
19 uncomfortable. I don't know. But I didn't
20 threaten her. And I indicated that to
21 Jennifer Jensen because it was not that at
22 all. But I ended up getting a write-up.
23 And I just felt that was totally wrong. I

Page 106

1  didn't threaten anybody or do anything
2  else. I mean, that was just totally
3  whatever.
4          And I just felt -- to be perfectly
5  honest with you, I just felt that --
6  because many times during -- not during my
7  entire tenure at The Montgomery Advertiser,
8  but certainly more so under Gannett and the
9  personnel from Gannett or from within that
10  worked under Gannett there was subtle --
11  well, systemic, yet subtle -- or subtle yet
12  systemic, I guess, racism at many avenues.
13          But the way I felt at that point was
14  as if I had gotten out of my place in
15  saying what I said or having an opinion
16  about what happened or that I had offended
17  a white person and I needed to be -- you
18  know, punished, so to speak. Because it
19  was really again taken totally out of
20  context.
21  Q      Is there anything else about this
22  performance notice that you disagreed with?
23  A      The fact that it was -- that our

Page 107

1  phone call was confrontational and
2  threatening. And what I don't understand
3  is how Jennifer Jensen could conclude that
4  if she didn't hear the phone conversation.
5  So I guess it was really based on Beth's
6  perception to her or whomever she called
7  from being out on the road. Let me just
8  read this again, please.
9  Q      Okay.
10  A      I'm not sure what your other
11  question was.
12  Q      My last question was, was there
13  anything else that you disagreed with about
14  this performance notice?
15  A      Well, I basically disagreed with
16  everything on it as not being a clear and
17  accurate assessment of everything that
18  transpired.
19  Q      When Beth placed an ad for one of
20  your customers, were you upset about that?
21  A      No. I had brought it to my -- was I
22  upset about it?
23  Q      Well, I was not so upset about

Page 108

1  that. I was upset about the fact that —
2  because I believe I brought that to
3  management's attention at some point or
4  maybe at this point when this issue came
5  up. But I was concerned about the fact
6  that in many areas of our operation
7  management did not seem to have a clear
8  hold on, you know, what was going on or how
9  things were being done.
10          And whenever one questioned that or
11  had concerns, it was generally not a good
12  idea that you even question the powers that
13  be.
14  Q      Why did you feel that you couldn't
15  question the powers that be?
16  A      Because by this point in my tenure
17  there I had made numerous complaints about
18  my immediate manager to upper management.
19  And I was feeling along the way
20  retribution. And at this point, it was
21  beginning to be turned on heavy because I
22  actually felt that I -- that my time there
23  was short because things kept -- there was

Page 109

1  just a series of, you know, little
2  write-ups about this thing or that that had
3  not very much merit at all.
4  Q      You said that you felt that or you
5  thought that you had reported the incident
6  with Beth to management when she had placed
7  an ad for your customer.
8  A      No, no, no. I'm saying at the time
9  that this came up I also mentioned to them,
10  well, you know, probably something like,
11  well, if Beth can run ads for my customers,
12  why can't I -- at least I wasn't stealing
13  her customer. That was my customer as
14  well. We shared a customer. And it was at
15  his request that I had made -- ordered the
16  ad. Because he said I need you to do this
17  for me because I'm leaving town and I
18  assured him that I would handle it and I
19  did.
20  Q      So, when Beth had run an ad for one
21  of your customers --
22  A      Uh-huh.
23  Q      — at the time did you report that

Page 110

1  incident?
2  A    No. Because I wasn't aware of it
3  until -- I had not looked at that
4  publication. I'm not sure at which point I
5  became aware that she had been running the
6  ads. One day I probably picked up the
7  publication and noticed one of my customers
8  in there. So, I'm not certain if it was at
9  that same time. I likely mentioned it when
10 it came up or when it seemed to be a big
11 issue with us having had that discussion.
12 Q    The third page of Defendant's
13 Exhibit 20 appears to be an e-mail
14 addressed to you. Do you recall receiving
15 this e-mail?
16 A    I do.
17 Q    What was this about?
18 A    Okay. Yeah. I would love to --
19 this was an ad that came out of Mobile,
20 Alabama that was faxed to me. When I
21 input the -- the customer was an existing
22 customer. But they had either changed, I
23 believe, phone numbers or there was some

Page 111

1  way that the name was listed differently.
2  But it ended up being -- and I set the ad
3  up and ran it totally unbeknownst that it
4  was an account that was listed under Joe
5  Howard.
6       Because, like I said, the phone
7  number -- it did not prefill in the system
8  or didn't come up as an account. So I
9  believe I set it up as a new account, which
10 was, you know -- a complete mistake. And
11 when Jennifer Jensen brought it to my
12 attention, then the revenue was taken away
13 and given, you know, to Joe Howard. But it
14 was -- and that is in the paperwork that
15 I have -- the faxes or what have you that
16 the ad was sent to me.
17      So, it didn't register as an account
18 when that name was put into the system or
19 phone number or what have you. So, I had
20 reset it as a new account.
21 Q    Okay. Explain to me how it works
22 when something comes in over the fax. How
23 do you go about checking to see if somebody

Page 112

1  else has that account? You mentioned a
2  couple of things, but I don't understand.
3  A    Well, you look them up. Most of the
4  times they are there alphabetically.
5  Q    Is this on a computer system?
6  A    No. We had printouts, physical
7  stack. You know, that you can look at and
8  page turn or what have you. And as I said,
9  I don't -- something about either the phone
10 number or the way that the name of the
11 company read, it was not listed the same as
12 it -- you know, or you wouldn't have just
13 seen it looking it up on that sheet.
14            (Defendant's Exhibit
15             No. 21 was marked
16             for identification).
17 Q    I'll show you what I have marked as
18 Defendant's Exhibit 21.
19 A    If I might say something further on
20 this issue before we move on.
21 Q    Sure. Back to Defendant's 20?
22 A    Yes. Let me just think what I was
23 going to say. This same incident happened

Page 113

1  with Joe Howard and myself or with Joe
2  having taken ads for my customers that I
3  believe I brought to Jennifer Jensen's
4  attention, the e-mail. And as best I can
5  know, there was never any conversation
6  about it, you know, any whatever about it.
7  Q    Do you mean that Joe had placed an
8  ad for one of your customers?
9  A    Several. Mine -- anyones. Anyones
10 that he could and get away with.
11 Q    Do you recall specifically bringing
12 that to Jennifer Jensen's attention?
13 A    Yes, I did.
14 Q    Do you remember when that was?
15 A    It was in an e-mail. It should be
16 somewhere in the records. I don't have an
17 exact recollection of that.
18 Q    Okay. Defendant's Exhibit 21
19 appears to be an e-mail addressed to you.
20 Do you recall receiving this e-mail?
21 A    I do.
22 Q    And this is from Ron Davidson. Who
23 is Ron Davidson?

Page 114

1   A    Advertising director.
2   Q    **Had you expressed some concerns to**
3   **Mr. Davidson prior to your receipt of this**
4   **e-mail?**
5   A    I believe we had had -- we had
6   discussed goals before.
7   Q    **Did Mr. Davidson address your**
8   **concerns?**
9   A    Well, I had spoken to him earlier
10  just generally across the board about goals
11  and the fairness of them or how they were
12  computed, et cetera.
13  Q    **What specifically had you talked to**
14  **him about regarding goals?**
15  A    How I or the group basically did not
16  have a clear understanding how they were
17  derived.  Because I always had the question
18  if there was a particular formula that was
19  used because the goals were apparently not
20  computed the way they had been done
21  previously with Multi-media, which was a
22  flat percentage upped, you know, from last
23  year.  And, you know, that was that.

Page 115

1   Q    **Since we are on that topic, when did**
2   **Gannett take over for Multi-media?**
3   A    '95.
4   Q    **Were you satisfied with the**
5   **responses that Mr. Davidson gave you in**
6   **this e-mail?**
7   A    No.
8   Q    **Why were you not satisfied with**
9   **those responses?**
10  A    Because the way that I understood
11  those were derived -- and that's the reason
12  I went to them from the beginning because I
13  had an exorbitant goal as compared to what
14  it had been the year prior.  And if there
15  had been changes to the way the goals were
16  computed that that was what I was trying to
17  understand.
18      Because, in other words, it wasn't
19  the way we had done them in the past.  But
20  that always seemed to be an issue that was,
21  you know, skirted.  And I couldn't tell you
22  that I really knew when I left there how
23  goals were computed after asking time and

Page 116

1   time and time and time again.
2   Q    **When you say that you don't**
3   **understand how goals were computed, do you**
4   **mean no one told you what your goal was?**
5   A    Near the end, they started calling
6   us in to have -- I forget what they call
7   them, goal setting sessions at the
8   beginning of the month.  That probably
9   months before I -- during that year of
10  2004, probably within the last five to six
11  months prior to my departure.
12      But it had not been -- you were just
13  handed a goal.  It was passed out at your
14  desk and there was no discussion prior to
15  that.
16  Q    **So you knew what the goal was, you**
17  **just didn't know how they reached that**
18  **number?**
19  A    Exactly.  And I used to know prior
20  and what I had concerns about was that what
21  we used to -- how we used to be able to
22  compute, that wasn't jiving with the
23  numbers we were now being given.  And I

Page 117

1   never quite understood, you know, where
2   they came from.
3   Q    **How did not knowing where those**
4   **numbers came from impact you?**
5   A    Well, it impacted me because -- as I
6   stated, Kathryn Mount was never fair in any
7   of her dealings.  I guess she had issues
8   with me because I had complained numerous
9   times to upper management about her.
10      I did not feel any ways -- at all
11  sure that my goal was ever really what it
12  should have been or that it could be shown
13  to me how -- you know how it was derived.
14  I never felt 100 percent sure that it was a
15  fair goal that was completely unbiased
16  because Kathryn Mount was giving them out.
17  Q    **Other than the fact that Kathryn**
18  **Mount was the one giving them out, did you**
19  **have any reason to believe that she was**
20  **being biased?**
21  A    Oh, absolutely, yes.
22  Q    **How did you know that?**
23  A    Because on one occasion that I have

Page 118

1  a clear recollection of, and this was
2  during my final year there, I spoke with my
3  desk -- they were calling us in to go over
4  the goals for the month. My deskmate and
5  work partner, Brenda Jackson -- they were
6  calling us in one by one. And Brenda had
7  gone in.
8       And I asked her to show me, you
9  know, how are they saying that you get this
10 actual goal. So she did the math, whatever
11 that was. I don't remember exactly the
12 procedure. But when she did what she
13 did -- showed me her -- and we were just
14 doing it. You know, she was my co-partner
15 and we were doing whatever.
16      She showed me what her goal was last
17 year, what they had done or what, quote,
18 formula was used, and what her goal was for
19 that particular day. I hadn't gone in for
20 my meeting yet, but I used that same
21 formula that Brenda showed me that she had
22 just come out of the office with Jennifer
23 and Kathryn on. I applied it to my numbers

Page 119

1  from last year, and I did not get the same
2  goal that had been given me.
3       And when I went in, and I brought
4  that to Kathryn and Jennifer's attention
5  that I had just used the formula that was
6  used for Brenda, and mine didn't compute,
7  then my goal was lowered by some $2000 plus
8  dollars. And Kathryn Mount signed that
9  goal sheet and made that adjustment.
10           (Defendant's Exhibit No.
11           22 was marked for
12           identification).
13 Q      Let me show you what I have marked
14 as Defendant's Exhibit 22. This also
15 appears to be an e-mail that is addressed
16 to you. Do you recognize this e-mail?
17 A      One moment, please.
18 Q      I apologize. The first page appears
19 to be an e-mail addressed to you. So we'll
20 deal with the first page first.
21 A      Okay. We'll deal with the first
22 page. I'm ready.
23 Q      Do you recall receiving this e-mail?

Page 120

1  A      I do.
2  Q      Is this something you received in
3  November 2003 from Jennifer Jensen?
4  A      Yes. I believe the entire group
5  did.
6  Q      Okay. When you say "the entire
7  group," do you mean all of the contract
8  sales reps?
9  A      Yes.
10 Q      The second page, is that your
11 response to this e-mail?
12 A      Yes, the top part, yes.
13 Q      And in your response you ask
14 Jennifer whether these notes were being
15 placed in everyone's files?
16 A      Uh-huh.
17 Q      Do you recall if you received a
18 response to that question?
19 A      I believe the response was simply
20 that they were -- I think we were told
21 initially that we were having the verbal
22 discussions. And I believe they told us
23 that we would all be getting something in

Page 121

1  writing is my recollection, I believe.
2  Q      Okay. This e-mail from Jennifer
3  Jensen to you, look on the first page,
4  number 1 says, "Splitting of ads that
5  crossed billing periods." What does that
6  mean?
7  A      Employment ads were -- we have a
8  Sunday, Monday combo or had a Sunday,
9  Monday combo for employment ads or
10 recruitment ads. A customer could not run
11 just Sunday. He had to commit to Monday as
12 well. It was a package.
13      So we were informed to split the
14 revenue from those ads. If it was a $500
15 ad, then $250 of it was to go on that
16 Sunday, which was -- I believe all of the
17 billing periods ended on Sunday. Yeah.
18      And the remaining $250 was to go to
19 the ensuing month on those totals. So, it
20 was sort of like if I had an ad and I
21 believe Gannett's intention was -- I only
22 say that loosely -- was that -- not let
23 $500 that was placed near the end of the

Page 122

1   month roll over to the next month.  And
2   we'll get $250 of it now and we'll count it
3   on these numbers and the other $250 would
4   go on the following month.  I believe that
5   was the rationale behind it.
6   Q      The third page of this exhibit at
7   the top says "phone guidelines."  Have you
8   seen this document before?
9   A      I have.  Let me -- I would like to
10  go back to page 2. Are we through with
11  that?
12  Q      Okay.  Go ahead.
13  A      Number 4, as I said, as I recall, we
14  all had those initial discussions, you
15  know, one on one.  And there was a position
16  that they were thinking of forming, asked
17  if we were interested in doing so, you
18  know, to express your desire to do so -- to
19  have that or to talk about it further.  I
20  did that.
21        And other people who expressed an
22  interest were called in and it was
23  discussed with them.  And I was never

Page 123

1   called in about the position even though I
2   had expressed an interest in it.
3   Q      Who was called in to discuss this
4   position?
5   A      Joe Howard was, Brenda Jackson was,
6   I believe.  One moment, please.  I'm not
7   certain if Thomas Taylor expressed an
8   interest in that or not.  I'm not sure.
9   But conceivably he might have.
10  Q      How did you come to find out that
11  Joe and Brenda and maybe Thomas had been
12  called in to discuss that position?
13  A      Well, as a matter of fact, come to
14  think of it, I believe they might have
15  called Brenda in. They might have wanted
16  Brenda to take the position.  I believe her
17  interest or their interest was initially in
18  speaking to her about -- wanting her to
19  have the position or what have you.
20  Q      When you say "they" wanted her to
21  have that?
22  A      Meaning Kathryn and Jennifer.  They
23  would have liked her to take the position.

Page 124

1   I remember her sharing that with me.
2   Q      Did you ever any discussions with
3   Kathryn or Jennifer about Brenda taking
4   that position?
5   A      No.
6   Q      So, you heard all of this from
7   Brenda?
8   A      The fact that they had called her in
9   or whatever, yes.
10  Q      Did you have any discussions with
11  Kathryn or Jennifer about Joe's interest in
12  that position?
13  A      No.
14  Q      Was anyone ultimately selected for
15  that position?
16  A      I don't think it ever came to pass.
17  Not before I left.
18  Q      Now, let's go back to the third page
19  of that exhibit, phone guidelines at the
20  top.  I believe you told me earlier that
21  you had seen this document; is that
22  correct?
23  A      Yes.

Page 125

1   Q      What does this document relate to in
2   terms of your job?
3   A      Basically that whenever you received
4   a phone call, you were to handle the --
5   even though we were -- our phones were only
6   -- at some point on a rotating basis where
7   whomever called the paper might receive --
8   we had the transient team basically took
9   private party ads from individuals to sell
10  items or what have you.  They were not,
11  quote, unquote business ads.
12        And when there was an overflow on
13  their lines, then the calls would come to
14  the contact teams.  And we were supposed to
15  handle those calls and to not wait for one
16  of the other transient team members to
17  become available.  In other words, to hold
18  the customer up and to wait to give the
19  call to one of them.
20  Q      So, even if it was not somebody that
21  was in your book of customers, you would
22  still help them?
23  A      Right.  You were still expected to

Page 126

1  help the customer, yes.
2  Q    The bottom of this document says,
3  "Pat Campbell refused to sign."
4  A    Uh-huh.
5  Q    Why did you refuse to sign the phone
6  guidelines?
7  A    Because what had happened with this,
8  Joe Howard and Shalawn Williams had had
9  what I really would have called a
10  confrontation one day regarding, you know,
11  transferring of phone calls. And the
12  reason I refused to sign this was instead
13  of them, meaning Kathryn Mount and Jennifer
14  Jensen, dealing with the people who had had
15  the real confrontation and addressing the
16  issues, instead of reprimanding or as far
17  as -- and the reason I say I don't know
18  they weren't reprimanded, but it wasn't
19  during business hours because you didn't
20  see them -- when this happened, you didn't
21  see them called into the office.
22      Generally when somebody was in
23  trouble about something you would kind of

Page 127

1  know if it was in close proximity to an
2  occurrence having happened. What I
3  disliked about this was, instead of dealing
4  with and/or punishing or writing up the
5  people who were involved -- because again,
6  there were just clear -- if you were -- I
7  called them the pets.
8      If they were pets or people that
9  they generally were closer to on the floor
10  or liked better, they got better
11  treatment. So instead of admonishing or
12  punishing the people who had this, we were
13  all called into a meeting to listen
14  about -- listen to this and to have to sign
15  something.
16      And I just disagreed with that
17  because I didn't do anything. These people
18  had this altercation about this matter and
19  it should have been contained within the
20  two of them. We all knew what our
21  responsibilities were. And in effect this
22  was to keep from punishing people who were
23  involved and to call us all in and make us

Page 128

1  sign something else.
2      And it just didn't make a lot of
3  sense to me. Because I knew if I had
4  been -- had a loud outburst on the floor or
5  whatever that there would have been a
6  write-up or there would have been
7  something.
8      But you don't -- to keep from
9  punishing individuals for their behavior,
10  you bring the whole group in to sign the
11  form. I didn't agree with that because
12  that's exactly what happened.
13  Q    But you don't know for certain
14  whether Joe and Shalawn were disciplined
15  for that incident, do you?
16  A    I don't know for certain. I know
17  that they weren't called in. Yeah, I did
18  not see any conferences because the offices
19  had glass. There was glass. There were no
20  doors, you know -- there were not closed
21  premises that you could not see.
22  Q    So, when you refused to sign this
23  document, were you objecting to the way

Page 129

1  that they handled that situation as opposed
2  to objecting to what the phone guidelines
3  themselves were?
4  A    Absolutely. I knew this. We didn't
5  need to have this reiterated. It was in my
6  sense and in my thinking as had happened on
7  at least one or two other occasions that
8  when one who was in their favor broke rules
9  or did whatever, they skirted the issue of
10  punishing them. And they, instead, was
11  reiterated with a memo or something.
12      So that likely -- may have been
13  something else that I probably didn't sign
14  as well. I don't know.
15  Q    The handwriting on this phone
16  guideline sheet says that you were present
17  in two department meetings where the phone
18  guidelines were discussed; is that a true
19  statement?
20  A    I remember one. I couldn't say
21  about two. I don't have a clear
22  recollection of that.
23  Q    Okay. This is what I have marked as

Page 130

1  Defendant's Exhibit 23.  Do you recognize
2  this document?
3            (Defendant's Exhibit No.
4            23 was marked for
5            identification).
6  A     Give me a memo, please.  Okay.
7  Q     Do you recall receiving this
8  performance notice?
9  A     Yes.
10 Q     Is that your signature at the bottom
11 of the page?
12 A     It is.
13 Q     Who went over this performance
14 notice with you?
15 A     I don't know if it was Kathryn or
16 Jennifer.  One of them.
17 Q     And this is related to splitting of
18 ads across billing periods?
19 A     Uh-huh, yes.  I'm sorry.
20 Q     Do you dispute that you had not
21 split ads across billing periods?
22 A     I don't dispute that.  Not wholly I
23 don't dispute that.

Page 131

1  Q     Do you dispute that in some other
2  way, in some partial way?
3  A     Well, we may get to that at some
4  later point.
5  Q     Well, let's get to it now.
6  A     After this became, you know, an
7  issue or whatever after a warning -- I can
8  recall -- I think there was maybe a second
9  time.  That may be to come.  I'm not, you
10 know, clear on this.  But when -- let's
11 see.  I forgot my point.  Just a moment,
12 please.
13        Oh, after this had become, I think,
14 a condition of employment, this may have
15 been after the performance improvement plan
16 that's probably coming somewhere in there.
17 But what I take issue with this is that
18 when it became absolutely clear that this
19 was, you know, a major thing, I made every
20 attempt to thoroughly, you know, check that
21 knowing that it could be a condition of
22 employment.
23        So I made every attempt to, you

Page 132

1  know, check that very carefully from that
2  point on.  What I want to make clear is
3  that on one of the occasions that I got a
4  write-up -- I don't believe it was this,
5  but probably something you have there.
6  When I went back to check, Kathryn and
7  Jennifer had called me in, I believe.
8  Maybe I should wait.  There may be
9  something else coming that I should
10 address.  But I'll go ahead and talk about
11 it.
12        But there were -- give me a moment,
13 please.  On one occasion, because there
14 were a couple of write-ups about this.  But
15 on one occasion they had given me a
16 write-up, I believe there were four ads
17 that were split -- I mean, that were in
18 question.  And two of the four -- one was
19 not -- in other words, neither of them
20 qualified, so that meant that I was really
21 within the acceptable framework of the one
22 or two that they deemed acceptable.
23        But one of them was for an account

Page 133

1  for Avon, as I remember distinctly.
2  Jennifer was aware that this woman -- she
3  had problems understanding the billing
4  cycle.  So, whatever date we started her
5  from, we always billed her from 30 days for
6  that.
7        In other words, so that her billing
8  amount would be the same.  So, it crossed
9  with Jennifer's knowledge.  I won't say
10 with permission, but with her knowledge
11 that was something that we set up so the
12 customer would understand her billing.  And
13 on another one, it was for -- it was not
14 even an employment ad.  It was for Jenny
15 King, which was -- what's the little thing
16 where -- business opportunity.  It was a
17 business opportunity.
18        It was not -- so in other words, it
19 didn't even qualify as one of the ads that
20 would have been split.  It had no Monday
21 run.  So, they erroneously noted those two
22 that really should not have been qualified
23 for a write-up.

Page 134

1    But it had become painfully clear at
2  that time, which was late in or early in
3  mid 2004. It had become painfully clear to
4  me that my time at The Advertiser was
5  short. And it was write-up after write-up
6  or discussion after discussion about this
7  thing or that. You know, generally most
8  times had no merit or were things that were
9  built -- totally exacerbated or built out
10  of proportion to make a case out of me or
11  firing me to the point that one time in a
12  meeting with Jennifer and Kathryn that
13  I just point-blank told them that it seemed
14  to me that they were intending on firing me
15  so why didn't they go ahead and get it over
16  with. Because the harassment had grown to
17  levels that were just -- almost not
18  tolerable anymore.
19  **Q     On the performance notice that is**
20  **marked as Defendant's Exhibit 23, do you**
21  **admit that you had not split these**
22  **particular bills?**
23  A     Let me look at this please.

Page 135

1  **Q     I'm sorry. These particular ads**
2  **across billing periods.**
3  A     I can't really tell which is --
4  nothing is highlighted so you will have to
5  just give me a minute to look over them.
6  **Q     I believe that the actual**
7  **performance notice says, "The following ads**
8  **had components that were not split. $75**
9  **Job Pack, $30 on-line upsales, five-day**
10  **flight plans." Does that help you at all?**
11  A     Okay. And what was the question now
12  regarding that again? What was your
13  initial question?
14  **Q     Do you admit that you had not split**
15  **these ads across billing periods?**
16  A     Yes.
17         (Defendant's Exhibit
18         No. 24 was marked
19         for identification).
20  **Q     Now, I'll show you what has been**
21  **marked as Defendant's Exhibit 24. Do you**
22  **recognize this document?**
23  A     I do recognize it, yes.

Page 136

1  **Q     Was this performance notice covered**
2  **with you?**
3  A     I don't have a clear recollection of
4  this one.
5  **Q     Can you tell from the report that is**
6  **attached whether you had actually failed to**
7  **split the ads across billing periods?**
8  A     The question once more?
9  **Q     Can you tell from the report that is**
10  **attached here whether you had actually**
11  **failed to split the ads across billing**
12  **periods?**
13  A     Whether I or someone? And by that I
14  mean, if we were ever out on sick leave or
15  vacation or what have you, we had backup
16  partners who were contained in one little
17  desk area together. And they used our
18  logons.
19         In other words, if I was out sick
20  today and my backup here did my ads for
21  that day, it would reflect that I had done
22  them, you know, myself or I could have been
23  at lunch or whatever. Sometimes a customer

Page 137

1  might want immediate assistance and did not
2  want to wait until you were back from
3  lunch. So they might want your backup
4  person to do them. So I can't say with 100
5  percent certainty that I did that.
6  **Q     Is it correct that there are ads**
7  **listed under your name that were not split**
8  **across billing periods?**
9  A     That is correct.
10         (Defendant's Exhibit No.
11         25 was marked for
12         identification).
13  **Q     Let me show you what I have marked**
14  **as Defendant's Exhibit 25. Do you**
15  **recognize this performance notice?**
16  A     Do I recognize this?
17  **Q     Yes.**
18  A     I do.
19  **Q     Is this a performance notice that**
20  **was covered with you?**
21  A     Yes.
22  **Q     Do you recall who went over it with**
23  **you?**

Page 138

1   A   Kathryn Mount and Jennifer Jensen, I
2  believe.
3  **Q   What was this performance notice**
4  **about?**
5   A   To try to get a paper trail to
6  eventually terminate me.
7  **Q   What did they tell you that it was**
8  **about?**
9   A   Let me recount the incidents. I
10  don't remember the gentleman's name, but
11  there was a customer who called in at
12  approximately five minutes until 5:00 on a
13  Friday. We generally had a cutoff time
14  that was published in the paper for 3:30 in
15  the afternoon.
16      But we hardly ever, you know, went
17  by that or whatever. But technically that
18  was supposed to be our deadline for weekend
19  ads. As was always the case with me, I was
20  always willing to -- because I didn't, you
21  know, have a family to rush home to or
22  whatever. So, I was always -- it was
23  always -- in my thinking, I was always

Page 139

1  wanting to help a customer and get the
2  customer's ads in.
3      This guy called up at about five
4  minutes to 5:00, which was well past the
5  deadline. And he said, well, I've got this
6  ad that I need to get it in can you get it
7  into the paper for me? And told him, yeah,
8  we were way past deadline, but if he would,
9  you know, get it to me as quickly as he
10  could I would be happy to get it in the
11  paper for him.
12      And I assume from this that he might
13  have asked -- you know, fax it or e-mail
14  it. And I responded to him, you know, it
15  really didn't matter, or I don't care how
16  you do it at this point, either way, just
17  get it to me and I'll get it in for you.
18      And Kathryn and/or Jennifer were
19  standing by and did not like the way that I
20  addressed the gentleman. But it certainly
21  was not rude. Because I didn't have to
22  take his ad at five minutes to 5:00. And
23  most other of my comrades would not have

Page 140

1  because they would have been ready to bolt
2  out the door.
3      But I told him if he could get it to
4  me as quickly as he could I would get the
5  ad in the paper. He did and I did. And it
6  was their perception that I spoke to him in
7  a rude fashion. And I disagreed with that
8  as well.
9      And the next one was so run-of-the
10  mill that I really did not believe that
11  they had actually put it in a write-up.
12  That's how I really knew they were grasping
13  for straws. But Friday I always tried to
14  get my customers to fax. They knew Fridays
15  were busy days. So, I would encourage them
16  to get their ads in as soon as they knew
17  they were going to advertise for the
18  weekend. And it made for a better flow of
19  things and there were less errors, et
20  cetera.
21      I don't remember this clearly who
22  the customer was, but I certainly remember
23  that often times people would fax ads in or

Page 141

1  they would e-mail them and you would do
2  them -- which is only fair, you would do
3  them in the order that they came in as you
4  would a customer -- if you had a line of
5  customers, you deal with them as they get
6  to your window.
7      So, I would do the ads as they came
8  in. Most of the times people didn't call in
9  and give ads over the line. They would
10  either fax them in or e-mail them. And you
11  would, in turn, set up their run dates,
12  give the customer a callback, you know,
13  with their charges or try to up sell them
14  or do whatever else.
15      So this was just simply -- yeah,
16  someone may have called, and I said, well,
17  I haven't gotten to your ad yet, but I will
18  get back with you in a few minutes or I'll
19  get back with you shortly. That was
20  customary. Something we all did.
21      If you hadn't done it, you just --
22  and then generally what you would do is --
23  because some customers knew and trusted

Page 142

1  that you would get their work in. They
2  wouldn't call back for any reason. If they
3  knew you had it, and had had a good working
4  relationship with you, they knew you were
5  dependable, they didn't worry about it
6  anymore.
7        Others would want a quote right
8  away. So, if someone called and they
9  wanted a quote quicker than they were in
10 line, I would still move them up and tell
11 the customer I haven't got to your ad, but
12 I will get right back with you in a few
13 minutes. Which was good customer service
14 which many times they were, you know,
15 late. But you didn't hold that against
16 them. That's business.
17       So you just got back with them as
18 quickly as you could. So, that was just --
19 when I saw that, that was just scraping the
20 bottom of the barrel for something to
21 complain about. Because most of my
22 customers were extremely happy with the
23 service that I gave them. And there are

Page 143

1  documents that will back, you know, that
2  up, that I gave good customer service. I
3  know that I did and my customers did as
4  well.
5  Q    And you refused to sign that
6  performance notice?
7  A    I didn't sign anything that is not
8  an accurate assessment or portrayal of the
9  truth. I absolutely did not.
10       (Defendant's Exhibit No.
11       26 was marked for
12       identification.)
13 Q    I'll show you what I have marked as
14 Defendant's Exhibit 26.
15 A    Did you ever ask a question in
16 conjunction with this?
17 Q    I'm waiting for you to review it.
18 A    Okay.
19 Q    Do you recognize that document?
20 A    I do.
21 Q    Is that your performance evaluation
22 from July of 2004?
23 A    Okay.

Page 144

1  Q    Is that your performance evaluation
2  from July of 2004?
3  A    Yes.
4  Q    The first page of this exhibit has a
5  header of employee pro time and it's got a
6  section that says salary information. Do
7  you see that?
8  A    Uh-huh, yes. I'm sorry.
9  Q    It says hourly rate $10.23. Was
10 that your hourly rate at the time you left
11 The Montgomery Advertiser?
12 A    I don't recall without looking at an
13 old check stub. It doesn't ring a bell
14 right off. I'm sorry. I thought it was
15 higher than that, so I'm not real sure.
16 Q    Who gave you this evaluation?
17 A    Do you mean who discussed it with
18 me?
19 Q    Yes.
20 A    I believe Jennifer Jensen.
21 Q    Was anyone else present?
22 A    I can't recall if this was the one
23 where Linda Ryder, who was HR's department

Page 145

1  person was present or not. I can't recall
2  if it was this or the performance plans. I
3  don't really know.
4  Q    Do you recall what was discussed
5  regarding this performance appraisal during
6  your meeting with Jennifer Jensen?
7  A    You know, I'm still trying to
8  have -- I know I took issue with, you know,
9  several things here. One of the things
10 that is jumping off the page right now is
11 that, "Pat spends much of her time on
12 non-productive activities such as policing
13 her co-workers."
14       And what they deemed my policing my
15 co-workers is when I would come by
16 information on the floor generally by the
17 person who had been given some favorable
18 treatment -- you see what went awry here
19 lots of times is that the people who had
20 been treated deferentially often either did
21 not know that they were, or they would go
22 on to speak about it just in matter of fact
23 terms.

## Page 146

1    And I would always make a mental or
2  written note when I knew that that was in
3  direct contrast to a way that I might have
4  been treated regarding the same issue or
5  whatever. So, that's what they refer to
6  when I would bring something to their
7  attention that a particular person might
8  have been treated one way and I was treated
9  another way.
10    Then again, they didn't like to be
11  questioned. And that's what they termed my
12  policing my co-workers. I was not policing
13  my co-workers. I was just trying to be
14  treated the same as everyone else was
15  treated. And that was often generally not
16  the case.
17  Q    **Did Ms. Jensen provide you with an**
18  **example of what she meant by "policing your**
19  **co-workers"?**
20  A    No.
21  Q    **So, what you have just explained to**
22  **me is your perception of what she meant?**
23  A    Yeah. Because whenever I had

## Page 147

1  concerns it was like I shouldn't even be
2  concerned about this or that. And I felt I
3  should be since we were all working under
4  supposedly the same rules and regulations.
5  And it did not apply across the board to
6  everyone.
7    And whenever I would have questions
8  about some of those things, you know,
9  clearly it was -- they did not like to be
10  questioned.
11  Q    **Do you recall specifically what was**
12  **discussed during the meeting about this**
13  **performance appraisal?**
14  A    Well, in the next to last paragraph
15  the issue of -- just a moment. There had
16  been a restructuring of the department.
17  Shortly after the first of the year, I
18  would imagine somewhere around April or
19  May, that the book of accounts were -- the
20  structure was different.
21    They had taken some accounts that
22  were previously not handled by anyone in
23  particular. There were accounts that

## Page 148

1  anybody -- any of us in the employment team
2  if that customer called in and they were on
3  what they called the -- I believe it was
4  books -- anyway, they were unassigned. So
5  any of us, if we happened to get that
6  customer on the phone could handle them and
7  get the revenue for working the ads.
8    Well, when they came up with
9  restructuring, the idea was that accounts
10  would be leveled out. At that time, I had
11  a smaller account base than most of my
12  co-workers or perhaps all of them
13  probably. Which again went back to Kathryn
14  Mount because I had requested on numerous
15  occasions when I moved back from the
16  demotion back to the contract team, I had a
17  lesser book of accounts.
18    And I had inquired of Kathryn at
19  that time leveling out -- I had virtually
20  no accounts. So, I really had to rebuild a
21  book. Which I did account by account and
22  built it up. I probably had less than 40
23  accounts starting out and that went to over

## Page 149

1  200, you know, in the course of several
2  years or what have you.
3    But Kathryn Mount refused to give me
4  or level accounts out early on, which would
5  have been a good thing to do. We would
6  have all had, I guess, the same workload.
7  But she chose not to do that.
8    Well, when they came up with a new
9  plan of leveling out of accounts, I had no
10  problem with that. But I had suggested or
11  brought it to Ron Davidson's attention in a
12  letter to him and HR person, Linda Browder,
13  that I had concerns about the splitting of
14  the accounts by virtue of the account I had
15  a smaller book.
16    If they went about it a different
17  way, I would be given a gigantic portion
18  of, you know, these accounts, many of whom
19  were one time advertisers which may or --
20  which meant I would get a goal for them,
21  and I may or may not be able to recoup
22  monies from that account. Because many of
23  them on that unnamed book were one-time

Page 150

1    advertisers.
2        So, I expressed those concerns to
3    Ron Davidson that when that time came I
4    wish that he would, you know, have a keen
5    eye on the process. Because as with
6    anything else, I did not trust Kathryn
7    Mount being fair to me because it appeared
8    that I was -- well, you know, she was just
9    rarely ever fair with me. There was just a
10   different set of rules for me.
11       I explained to him my concerns about
12   being given the gigantic share of that
13   because they were not necessarily revenue
14   producing accounts. And it fell on deaf
15   ears. So, when they leveled out the
16   accounts, I got this whole big old -- it
17   was an onslaught of new accounts.
18       And I probably had several, several
19   100. My workload probably quadrupled.
20   Because with all the new accounts there had
21   to be new paperwork done. Every time that
22   they did an ad, I had to do account setup
23   forms, which took, you know, a good deal of

Page 151

1    time to do that.
2        So, I think it was not an accurate
3    assessment that I had -- let's see. Oh, I
4    struggled to handle the additional work due
5    to the lack of organization. It was not
6    due to the lack of organization. It was
7    due to the lack of -- to the fact that I
8    was probably putting in hundreds more new
9    account forms that other people didn't have
10   to do.
11       And generally, as with most other
12   things, generally -- many of those accounts
13   that were still on that list should
14   actually have had account forms done by
15   other people as they handled them. But for
16   the most part, they did not do that. You
17   know, they didn't assign them an account
18   number or what have you.
19       So, my actual physical paperwork, it
20   really quadrupled. So I was never -- it
21   wasn't that I had difficulty. It was just
22   that there were so many hours in a day.
23   And exactly what I thought would happen

Page 152

1    when they made this change the way that
2    they did did happen. You know, what my
3    worst fears were.
4        And at that point, I also began to
5    not be -- to not make goal as often as I
6    had in the past. I was impacted that way
7    which was a concern I had expressed to Ron
8    Davidson and Linda Browder if this change
9    was, in fact, made that way. Instead of
10   splitting the accounts up and then leveling
11   out the books once they were split up. In
12   other words, where I might have gotten some
13   revenue-producing accounts as well, I got
14   just one big sack of literally nothing that
15   I had goal for. And little money to come
16   with those accounts. And I think that was
17   intentional.
18   Q    Do you have any reason to believe
19   that it was intentional? Did anybody tell
20   you it was intentional?
21   A    They didn't have to.
22   Q    When you received this performance
23   appraisal, were you informed that you would

Page 153

1    be placed on a performance improvement
2    plan?
3    A    I was.
4    Q    Were you informed that if you did
5    not successfully complete that performance
6    improvement plan that you would be subject
7    to disciplinary action up to and including
8    termination?
9    A    Yes.
10              (Defendant's Exhibit
11              No. 27 was marked
12              for identification).
13   Q    Let me show you what I have marked
14   as Defendant's Exhibit 27. Is that the
15   performance improvement plan that you
16   received?
17   A    It appears to be so.
18   Q    Who discussed this performance
19   improvement plan with you?
20   A    I'm certain that this is the one
21   that was discussed with Jennifer Jensen and
22   Linda Browder, HR director.
23   Q    What was said during that meeting?

Page 154

1    A    I think Jennifer read over
2  everything that was on this and just read
3  it and -- Jennifer read over this, as I
4  recall.
5    Q    **Following this performance**
6  **improvement plan, did you participate in**
7  **anger management counseling sessions?**
8    A    Per direction of Linda Browder, yes.
9    Q    **Who was your counselor?**
10   A    Cate was the last -- C-A-T-E -- no.
11  Linda Cates or something like that. I
12  could provide that later, but I'm not 100
13  percent certain on that right now.
14   Q    **So, when you told me earlier that**
15  **you had not seen a counselor that was**
16  **incorrect?**
17   A    Well, I didn't know that you
18  meant -- well, I guess she's a counselor.
19  I assume.
20   Q    **What did you talk about during those**
21  **meetings with Ms. Cates?**
22   A    I recounted to her that I didn't
23  really know why I was there. That what

Page 155

1  they had considered, I guess, outbursts on
2  the floor simply were not that. I also
3  indicated to her that I felt in my heart,
4  again, that they were trying to build a
5  case for firing me.
6    Q    **Did you discuss anything else with**
7  **Ms. Cates?**
8    A    I indicated -- I remember discussing
9  problems that I had with, you know, Kathryn
10  Mount or with management, I believe. And
11  that sometimes -- I don't know. I can't --
12  you know, we talked about the newspaper,
13  you know, or whatever.
14   Q    **Did you tell her that you felt like**
15  **you did not need anger management**
16  **counseling?**
17   A    I did.
18   Q    **Do you know whether she agreed with**
19  **that assessment?**
20   A    Well, we ended up really a lot of
21  times just talking about other things to
22  fill up the time. I went there because I
23  was told that that was a condition of my

Page 156

1  employment, that I had to go. I indicated
2  to them that I didn't understand why I had
3  to go to anger management.
4         There was -- I don't feel that at
5  any time my temper was ever out of control
6  at The Advertiser or that I ever behaved in
7  any way that was -- I never used
8  profanity. I never had any, you know, what
9  I considered real confrontation with
10  anybody.
11        So, I felt that those were totally,
12  you know, unwarranted. I felt that they
13  were -- because I had been in trouble
14  before that they were maybe covering
15  themselves if they felt that something
16  might happen that they would have done
17  whatever. But there was no real basis for
18  having been sent. My anger was well
19  contained or well controlled.
20   Q    **But you did have anger?**
21   A    Excuse me?
22   Q    **You did have anger?**
23   A    I think everybody who is human has

Page 157

1  anger at some point in their lives about
2  something. So, you know -- and I don't
3  mean to be flippant. I think that's a fair
4  statement, you know.
5    Q    **How many sessions did you have with**
6  **Ms. Cates?**
7    A    Two or three.
8    Q    **Did that satisfy the requirement**
9  **that The Advertiser had placed on you?**
10   A    Yes.
11   Q    **Who is Laura Lynn?**
12   A    Laura Lynn is a person from Career
13  Builder. I'm glad you brought her up.
14  Laura Lynn came to do -- we were doing
15  on-line sales. And Laura Lynn, I believe,
16  came to do a little presentation or just to
17  talk up Career Builder which was her main
18  thing or where she worked. And, you know,
19  to kind of -- so that we would beef up
20  sales or different things or what have you.
21   Q    **Was she a customer?**
22   A    No. She was a visitor to The
23  Advertiser who worked at Career Builder,

Page 158

1  which was our on-line -- where we did our
2  on-line sales. I am getting warm in here.
3  I might need to come out of my jacket.
4      So, she came there to do a
5  presentation for a couple of days, I
6  believe. I would like to recount an
7  incident, if I can.
8  **Q    Go ahead.**
9  A    I had kind of a thing about cell
10  phones in the office because -- and I
11  brought that to Kathryn Mount's attention
12  before because they were rather
13  disruptive. You are probably aware of how
14  much cell phone courtesy is lacking, just
15  in your normal everyday life.
16      But we had the desk phones ringing.
17  And often times there were people with, you
18  know, the rings into their cell phone. And
19  so they were pretty much disruptive a lot
20  of times if you were on phone
21  conversations.
22      Well, when Laura was there visiting,
23  the partitions to our desk were probably

Page 159

1  like so (indicating). And one day I was --
2  she came by and she apparently put a cell
3  phone up there or a timer. I believe it
4  was a cell phone. And I believe I may have
5  been doing some work. And it startled me.
6  And it went off. And I said something
7  like, "You've got to get that away from
8  here. You have got to move that somewhere
9  else." Again, just that.
10      Laura moved down probably about two
11  desk sections down, had a conversation with
12  Thomas Taylor where he literally lit into
13  her probably suggesting that the reason she
14  was there and what they were doing,
15  whatever little contest or whatever may
16  have happened was just -- it was silly or
17  it didn't amount to much. He was extremely
18  rude to her and even admitted that later.
19      I think at some point her feelings
20  were hurt or something. But I don't feel
21  that I hurt them. Thomas really waylayed
22  into her with inflections in his voice and
23  everything.

Page 160

1      And it was the funniest thing that
2  later that day I believe after I came from
3  lunch that Kathryn -- I'm not sure if
4  Jennifer was there, but I think so. And I
5  believe the publisher was in -- Scott Brown
6  was in Kathryn's office as well.
7  Unbeknownst to me, they were questioning
8  people about what had happened on the floor
9  that morning. Never called me in to ask --
10  because as far as I was concerned, that was
11  nothing. She had sat something here that
12  had completely startled me and I asked her
13  to move that -- you know, "You have got to
14  move that from here." I didn't feel that I
15  said anything wrong with her. I didn't
16  feel that she did, she may have. I don't
17  know.
18      But anyway, unbeknownst to me they
19  were questioning my co-workers on the floor
20  about what had happened out there, you
21  know, that morning. And the next thing I
22  knew that was, I believe, recounted when we
23  have this meeting.

Page 161

1  **Q    When you had the performance**
2  **improvement?**
3  A    When we had the performance. I
4  believe that was the first time that that
5  was brought to my attention -- and it just
6  didn't fly, you know. Well, why am I
7  going? And I asked in several e-mails, why
8  do I have to go to anger management?
9      I believe there may have been some
10  comment in here about -- if you will give
11  me a moment please to let me just read.
12  But anyway, the gist of it was that they
13  felt I had been rude and/or unprofessional.
14      So, I never really knew why they
15  sent me to anger management. They made
16  references to the conversations we had
17  earlier where we talked about Shalawn
18  Williams and what's his name, Cornelius
19  Jones. And I asked, well, if there was
20  such a concern about outbursts and
21  confrontation, why are you sending me in
22  whatever this was in July for something --
23  you know, if you weren't concerned back

Page 162

1  then, why am I being sent to anger
2  management? So, I just really didn't
3  understand that.
4  Q      Did you make a comment to Ms. Lynn
5  about her age?
6  A      Yes, I did.
7  Q      What did you say?
8  A      As best I can recall, she said --
9  oh, yeah. She was making -- very informal
10 little talk. And she was talking about
11 Career Building. And she said, well, I've
12 been doing this for a long time.
13       And I made some comment about her
14 age. You know, maybe said, well, what are
15 you 24 or 25? As if to suggest that she
16 wasn't just an old, old whatever. And I
17 thought it was taken in jest. I had no
18 idea that was offensive to her, you know.
19       But I did make light of -- it was
20 like -- because here I was 50-plus years
21 old, and she was saying, I have been doing
22 this a long time. And here is this person
23 who is just extremely young.

Page 163

1      So, it was just to me kind of
2  comical that -- it was like I've been doing
3  this for 40 or 30 years and you are only
4  just so old. So there was something about
5  that. I do recall that, yes.
6  Q      After you were placed on your
7  performance improvement plan, did you have
8  to report regularly about your progress?
9  A      I attempted to. Jennifer Jensen met
10 with me and we were supposed to meet, I
11 believe, on the eight -- two months. So,
12 that would have been eight weeks, I
13 believe.
14      Jennifer Jensen only met with me in
15 two weeks and there was never anything
16 further about any meetings or anything
17 else. So, she did not follow up on what
18 they were supposed -- their end of the deal
19 to meet with me on a weekly basis.
20 Q      Did you receive e-mails about issues
21 relating to your performance improvement
22 plan?
23 A      Did I receive what?

Page 164

1  Q      E-mails relating to issues that were
2  addressed in your performance improvement
3  plan?
4  A      Probably in response to e-mails I
5  sent regarding -- well, I know the anger
6  management thing I had concerns about
7  that. But did I receive e-mails about -- I
8  mean, what particularly? I'm not sure I
9  understand exactly what you may be speaking
10 of.
11 Q      I'm just asking if anyone had
12 followed up with you on the issues that
13 were discussed with you in the performance
14 improvement plan via e-mail as opposed to
15 in person?
16 A      As to how well I was coming along or
17 whatever?
18 Q      Right.
19 A      Not that I can recall, not after
20 those two initial meetings with Jennifer I
21 don't recall that there were anymore. I
22 don't recall any e-mails at this point.
23       (BREAK TAKEN).

Page 165

1           (Defendant's Exhibit No.
2           28 was marked for
3           identification).
4  Q      I'll show you what I have marked as
5  Defendant's Exhibit 28. Is that your
6  handwriting on that document?
7  A      It is.
8  Q      Did you submit this document to
9  somebody at The Montgomery Advertiser?
10 A      I did not.
11 Q      Why did you make these notes?
12 A      They were -- let me read the second
13 one. I made them just in a tablet that I
14 had because they were of instances that I
15 felt activities were questionable.
16 Q      Did you report these questionable
17 activities to anyone?
18 A      No.
19 Q      Why not?
20 A      Not at that time.
21 Q      Why not?
22 A      Because at that time I thought that
23 they would be met with deaf ears by the

Page 166

1  then advertising director.
2  Q    Who was the advertising director at
3  that time?
4  A    Mark Logsdon.
5  Q    Why did you feel that Mr. Logsdon
6  would meet your complaints with deaf ears?
7  A    Probably because he was a
8  perpetrator.
9  Q    What was he a perpetrator of?
10 A    This was an instance of where a
11 black worker and a white worker were
12 treated differently and I simply made note
13 of it.
14 Q    Did this pertain to you?
15 A    No, not directly, not the top part,
16 no.
17 Q    Who was the black worker?
18 A    Her name was Wilma Smith.
19 Q    Who was the white worker?
20 A    Windsor Meadows.
21 Q    Windsor?
22 A    Yes.
23 Q    This note that you made relates to

Page 167

1  working on Saturdays. Were you contending
2  that Wilma was working every Saturday and
3  that Windsor was never working on Saturday?
4  A    When this particular job came open,
5  it was with the idea that they would
6  actually have somebody working weekends.
7  And then I believe just three other days
8  during the week. And when Windsor Meadows
9  was given the job, it didn't pan out that
10 way.
11 Q    So, he did not end up having to work
12 on the weekends?
13 A    She did not.
14 Q    Oh, Windsor is a woman?
15 A    Yes.
16 Q    Sorry. Do you know if there was a
17 reason that Windsor did not work on the
18 weekends?
19 A    I don't know.
20 Q    The second notation that's on this
21 page, who did this pertain to?
22 A    Christy Marsh who was, I believe,
23 the obit person at that time.

Page 168

1  Q    Is Christy Marsh a white female?
2  A    Correct.
3  Q    And this pertains to wages?
4  A    Yes.
5  Q    You felt that Christy Marsh was
6  being paid more than you were?
7  A    I believe that she had shared with
8  co-workers that she was not happy with the
9  amount of money she was making, and that
10 she was going to probably leave the job.
11 And they ended up giving her a higher
12 hourly wage.
13 Q    They gave her a higher hourly wage
14 --
15 A    Yes.
16 Q    -- when she threatened to leave the
17 job?
18 A    Yes.
19 Q    Did you ever threaten to leave the
20 job if you did not receive a higher hourly
21 wage?
22 A    No.
23 Q    Where did you keep these notes?

Page 169

1  A    Just in a spiral back tablet.
2  Q    Did you write them at work?
3  A    Either at work or at home that
4  night.
5  Q    Did you keep the tablet at work or
6  at home?
7  A    At home.
8  Q    Were there other things that you
9  wrote on that tablet besides notations
10 about work?
11 A    I don't recall. There probably were
12 other things.
13 Q    Do you still have that tablet?
14 A    I don't think so. I doubt it
15 seriously.
16       (Defendant's Exhibit No.
17       29 was marked for
18       identification).
19 Q    Let me show you what I have marked
20 as Defendant's Exhibit 29. Is that your
21 handwriting on this two-page document?
22 A    It is.
23 Q    Are these notes that you made in

Page 170

1  **1999?**
2  A    Yes.
3  **Q    And what did these notes pertain to?**
4  A    This was back when I was on the
5  transient team after I had been, quote,
6  demoted. They pertain to working --
7  Jonathan Villacamfa was an avid church
8  goer. And the job required weekend work.
9  He had worked out with one of his partners
10 that she would work his Sundays and he
11 would in turn take all of her Saturdays.
12     I believe she preferred Saturdays so
13 they worked that out between them. There
14 came an occasion where she couldn't work
15 for him on one Sunday and we were required
16 to pull lots to see who would take the
17 position to work or whatever.
18 **Q    Did you have a problem with that?**
19 A    I did.
20 **Q    Why?**
21 A    Because the requirement of the job
22 was that you worked weekends on a rotating
23 basis.

Page 171

1  **Q    Were these notes kept in the same**
2  **notepad?**
3  A    Yes.
4         (Defendant's Exhibit No.
5          30 was marked for
6          identification).
7  **Q    Let me show you what I have marked**
8  **as Defendant's Exhibit 30. Is that your**
9  **handwriting on that document?**
10 A    It is.
11 **Q    Are these more notes that you kept**
12 **in the same notepad?**
13 A    It is, yes.
14 **Q    What are these notes about?**
15 A    We were required to -- I guess at
16 the beginning of the year or shortly
17 thereafter we had to have requested
18 vacation dates in or for the most part.
19 And you are not generally held to those,
20 but it was sort of like securing some dates
21 off.
22     And you could do all of your time or
23 some of it. But it was just indicated that

Page 172

1  if you had it scheduled at a certain point
2  that they would schedule it for you or what
3  have you. Somewhere in the course of that
4  they had a policy that only one person
5  could be off, you know, on a given day.
6  And let me read it further, please.
7  I had requested a day, as I recall, and was
8  told that I could not take that day off
9  because someone else was off. And I
10 brought it to Kathryn Mount's attention in
11 another instance where two people were off
12 or scheduled off on the same day.
13 **Q    Do you know the circumstances**
14 **surrounding the incident when two people**
15 **were off on the same day?**
16 A    Just that Sherry Herring requested
17 to be off, and she had asked Thomas to swap
18 days with her, and he said he couldn't.
19 So, they were allowed to be off anyway on
20 the same day.
21 **Q    Did you submit this document to**
22 **anybody at The Montgomery Advertiser?**
23 A    Not at that time.

Page 173

1  **Q    Did you submit it at a later date?**
2  A    I did.
3  **Q    When did you submit it?**
4  A    Late '03.
5  **Q    To whom did you submit it?**
6  A    It was contained in information I
7  gave to Ron Davidson and Linda Browder.
8         (Defendant's Exhibit No.
9          31 was marked for
10         identification).
11 **Q    I'll show you what I have marked as**
12 **Defendant's 31. This appears to be a memo**
13 **to Kathryn Mount from you. Did you author**
14 **this memo?**
15 A    Did I do what? I'm sorry.
16 **Q    Author this memo.**
17 A    I did.
18 **Q    I apologize. Only the first two**
19 **pages are a memo. The second page or the**
20 **third page appears to be an e-mail. And**
21 **I'm not sure what the rest of that is. But**
22 **I'm going to get you to explain it to me in**
23 **a minute. The first two pages, that**

Page 174

1  consists of a memo --
2  A    Uh-huh.
3  Q    -- did you submit this to Kathryn
4  Mount directly?
5  A    I did.
6  Q    Was it in January 2002?
7  A    Or thereabouts, as far as I can
8  recall, yes.
9  Q    Do you know whether the documents
10 that are attached to this memo were
11 attached when you gave them to Kathryn
12 Mount?
13 A    Your question was were they sent at
14 the same time?
15 Q    Were those attachments actually
16 attached to this memo when you gave them to
17 Kathryn Mount?
18 A    I don't recall. I don't recall.
19 Q    Do you know whether you ever gave
20 these attachments to Kathryn Mount?
21 A    I did at some point.
22 Q    On the first page down at the bottom
23 there's a paragraph that's numbered one.

Page 175

1  And the very first line reads, "You are not
2  greatly liked nor respected."
3       Were you directing that sentence
4  toward Ms. Mount?
5  A    Yes.
6  Q    Did you consider this memo to be a
7  criticism of Ms. Mount's job performance?
8  A    I don't know if it was so much a
9  criticism or just a request for change
10 because it was just a gloomy work
11 environment.
12 Q    You were not Ms. Mount's supervisor,
13 correct?
14 A    Correct.
15 Q    How long had you felt that a change
16 needed to be made?
17 A    I can't recall right off.
18 Q    Did you dislike Ms. Mount at that
19 time?
20 A    I never disliked Ms. Mount. I
21 disliked the things that she did.
22 Q    Did you respect Ms. Mount?
23 A    Not very much, no.

Page 176

1  Q    Did you feel that Ms. Mount did not
2  like you?
3  A    It seemed that way sometimes.
4  Q    Did you feel that there were any
5  other employees that she did not like?
6  A    Probably over a period of time. I'm
7  not certain I can say at that time. I
8  don't know. I couldn't really answer
9  that. I don't really know.
10 Q    Had you observed any conduct by
11 Ms. Mount that you indicated that she
12 did not like one of your co-workers?
13 A    I can recall an incident with
14 Yolanda Franklin, who was a black female.
15 Q    What incident was that?
16 A    Yolanda and aforementioned Jonathan
17 Villacamfa went once on a weekend or an
18 overnight seminar or something. Sometimes
19 there were training programs. And those
20 two were selected to go. And there were
21 overtime hours spent because they were
22 required to drive. I believe it was to
23 Atlanta or somewhere.

Page 177

1       And when they returned from the trip
2  or the next day or when the pay period came
3  Yolanda inquired about overtime pay because
4  she was -- she worked above and beyond the
5  eight-hour workday. And she was not given
6  overtime pay and her counterpart, Jonathan
7  Villacamfa was.
8  Q    Did you inquire about that?
9  A    She shared that information with
10 me. And I asked her if she asked her why.
11 And she said Kathryn told her that he was
12 given paid overtime because he drove.
13 Q    But did you not have a conversation
14 with Kathryn about that?
15 A    No, I did not.
16 Q    This next packet, I'm not going to
17 mark it, but I want you to take a look at
18 it. This information was clipped together
19 like this when I received it from your
20 lawyer. And I'm not sure if it was clipped
21 together because it all went together or
22 not.
23      So, the first page appears to be a

Page 178

1  memo from you. And I'm wondering if the
2  pages that follow have were attached to the
3  memo when you submitted it?
4  A    Yes, they were.
5  Q    They were?
6  A    Among others.
7  Q    Then let me mark it for you real
8  quick. This will be Defendant's Exhibit
9  32. Did you submit this memo to Ron
10 Davidson and Linda Browder?
11            (Defendant's Exhibit No.
12            32 was marked for
13            identification).
14 A    I did.
15 Q    Do you recall when you submitted it
16 to them?
17 A    I would assume on the date that is
18 on the cover.
19 Q    And you told me earlier that Linda
20 Browder is the HR manager?
21 A    Yes.
22 Q    Was she the HR director the whole
23 time you were at The Montgomery Advertiser?

Page 179

1  A    No.
2  Q    When did she start, do you remember?
3  A    I believe in 2003.
4  Q    What prompted you to write this memo
5  to Mr. Davidson and Ms. Browder?
6  A    As was stated in the first
7  paragraph, because I just felt that my job
8  was in jeopardy, and I needed to make them
9  aware of many things that were happening
10 and had happened in the past to sort of
11 give them both some history.
12 Q    Were you requesting that they do
13 something?
14 A    Yes.
15 Q    What did you want them to do?
16 A    Be aware of and take -- to be aware
17 of and I was seeking, I guess, protection
18 from Kathryn Mount.
19 Q    The second page of this exhibit
20 looks like handwritten notes. Is that your
21 handwriting?
22 A    It is.
23 Q    Are these notes that you took on the

Page 180

1  same notepad that we discussed earlier?
2  A    Correct.
3  Q    This addresses Jonathan Villacamfa
4  again. Do you know Mr. Villacamfa's race?
5  A    I believe Hispanic.
6  Q    And you believed that he had a
7  January quota of $12,000 that was lowered
8  to $8,000, correct?
9  A    Yes.
10 Q    How did you come about that
11 information?
12 A    Because he said it. It was one of
13 those conversations that, you know, you
14 held on the floor or that people would
15 innocently say something not knowing that
16 they were divulging information that they
17 probably shouldn't be divulging.
18 Q    Did you have any conversations with
19 anyone above Jonathan in the management
20 hierarchy about Jonathan's quota?
21 A    No.
22 Q    Did you have any information from
23 anyone other than Jonathan that his quota

Page 181

1  was at any particular level?
2  A    No.
3  Q    And at the top of that page it says
4  January 20th. And I can't really tell if
5  it's 1998 or 1999. Do you know what that
6  says?
7  A    It's probably '99. I believe that's
8  when I was in that -- you know, in that
9  section of the paper, the transient
10 section.
11 Q    Did you complain about Jonathan
12 Villacamfa and his quota at that time?
13 A    I don't recall.
14 Q    The third page of that exhibit looks
15 like some writing on top of newspaper
16 print. Is that your handwriting?
17 A    It is.
18 Q    Can you tell me what it says? It's
19 kind of hard to read.
20 A    It's a copy of the ad that Thomas
21 Taylor was running in the retail section of
22 the paper that we discussed earlier.
23 Q    Okay. And the next page of that

Page 182

1  exhibit has a header of "Salesperson of the
2  Year Points." Did you draft this document?
3  A    I did.
4  Q    How did you obtain these numbers?
5  A    From the salesperson of the month
6  awards that were posted in the department.
7  They are rarely on time, but eventually
8  they are posted.
9  Q    Did you make monthly notes?
10  A    Well, I got a copy. We could take
11  it down and copy it or just write them
12  down. But I believe I made copies of them.
13  Q    And this reference, Joe Howard,
14  correct?
15  A    Yes.
16  Q    The last page of this exhibit says,
17  "Salesperson Sales Activity Report." What
18  is this?
19  A    That was to show -- I believe I
20  indicated to you earlier that I had run an
21  ad previously for Alabama Orthopedic and
22  Retail. And that was in '01. And this is
23  to show where that ad had, in fact, run in

Page 184

1  wanted to share with them. So, that would
2  probably -- the September 14th date would
3  have been the date of submission, not this
4  date as I see now.
5  Q    Okay. So you began drafting it on
6  August 1st 2003?
7  A    Yes.
8  Q    But you submitted it to Mr. Davidson
9  and Ms. Browder on September 14th 2003?
10  A    Correct.
11  Q    What was the purpose of submitting
12  this information to Mr. Davidson and
13  Ms. Browder at that time?
14  A    I had had a series of write-ups that
15  I felt were totally undeserved. And as I
16  said, to seek protection or to make them
17  just aware.
18  Q    I don't know what page of the packet
19  this is on. But if you could flip through,
20  there's a page of handwritten notes marked
21  September 3rd 1999.
22  A    I see one. Referring to Laura
23  Hicks?

Page 183

1  the paper.
2  Q    Okay. This packet of information is
3  marked as Defendant's Exhibit 33. It was
4  produced to me this way all together. So
5  I'm assuming that you submitted it all
6  together. But I want you to make sure for
7  me.
8            (Defendant's Exhibit No.
9            33 was marked for
10           Identification).
11  A    This was part of this document
12  (indicating), this information to Ron
13  Davidson and Linda Browder.
14  Q    Part of the August 1, 2003 memo that
15  was marked ads Defendant's Exhibit 32?
16  A    Yes.
17  Q    The front page of Defendant's
18  Exhibit 33 --
19  A    Well, now here is -- let's see.
20  September, August, September -- what
21  happened was I think I started this
22  document then and worked on it probably
23  several weeks amassing information that I

Page 185

1  Q    Yes.
2  A    Uh-huh.
3  Q    Okay. Are these more notes that you
4  kept in that same notepad?
5  A    All of these that are handwritten
6  came from that notepad.
7  Q    Okay. Who is Laura Hicks?
8  A    She was a former co-worker.
9  Q    In what department?
10  A    In classifieds.
11  Q    Was she a transient sales rep or a
12  contract sales rep?
13  A    I think Laura was a contract rep.
14  Q    In your notes, it indicates that
15  Kathryn had adjusted Laura's goal. How did
16  you come about that information?
17  A    Laura gave the information.
18  Q    What is Laura's race?
19  A    White female.
20  Q    Did you hear this information from
21  Kathryn at any time?
22  A    No.
23  Q    Did you hear this information from

Page 186

1  anyone, other than Laura?
2  A    No.
3  Q    Did you ever see any documentation
4  indicating that Laura's goal had been
5  changed?
6  A    No.  But she said that in front of
7  several people who were on the floor, but I
8  did not know.
9  Q    Do you know if there were any
10  special circumstances that warranted a goal
11  change for Laura?
12  A    To my knowledge, there were none.
13  Q    Did you complain about this goal
14  change in 1999?
15  A    Not that I can recall.
16  Q    The next page is more handwritten
17  notes.  And it's --
18  A    I believe that's the same sheet that
19  we had.
20  Q    Actually, that's the one we just
21  went over.  Okay.
22  A little bit further, four pages
23  after that, there's a typewritten page with

Page 187

1  a header of "Regarding the Performance
2  Notice of 7/11/2003."  Do you see where I
3  am?
4  A    Uh-huh.
5  Q    And this is about the exchange that
6  you had had with Shalawn that we had
7  discussed earlier?
8  A    Correct.
9  Q    In the first paragraph almost at the
10  end you say, "We, in the black community,
11  often chide each other this way and call it
12  keeping each other in check."
13  A    Uh-huh, yes.
14  Q    Is that what you wrote?
15  A    Yes.
16  Q    Were you arguing that your behavior
17  was permissible because you and Ms.
18  Williams were black?
19  A    No.  I'm -- there was no behavior.
20  That was -- I mean, so I'm not alluding to
21  the fact that there was any unacceptable
22  behavior.
23  Q    That your comment was acceptable

Page 188

1  because you and Ms. Williams were black.
2  A    No.  Well, wait just a minute.  Let
3  me look at this again now.  Rephrase -- I
4  mean, ask your question again so I can make
5  sure I understand it again.
6  Q    Were you trying to state that your
7  exchange with Ms. Williams was okay because
8  you and Ms. Williams are black?
9  A    I'm reading the sentence prior.  It
10  was to say that whereas Jennifer, I guess,
11  had thought it was an issue, that with
12  us it was -- we didn't think of it as an
13  issue, probably thought no more about it.
14  In other words, where she might have
15  said, you go somewhere and sit down, and I
16  said stop being so selfish.  I'm really not
17  sure if I know how to answer that question.
18  Q    I'm really asking why did you feel
19  it necessary to include in this account
20  that you and the black community often
21  chide each other as a way of keeping each
22  other in check?
23  A    Maybe I meant it in the vein that I

Page 189

1  might feel -- where Shalawn and I might
2  react to this one way, and perhaps it might
3  have been different with someone else.  I
4  don't even know that it would be someone
5  white, but maybe somebody that I didn't
6  have that kind of rapport with of years
7  working together.
8  But it's a thing -- I guess where I
9  might have felt more comfortable saying
10  whatever -- well, I don't know any other
11  way to answer that.  I'm sorry.
12  Q    Two pages later there's a paragraph
13  that begins on the issue of the write-up of
14  February of 2003.  Do you see where I am?
15  A    I do.
16  Q    About five lines down you say,
17  "Kathryn was abusing her authority.  At
18  that time, most of the instances of
19  questionable behavior came along racial
20  lines.  I very pointedly told her of
21  several instances where it was the
22  perception that people were being treated
23  differently and I didn't feel that was

Page 190

```
 1  fair."
 2      Did you specifically tell Ms. Mount
 3  that you felt that people were being
 4  treated differently because of their race?
 5  A    Yes.
 6  Q    When did you tell her that?
 7  A    And now that I can recall, that was
 8  back when we had that -- well, that's that
 9  write-up where we went through the bulleted
10  items if you recall. I don't know. But
11  this was -- that was referencing the
12  conversation we had prior to that.
13  Q    How was it that people were being
14  treated differently because of their race?
15  A    Because goals were one of the issues
16  that were not done across the board.
17  Whites seemed to receive more consideration
18  or some consideration if there were
19  problems or differences.
20  Q    Anything other than goals? Let me
21  back up.
22      Did you specifically address goals
23  being a racial issue with Ms. Mount?
```

Page 191

```
 1  A    Goals? I don't directly remember
 2  all that we discussed. But I do recall
 3  that there was an issue of race or the
 4  perception was or there were some incidents
 5  that were just clearly black and white.
 6  Q    What incidents other than goals?
 7  A    I can't recall right off.
 8  Q    About five pages later there's a
 9  short paragraph on a page by itself that
10  says "E-mail to Kathryn regarding
11  salesperson of the month award." Do you
12  see where I am?
13  A    Uh-huh, yes. I'm sorry.
14  Q    You note that Cornelius had won the
15  salesman of the month award five or six
16  times in a row.
17  A    Yes.
18  Q    Cornelius is black, correct?
19  A    Yes.
20  Q    And you mentioned that the same
21  thing had happened with Joe the year
22  before, right?
23  A    Yes.
```

Page 192

```
 1  Q    And Joe is black, right?
 2  A    Correct.
 3  Q    So, were Cornelius and Joe being
 4  treated differently on behalf of their
 5  race?
 6      MR. AUSTIN: Object to the form.
 7  A    Their gender probably. Excuse me?
 8      MR. AUSTIN: I just objected.
 9  Q    Were Cornelius and Joe being treated
10  differently on the basis of their race?
11      MR. AUSTIN: Object to the form. It
12  calls for a legal conclusion.
13  A    I can answer?
14      MR. AUSTIN: You can answer.
15  A    No, because of their gender.
16  Q    And who did you feel was treating
17  them differently because of their gender?
18  A    Kathryn Mount and in some instances
19  Jennifer Jensen.
20  Q    And Kathryn and Jennifer are both
21  female, correct?
22  A    Yes.
23      (Defendant's Exhibit
```

Page 193

```
 1          No. 34 was marked
 2          for identification).
 3  Q    I marked this packet of documents as
 4  Defendant's Exhibit 34. Again, this packet
 5  was produced to me this way as a packet so
 6  that's how I'm introducing it to you. If
 7  you could flip through those documents
 8  quickly and let me know if you recognize
 9  the documents that are in that packet?
10  A    What was the question again?
11  Q    Do you recognize the documents in
12  this packet?
13  A    Yes.
14  Q    Does this packet contain e-mails
15  that you either sent or received at The
16  Montgomery Advertiser?
17  A    Yes.
18  Q    Is Patcamp@bellsouth.net your e-mail
19  at your home address?
20  A    At one time, yes.
21  Q    Why did you begin forwarding your
22  e-mails to your home e-mail address while
23  you were still employed at The Montgomery
```

Page 194

1 Advertiser?
2 A    Why did I?
3 Q    Yes.
4 A    Because I felt it was relevant
5 information.
6 Q    Relevant information to what?
7 A    Just information that I wanted to
8 keep.
9 Q    Why did you want to keep it?
10 A    Because I thought there were things
11 that were noteworthy, behaviors that I felt
12 were unwarranted and not correct.
13 Q    What did you plan to do with them?
14 A    I had no plans at the time.
15 Q    You just felt that you would keep
16 them?
17 A    Absolutely, yeah.
18 Q    Look at pages 4 and 5 of this
19 packet.
20 A    (Witness complies.)
21 Q    And I actually think those two pages
22 are reversed. I think 5 is supposed to be
23 first and then 4. Is this a string of

Page 195

1 e-mails that you participated in when you
2 were at The Montgomery Advertiser about
3 your anger management classes?
4 A    Yes.
5 Q    Now, the first e-mail in the string
6 which I think is the last thing on the page
7 that starts, "Two things please."
8 A    Uh-huh.
9 Q    Is that the e-mail that you first
10 sent about the anger management classes?
11 A    Is it the first one?
12 Q    Yes. Let me rephrase that.
13    Did you send any other e-mails prior
14 to this one about anger management classes?
15 A    I don't know, but I don't believe
16 so.
17 Q    Okay. Those anger management
18 classes were part of the performance
19 improvement plan that you received,
20 correct?
21 A    Yes.
22 Q    In this e-mail, were you objecting
23 to going to the anger management classes?

Page 196

1 A    Yes.
2 Q    Why did you forward this particular
3 e-mail to your home account?
4 A    Probably the same answer I gave a
5 moment ago.
6 Q    Just because you wanted to keep it?
7 A    Felt it might be relevant at some
8 point.
9 Q    Felt it might be relevant to what?
10 A    I felt a need to keep them.
11 Q    For no particular reason?
12 A    Not at that point in time.
13    (Defendant's Exhibit No.
14    35 was marked for
15    identification).
16 Q    I'm marking this as Defendant's
17 Exhibit 35. The first page appears to be
18 an e-mail from you to Joe Howard. Do you
19 recall sending that e-mail?
20 A    Just a moment. Did I send this?
21 Yes.
22 Q    Did you and Mr. Howard get along?
23 A    We got along fairly well.

Page 197

1 Q    If you can, flip to page 3 of that
2 exhibit.
3 A    (Witness complies.)
4 Q    At the very bottom of the page it
5 looks like an e-mail from you to Mr.
6 Howard. Do you recall sending that e-mail?
7 A    Yes.
8 Q    And in line 2 you say, "We cannot
9 get along," correct?
10 A    Yeah.
11 Q    So, you did not get along with Mr.
12 Howard?
13 A    We got along okay sometimes. We did
14 not get along when Mr. Howard was trying to
15 steal my customers, which he did frequently
16 at one time or another. He was about
17 trying to get money any way that he
18 possibly could.
19    So therein I didn't have anything
20 personal against him, but he often sought
21 measures that were untoward to achieve the
22 same ends that most of us were going --
23 trying to go about the right way.

Page 198

1  Q    Do you feel that Mr. Howard received
2  preferential treatment?
3  A    Yes.
4  Q    Do you believe that preferential
5  treatment was on the basis of his gender?
6        MR. AUSTIN:  Object to the form,
7  calls for a legal conclusion.  You can
8  answer.
9  A    Was it because of his gender?
10 Either that or just --
11 Q    I'll rephrase it.  Do you know why
12 Mr. Howard was receiving preferential
13 treatment?
14       MR. AUSTIN:  Object to the form.
15 A    Do I know why?  That's not really a
16 question I could answer.
17 Q    Do you have an opinion as to why
18 Mr. Howard was receiving preferential
19 treatment?
20       MR. AUSTIN:  Object to the form
21 again.  You can answer.
22 A    They seemed to like him a lot.
23 Q    Who liked him a lot?

Page 199

1  A    Kathryn and Jennifer too sometimes
2  seemed -- he was allowed, I guess -- well,
3  it seems he was allowed more leeway than
4  others of us on most things.
5  Q    Can you give me some examples of
6  where he was allowed more leeway than you
7  were?
8  A    Well, I gave one earlier.  Whenever
9  he made missteps, it appeared that he was
10 not personally held responsible for them.
11 You know, I can remember two occasions
12 where we were called in to group meetings
13 to sign another form or something where Joe
14 had been out of step.  And rather than to
15 discipline him, we had meetings or what
16 have you and more forms to sign.
17 Q    I think we talked about one of those
18 earlier.  The phone guidelines; is that
19 right?
20 A    Uh-huh.
21 Q    What was the other one?
22 A    It had to do with a customer calling
23 me and Joe told the customer that a certain

Page 200

1  person -- I don't remember the specifics,
2  but it had to do with something he had been
3  untruthful about saying that a certain
4  person didn't work there anymore, and that
5  he would handle the account instead.
6        And as I recall, we had a meeting
7  after that about the virtues of this, that
8  and the other and it all stemmed from Joe's
9  behavior.
10 Q    Did you consider Mr. Howard to be
11 the golden child, so to speak, of the
12 contract sales reps?
13 A    Not in my estimation.
14 Q    That he was treated that way?
15 A    I felt that he got preferential
16 treatment.  That's as far as I can go on
17 that.
18 Q    Did anybody else in the inside sales
19 team talk to you about feeling that Joe got
20 preferential treatment?
21 A    I think it was pretty much common
22 knowledge that he was considered special.
23 Q    Was it common knowledge among

Page 201

1  everyone on the team or did you have
2  specific conversations with anyone?
3  A    There were always comments made by
4  pretty much everybody on the team that --
5  in other words, he pretty much got things
6  his way or they allowed him to do whatever.
7  Q    Do you know if Mr. Howard had ever
8  complained of discrimination or harassment
9  of any kind?
10 A    I have no idea.
11       (Defendant's Exhibit
12       No. 36 was marked
13       for identification.)
14 Q    Look at this document.  It's
15 Defendant's Exhibit 36.  Is this an e-mail
16 that you sent to your home e-mail account?
17 A    Correct.
18 Q    And it is about Pam Portis?
19 A    Correct.
20 Q    Did Ms. Portis work with you in the
21 inside sales department or on the inside
22 sales team?
23 A    She worked in the -- Pam was the



Page 202

1  legals clerk for a time. At this juncture
2  anyway.
3  Q    Why did you feel the need to send
4  this to your home account?
5  A    Because I wanted to date that
6  information. I wanted to date it or
7  whatever. And that was an occurrence that
8  day and I wanted to note it.
9  Q    This says that Pam had told you that
10 she had talked to Jennifer. It addresses
11 ads set to crossover this weekend.
12 A    Uh-huh.
13 Q    Is that splitting ads?
14 A    Uh-huh.
15 Q    Is that a "yes"?
16 A    Yes. I'm sorry. I forget that,
17 yes.
18 Q    And Jennifer was telling Pam that
19 she needed to fix the crossover?
20 A    Yes.
21 Q    And she needed to split them?
22 A    Yes.
23 Q    Do you know whether Jennifer ever

Page 203

1  wrote Pam up for failing to split ads cross
2  billing periods?
3  A    Not to my knowledge. I know -- I'm
4  sure she wouldn't have that time because
5  she -- apparently had looked in the system
6  and advised her that she had some set to
7  crossover and to fix them.
8  Q    Do you know how many crossovers Pam
9  had?
10 A    No.
11        (Defendant's Exhibit No.
12         37 was marked for
13         identification).
14 Q    I've marked this as Defendant's
15 Exhibit 37 which appears to be an e-mail
16 exchange between you and Jennifer Jensen.
17 Do you remember this exchange?
18 A    I vaguely remember this, yes.
19 Q    Is the handwriting at the bottom of
20 that page yours?
21 A    Yes.
22 Q    And you were indicating that Jean
23 had requested some time off. Who is Jean?

Page 204

1  A    Former co-worker, now deceased.
2  Q    What is her last name?
3  A    Robinson-Smith.
4  Q    Is that the same person you referred
5  to earlier as Margie?
6  A    Yes.
7  Q    Did she go by both names?
8  A    Margie Jean Robinson-Smith. All
9  four of them. A lot of names.
10 Q    Why do you believe that Margie Jean
11 was given this time off and you were not?
12 A    Very clearly there seemed to in most
13 instances be a separate set of rules for
14 me, for Pat.
15 Q    I'll mark this document as
16 Defendant's Exhibit 38. Do you recognize
17 this performance notice?
18        (Defendant's Exhibit No.
19         38 was marked for
20         identification).
21 A    Yes, I recognize it.
22 Q    Is this your termination form?
23 A    Yes.

Page 205

1  Q    Did someone go over this document
2  with you?
3  A    Jennifer Jensen gave a quick read
4  over it, along with Ron Davidson.
5  Q    Was there anyone else present in
6  that meeting?
7  A    No.
8  Q    When did that meeting take place?
9  A    September 27th.
10 Q    Do you recall what time of day it
11 was?
12 A    Afternoon.
13 Q    And your termination came at the end
14 of your performance improvement plan,
15 correct?
16 A    Yeah, yeah. I guess it was the
17 end. I'm not certain. Because, as I
18 indicated, we only met for two weeks of the
19 eight, so I wasn't sure what was going on
20 anymore.
21 Q    Do you know who made the decision to
22 terminate your employment?
23 A    No, I don't.

Page 206

1  Q      Did anyone ever tell you a reason
2  for your discharge, other than what is on
3  this form?
4  A      Jennifer read this, so I asked her
5  about whatever. And she just said a lot of
6  things. And I can recall on that last day
7  that she said that I would be getting some
8  information in the mail. And I never did.
9  So I thought there was something, you know,
10 more than this, but I never got anything.
11 Q      So, no one ever told you a reason
12 for your termination, other than what's on
13 this document?
14 A      No.
15             (Defendant's Exhibit No.
16             39 was marked for
17             identification).
18 Q      This is Defendant's Exhibit 39. Is
19 this the complaint that you mentioned you
20 reviewed in preparation for your
21 deposition?
22 A      Yes.
23 Q      Did you review this document before

Page 207

1  it was filed with the Court?
2  A      No.
3  Q      Are the facts contained in this
4  document correct to the best of your
5  knowledge?
6  A      There are a couple of errors.
7  Q      Okay. Where are those errors?
8  A      Number 14, page 4.
9  Q      Yes.
10 A      That should have read "16 of 20
11 months," not "16 in a row."
12 Q      Okay. Anything else?
13        MR. AUSTIN: I can help you out here
14 if you want.
15        MS. PALMER: Okay.
16        MR. AUSTIN: Paragraph 18, the first
17 sentence.
18        THE WITNESS: Which page are we on?
19        MR. AUSTIN: That would be page 5,
20 salesperson of the year.
21 A      Oh, yes. That would have been --
22 that reference would be for determining
23 monthly sales goals, not salesperson of the

Page 208

1  year.
2  Q      Okay.
3        MR. AUSTIN: Paragraph 24, the
4  second sentence.
5  A      I believe it was stated -- third
6  sentence. "At this time, all classified
7  sales persons had already turned in their
8  numbers for the month." That was not
9  correct. It was, I believe a day or two
10 prior to the month ending.
11 Q      Okay.
12 A      And the -- hold on. And I'm sorry,
13 it was not "to increase sales by eight
14 percent." It was to decrease our sales
15 goals by 8 percent. Adjust downward in
16 other words. They were decreased or
17 changed at the end of the reporting period.
18 Q      Just so I'm clear on this one.
19 Should paragraph 24 read, "On one occasion,
20 Kathryn Mount told employees, including
21 Ms. Campbell, that they had to decrease
22 sales goals by 8 percent because there are
23 two months out of the year that Gannett has

Page 209

1  to make its numbers"?
2  A      Yes.
3  Q      "At this time, it was one to two
4  days prior to month's end"?
5  A      Month's end, uh-huh.
6  Q      Okay. Are there any other
7  corrections that need to be made?
8  A      Not that I can see at this point.
9        MR. AUSTIN: One more. Paragraph
10 26.
11        THE WITNESS: Page 6?
12        MR. AUSTIN: No, paragraph 26.
13 A      Right -- oh. The last sentence
14 saying words to the effect -- on 26, saying
15 words to the effect that "they look like
16 slaves bending over picking cotton." That
17 was not a comment that I made to Ms.
18 Browder, but that was a thought I had had
19 about the scene that I took in.
20 Q      Did you make that comment to anyone
21 at The Montgomery Advertiser?
22 A      I probably made it a couple of my
23 co-workers because I was, you know, a

Page 210

1  little upset by it.
2  Q    Did you make that comment to anyone
3  in management at The Montgomery Advertiser?
4  A    To Linda Browder, HR director.
5  Q    Okay. Let's clarify here. That
6  last phrase or the last -- after the comma
7  in paragraph 26, "that they looked like
8  slaves bending over picking cotton," you
9  are correcting yourself saying you did not
10 actually say that to Linda --
11 A    To Linda Browder.
12 Q    Did you actually say those words to
13 anyone at The Montgomery Advertiser?
14 A    I'm sure I did to a couple of my
15 co-workers.
16 Q    Did you say "they looked like slaves
17 bending over picking cotton" to anyone in
18 management at The Montgomery Advertiser?
19 A    No.
20 Q    Were there any other corrections
21 that you need to make to the complaint?
22      MR. AUSTIN: I apologize. That is
23 lawyer drafting right there.

Page 211

1       MS. PALMER: We're human. Though
2  some people might not think so.
3       MR. AUSTIN: Do you mean super human
4  or subhuman?
5  Q    (By Ms. Palmer) Other than the fact
6  that you are an African American and you
7  were terminated, what makes you think that
8  your termination from The Montgomery
9  Advertiser was on the basis of your race?
10      MR. AUSTIN: Object to the form on
11 multiple grounds. One of which calls for a
12 legal conclusion, but you can answer and to
13 the extent that that has already been
14 testified to.
15 A    Question again, please?
16 Q    What makes you think that your
17 termination from The Montgomery Advertiser
18 had to do with your race?
19      MR. AUSTIN: Same objection. You
20 can answer.
21 A    Because I think it had do with the
22 fact that -- well, this goes -- I think it
23 was perceived by Kathryn Mount and others.

Page 212

1  Q    What others?
2  A    Probably Ron Davidson and Linda
3  Browder. As indicated in some of my
4  writings, the culture there was -- racism
5  was subtle, but it was very prevalent. And
6  I felt often that they felt -- and this may
7  be. This is the only way I know how to say
8  this, so I'll just say it that way.
9       But I felt as if they felt that --
10 there's a term I guess you might call I was
11 an uppity black. Which meant to me that I
12 had respect for myself and the way that I
13 wanted to be treated or should have been
14 treated on the job.
15 Q    Had anyone said anything to you to
16 indicate or to make you feel that they felt
17 you were a quote uppity black?
18 A    Their actions showed that.
19 Q    What specific actions?
20      MR. AUSTIN: I'll object to the form
21 to the extent that it's already been
22 testified to. You can answer.
23 A    There were numerous.

Page 213

1  Q    Can you name them for me, please?
2       MR. AUSTIN: Same objection.
3  A    The -- when I made -- brought things
4  to their attention or when I complained
5  about what I deemed unfair treatment, it
6  generally was not received well. And
7  often, depending on what the complaint was
8  and to whom it was against, eventually
9  there would be retribution in some form or
10 another.
11 Q    How did you know that those actions
12 were retribution?
13 A    Because basically that was how
14 Kathryn Mount did things. You knew if she
15 didn't get you then, she would get you
16 later. But you knew that she would get
17 you.
18 Q    Did she say anything to you to the
19 effect of she would get you?
20 A    She didn't have to. Her actions
21 said so.
22 Q    Are there any incidents that we have
23 not previously covered today that

Page 214

1  contribute to your belief that your
2  termination was related to your race?
3  A    I'm sure there are other things.  I
4  can't recall all of them at this moment.
5  Q    Can you recall any of them at this
6  moment?
7  A    We've mentioned -- I've mentioned
8  some.  It comes to basically I got the
9  impression that I offended them or I got
10  out of what they might have perceived as
11  my, quote, place.  That's the best way I
12  know how to answer that.
13  Q    So, other than what we have already
14  discussed today, you cannot recall any
15  other incidents that led to your opinion
16  that you were terminated because of your
17  race?
18  A    Not at this moment.
19  Q    Did you ever complain to anyone that
20  you felt that you personally had been
21  treated differently on the basis of your
22  race?
23      MR. AUSTIN:  Object to the form to

Page 215

1  the extent that it's already been testified
2  to.  You can answer.
3  A    I complained to -- was that the
4  question, did I complain to someone?
5  Q    Yes.
6  A    To Terry Sullivan as well as to Ron
7  Davidson.
8  Q    When did you complain to Terry
9  Sullivan?
10      MR. AUSTIN:  Same objection.  You
11  can answer.
12  A    I'm trying to think when he was is
13  there.  Probably in '02.  I'm not certain
14  when Ron Davidson came, so there's kind of
15  a fog there.  But just during -- when he
16  was the advertising director prior to Ron
17  Davidson.
18  Q    Other than the written documentation
19  that you submitted to Mr. Davidson, did you
20  ever tell him that you felt that you had
21  been treated differently on the basis of
22  your race?
23  A    We had several talks in his office.

Page 216

1  So, I'm sure that may have come up at some
2  point.
3  Q    Do you have a specific recollection
4  of telling Mr. Davidson verbally that you
5  felt you had been treated differently on
6  the basis of your race?
7  A    Not a distinct recollection, no.
8  Q    Did you complain to Mr. Sullivan on
9  more than one occasion?
10  A    Probably.
11  Q    Do you have a specific recollection
12  of complaining to Mr. Sullivan on more than
13  one occasion?
14  A    Well, I know that I sent him written
15  information, and we later met to discuss
16  that information.
17  Q    During your employment with The
18  Montgomery Advertiser, did anyone ever tell
19  you that you should not be working there
20  because of your race?
21      MR. AUSTIN:  Object to the form.
22  You can answer.
23  A    No.

Page 217

1  Q    Did anyone ever make derogatory
2  comments about your race at The Montgomery
3  Advertiser?
4      MR. AUSTIN:  Object to the form.
5  You can answer.
6  A    No.
7  Q    Did anyone ever make any comments
8  that you consider to be inappropriate about
9  your race?
10  A    Yeah.  Back to the incident of
11  pulling the blades, pulling the grass up or
12  the weeds or whatever -- ask that question
13  once again.  I want to make sure I'm
14  answering this properly.
15  Q    During your employment with The
16  Montgomery Advertiser, did anyone ever make
17  any comments about your race that you felt
18  were inappropriate?
19  A    I'll tell you what I'm viewing that
20  as, and you can decide if it qualifies or
21  not.  But on the occasion where they were
22  pulling the weeds from the grass, it had
23  rained earlier that morning and I was

Page 218

1  speaking with one of the maintenance guys
2  who had been directed to, quote, oversee
3  the pulling of weeds by the mail room
4  staff.
5        And he indicated that his boss had
6  told him to get some large garbage bags and
7  cut a hole out for the head and the arms
8  and the people were to wear the bags if it
9  was still raining. And to me, that was
10 insulting. Personally.
11 Q    Did you feel that that had something
12 to do with the race of the individuals who
13 might be wearing those bags?
14 A    Yes.
15 Q    What made you think that?
16 A    The whole scene. It was just kind
17 of degrading to me and insulting to me,
18 though I was not a part of it.
19 Q    Did you ever hear anyone at The
20 Montgomery Advertiser make a joke about
21 someone of your race?
22 A    No.
23 Q    Other than the issues we have

Page 219

1  already discussed today, are there any
2  other reasons why you think your
3  termination may have been influenced by
4  your gender?
5        MR. AUSTIN: Object to the form.
6  You can answer.
7  A    Other than things we've already
8  discussed?
9  Q    Correct.
10 A    Nothing else comes to mind right
11 away.
12 Q    Did you ever complain to anyone at
13 The Montgomery Advertiser that you felt you
14 had been treated differently because of
15 your gender?
16        MR. AUSTIN: Object to form. You
17 can answer.
18 A    I would assume to -- basically to
19 Ron Davidson and Linda Browder.
20 Q    You said you would assume?
21 A    Well, that's bad wording. But I
22 mean, in the writings that I sent to them,
23 there were probably references to same as I

Page 220

1  recall.
2  Q    Do you recall whether you made
3  specific reference to differential
4  treatment on the basis of gender?
5  A    I don't recall right off.
6  Q    Other than those written submissions
7  to Mr. Davidson and Ms. Browder, did you
8  make any complaints to anyone at The
9  Montgomery Advertiser that you felt you
10 were being treated differently on the basis
11 of your gender?
12        MR. AUSTIN: Object to the form.
13 You can answer.
14 A    No, not that I recall.
15 Q    During your employment with The
16 Montgomery Advertiser, did anyone ever tell
17 you that you should not be working there
18 because of your gender?
19        MR. AUSTIN: Object to the form.
20 You can answer.
21 A    No.
22 Q    Did you ever hear anyone making
23 remarks about your gender that you

Page 221

1  considered to be inappropriate?
2  A    No.
3  Q    Did you ever hear anyone at The
4  Montgomery Advertiser tell a joke about
5  members of your gender?
6  A    No.
7  Q    Other than the things that we have
8  discussed today, can you name any other
9  specific instances that made you think that
10 your termination from The Montgomery
11 Advertiser was in retaliation for a
12 complaint that you had made?
13        MR. AUSTIN: Object to the form.
14 You can answer.
15 A    One more time, please. I'm sorry.
16 Q    Other than the things that we have
17 covered here today --
18 A    Uh-huh.
19 Q    -- do you recall any specific
20 instances that led you to believe that your
21 termination may have been in retaliation
22 for a complaint that you had made?
23 A    Yes.

Page 222

1  **Q    What are those things?**
2  A    There came a time in -- it was in
3  '04 when they -- they were restructuring
4  the department, as well as coming up with a
5  new commission bonus plan. And our group
6  in toto came together, not at my
7  suggestion, but there were concerns all
8  around about the new commission plan.
9      We all had comments that we combined
10  in one letter to management to include
11  Jennifer Jensen, Kathryn Mount, Ron
12  Davidson, and I believe, Scott Brown,
13  though I don't recollect right off.  I
14  believe Scott Brown, the publisher, as
15  well.
16      And they were basically concerns
17  about the new pay program and how it seemed
18  at a glance that we would all be negatively
19  impacted by it.  And as had been on
20  occasions in the past my lot to either
21  question things, either for myself or to,
22  you know, just the group, just to question
23  things that I was not sure of or needed

Page 223

1  further clarification on.  When those
2  letters were submitted to them on -- I
3  don't know the date.  But Jennifer and
4  Kathryn met directly thereafter.  And, I
5  believe it was in Kathryn's office.  And
6  they talked for a while.  And shortly
7  thereafter they went down to Ron Davidson's
8  office.
9      During the time that they were gone,
10  I had printed information from my computer,
11  you know, just printed whatever to the
12  printer and I went to collect that
13  information.  And there I found about seven
14  copies of one of these write-ups for ad
15  crossing that was just printed out as they
16  met in there that day, which absolutely had
17  nothing to do with our request for or to
18  discuss the new bonus package or whatever.
19      And I had to draw the conclusion
20  from that that, you know, we're going to
21  get her once and for all.  Because that had
22  nothing to do with that.  But immediately
23  after their meeting, they had printed out

Page 224

1  these copies of one of these write-ups and
2  inadvertently left them on the printer.
3      And I, in turn, had printed
4  something from my computer and just
5  happened to find them.  And I merely took
6  them off and laid them face down on the
7  printer and took them off and forget them.
8  So, yes, it led me to believe that they
9  thought I had been the initiator of the
10  mutiny when I had not.
11  **Q    Do you know who had printed out**
12  **those performance notices about ad**
13  **splitting?**
14  A    Jennifer or Kathryn because it came
15  while they were in that office directly
16  after we sent those communicates to them.
17  And they then went to Ron Davidson's
18  office, I believe, for a meeting.  I'm not
19  sure if it was that same time or the next
20  day, but it was right in there.  And I just
21  happened to find those reports on there
22  right after that.
23      So it made -- you know, that was the

Page 225

1  first thing I thought about, yes.
2  **Q    And those reports were already on**
3  **the printer when you got to the printer,**
4  **correct?**
5  A    Yes.  Well, they had been printed
6  and left or forgotten.
7  **Q    Do you know when they had been**
8  **printed?**
9  A    Well, they had been printed that
10  same day because they hadn't been on there
11  prior to that.  We use the printer, you
12  know, all the time.  So, they were printed
13  out directly after that.
14  **Q    Are there any other instances, other**
15  **than the ones we've talked about today,**
16  **that led you to believe that your**
17  **termination was in retaliation for the**
18  **complaint you had made?**
19      MR. AUSTIN:  Object to the form.
20  You can answer.
21      THE WITNESS:  Every time you say
22  that -- I'm sorry, but I forget the
23  question.

Page 226

1    MR. AUSTIN: Go ahead. She'll
2 repeat the question and I'll say it again.
3    A    Once more now.
4    Q    Other than the things that we have
5 talked about today, are there any other
6 instances that led you to believe or that
7 contributed to your belief that you were
8 terminated on the basis or in retaliation
9 for a complaint that you had made?
10    MR. AUSTIN: Object to the form, and
11 you can answer.
12    A    Okay. There were numerous ones
13 along the way.
14    Q    Have we discussed all of them today
15 already?
16    A    There was one during Terry
17 Sullivan's tenure where I had not been
18 given a raise for something like eight or
19 nine months past the due date. And when I
20 brought it to his attention, he instructed
21 Kathryn Mount to give me an evaluation.
22 And he, in turn, paid me for the raise I
23 should have had for those nine months in a

Page 227

1 lump sum.
2    Q    Any other instances?
3    MR. AUSTIN: Same objection.
4    A    One moment. There are others. I
5 can't think of them all at this moment.
6    Q    Do you believe that The Montgomery
7 Advertiser retaliated against you on the
8 basis of one particular complaint?
9    MR. AUSTIN: Object to the form,
10 calls for a legal conclusion.
11    A    No.
12    Q    Do you believe that they retaliated
13 against you on the basis of all of your
14 complaints as a whole?
15    MR. AUSTIN: Same objection.
16    A    Accumulatively probably, yes.
17    Q    Do you know whether The Montgomery
18 Advertiser investigated the complaints that
19 you made?
20    A    I have no idea.
21    (BREAK TAKEN).
22    (Defendant's Exhibit No.
23    40 was marked for

Page 228

1    identification).
2    Q    I marked this as Exhibit 40. This
3 is a two-page exhibit. And after you look
4 over it, I would like to know if you have
5 seen these pages before.
6    A    I have, yes.
7    Q    Is the second page the charge of
8 discrimination that you filed with the
9 EEOC?
10    A    Yes.
11    Q    Is that your signature at the bottom
12 of the page?
13    A    Yes.
14    Q    And it's dated December 14th 2004.
15 Does that sound correct to you?
16    A    Yes.
17    Q    Why did you choose to file this
18 charge with the EEOC at that time?
19    A    Actually, when I was denied
20 unemployment and the hearing officer -- I
21 had some concerns that were not allowed
22 into that forum. And the hearing
23 officer -- a couple of things that I

Page 229

1 brought up she suggested or said that I,
2 you know, may consider filing with the EEOC
3 because that was not the proper forum for
4 my concerns.
5    Q    So, you waited until after the
6 unemployment compensation hearing had taken
7 place until you filed your EEOC charge?
8    MR. AUSTIN: Object to the form,
9 mischaracterizes the testimony. You can
10 answer.
11    A    I didn't necessarily wait for that.
12 I mean, I just -- I think probably when I
13 was terminated, I had some issues with
14 having been terminated.
15    Q    The first page of this exhibit is
16 entitled "Dismissal and Notice of Rights."
17 Do you recall when you received this
18 document?
19    A    Right off I do not. I would have to
20 rack my brain a little. I could probably
21 narrow it down, but I don't know.
22    Q    Do you believe that it was generally
23 shortly after the date on this Page 3/31

Page 230

1  2005?
2      MR. AUSTIN:  Object to form, calls
3  for speculation.  You can answer.
4  A    It was after that date.
5  Q    At what point did you retain an
6  attorney in this matter?
7  A    Maybe you can help with that.  Let
8  me just think for a moment, please.  I'm
9  sorry.  Maybe April -- March or April.
10 April perhaps.  Not 100 percent sure on
11 that.
12 Q    Do you recall whether it was before
13 or after you received your dismissal and
14 notice of rights from the EEOC?
15 A    I don't recall.
16 Q    Following the EEOC's dismissal of
17 your charge --
18 A    Uh-huh.
19 Q    -- what prompted you to file a
20 lawsuit?
21 A    Actually, I didn't agree with their
22 findings because I didn't know how the
23 procedure went.  But I was under the

Page 231

1  impression that perhaps someone would, you
2  know, speak with me or get some history so
3  that they would know what to look for.  And
4  they never did that, so I was not
5  completely, you know, satisfied with how
6  this came about.
7      And it was suggested to me somewhere
8  down the line by someone that the EEOC was
9  so backed up, you know, that they sometimes
10 didn't do a good job of things.  But that's
11 just hearsay, I suppose.
12 Q    Did you experience any physical
13 injury that you believe was a result of
14 your termination from The Montgomery
15 Advertiser?
16 A    Physical injury?
17 Q    Yes.
18     MR. AUSTIN:  Object to the form.
19 You can answer.
20 A    Well, yes, in that I no longer had
21 health insurance.  And I had, you know,
22 health problems that needed, you know,
23 fairly constant medical checking or

Page 232

1  whatever.
2  Q    Did you have any health problems
3  arise after your termination from The
4  Montgomery Advertiser that you believe were
5  caused by that termination?
6      MR. AUSTIN:  Object to the form.
7  You can answer.
8  A    Severe stress.  So absolutely, yes.
9  Because my ability to make money was gone,
10 so I think that's probably -- I think that
11 was stressful, yes.
12 Q    How did that stress exhibit itself?
13 A    Just general depression for a time.
14 Q    How long did that general depression
15 last?
16     MR. AUSTIN:  Object to the form.
17 You can answer.
18 A    It is still occurring.
19 Q    Had you ever experienced depression
20 before?
21 A    Probably fleetingly.
22 Q    When was that?
23 A    I couldn't say.  I don't mean to be

Page 233

1  flippant, but I think some of the things
2  you are asking are just part of the human
3  condition.  I think if you live you are
4  probably depressed at some point in time
5  about one thing or another.  So I don't
6  know.  You know, I think that's part of the
7  human condition.
8  Q    Did you see a doctor about this
9  general depression that you experienced
10 after your termination from The Montgomery
11 Advertiser?
12 A    No.
13 Q    Why not?
14 A    Because there were money issues.
15 Q    Following your termination from The
16 Montgomery Advertiser, did you experience
17 any emotional or mental problems that you
18 felt like were caused by your termination?
19     MR. AUSTIN:  Object to the form to
20 the extent that it's already been testified
21 to.  You can answer.
22 A    Well, there is the sense of
23 overwhelming -- a sense of failure, even

Page 234

1  though I knew I hadn't done anything to
2  cause my termination. So there was kind of
3  a sense of having failed. You know, I
4  guess in spite of all my efforts to do
5  well, so there was a sense of failure.
6  Q    Do you go to church?
7  A    Periodically, yes.
8  Q    Where?
9  A    Just visit various churches.
10 Q    Do you have one particular minister
11 that you talk to?
12 A    No.
13 Q    Have you discussed this lawsuit with
14 any ministers?
15 A    No.
16 Q    Have you discussed your termination
17 from The Montgomery Advertiser with any
18 ministers?
19 A    No.
20 Q    Do you have a significant other?
21 A    No.
22 Q    Have you had a significant other
23 since your termination from The Montgomery

Page 235

1  Advertiser?
2  A    No.
3  Q    Other than your lawyer, have you
4  talked to anyone else about this lawsuit?
5  A    Family members.
6  Q    What have you told your family
7  members?
8  A    Basically that I felt that I was
9  treated very unfairly.
10 Q    Anything else?
11 A    That I was retaliated against for
12 having been outspoken about matters that
13 concerned me or my job.
14 Q    Anything else?
15 A    The question again?
16 Q    What have you talked to your family
17 members about concerning this lawsuit?
18 A    Well, just basically how, you know,
19 how things -- how things happened. I
20 talked to them over a period of time, you
21 know, my mother. Just while the months
22 that this was going on, you know.
23 Q    Other than your lawyer, your mother

Page 236

1  and your brother, is there anyone else that
2  you have talked to about this lawsuit?
3  A    A couple of confidantes.
4  Q    Who are those confidantes?
5  A    Grace Boyd.
6  Q    Is she a friend?
7  A    Yes.
8  Q    How long have you known her?
9  A    Probably 20 plus years.
10 Q    What have you told her about this
11 lawsuit?
12 A    Basically just shared with her the
13 same things that I shared with my family.
14 Q    Are there any other confidantes that
15 you have shared information about this
16 lawsuit with?
17 A    Not that I can think of.
18 Q    Have you discussed the termination
19 of your employment from The Montgomery
20 Advertiser with Annetta Hill?
21 A    Annetta Hill?
22 Q    Yes.
23 A    Annetta Hill? I don't know who

Page 237

1  Annetta Hill is.
2  Q    Okay. Her name appeared on a
3  document that was produced to me by your
4  attorney that is entitled, "Initial
5  Disclosures." Do you recall ever hearing
6  the name Annetta Hill before?
7  A    Annetta Hill?
8  Q    Correct.
9  A    It doesn't ring a bell right now.
10 Q    Okay. Have you discussed the
11 termination of your employment with The
12 Montgomery Advertiser with Brenda Jackson?
13 A    Not really, not really.
14 Q    Have you discussed it with her at
15 all?
16 A    Well, we've talked. But I've not
17 discussed probably legal things if that --
18 I don't know if that is the question. What
19 do you mean? Just the fact that I was --
20 Q    Did you talk to her about why you
21 thought you were terminated?
22 A    I told her that it was along the way
23 that I felt -- you know, it was probably on

Page 238

1  more than one occasion. Just that I felt
2  that they were, quote, out to get me.
3  **Q    Do you believe that Ms. Jackson has**
4  **information that would help your case?**
5  A    She may have.
6  **Q    Have you discussed the termination**
7  **of your employment with Pamela Portis?**
8  A    I have not.
9  **Q    Do you believe that Ms. Portis has**
10 **information that would support your**
11 **allegations?**
12 A    She would have regarding the memo
13 that we discussed a time back about having
14 been warned about her ad splitting. So in
15 that regard, yes.
16 **Q    I believe you told me earlier that**
17 **Margie Jean Robinson-Smith is now deceased?**
18 A    Correct.
19 **Q    Have you discussed the termination**
20 **of your employment with Shalawn Williams?**
21 A    No.
22 **Q    Do you believe that Shalawn Williams**
23 **has information that would support your**

Page 239

1  **allegations in this case?**
2  A    I don't think so, but I don't know.
3  I don't know.
4  **Q    Have you discussed the termination**
5  **of your employment with Judy Mann?**
6  A    We've discussed some things, yes.
7  **Q    What have you discussed with Judy**
8  **Mann?**
9  A    Basically how we both were treated
10 by Kathryn, and she had some issues with
11 Kathryn as well.
12 **Q    What issues did she have with**
13 **Kathryn?**
14 A    She did not specify. It was just I
15 know that they had had issues in the past.
16 **Q    Have you discussed your lawsuit with**
17 **Judy Mann?**
18 A    Not in any detail, no.
19 **Q    Is Judy Mann aware that you have**
20 **filed a lawsuit?**
21 A    No.
22 **Q    Have you discussed the termination**
23 **of your employment with Suzanne Parker?**

Page 240

1  A    Suzanne Parker? No.
2  **Q    Do you believe that Suzanne Parker**
3  **has information that would support your**
4  **allegations in this case?**
5  A    I don't know. I don't think so.
6  **Q    Have you discussed the termination**
7  **of your employment with Melissa Sercey?**
8  A    No.
9  **Q    Do you believe that Melissa Sercey**
10 **would have information that would support**
11 **your allegations in this case?**
12 A    I don't know.
13 **Q    Have you discussed the termination**
14 **of your employment with Sharon Wade?**
15 A    No.
16 **Q    Do you believe that Ms. Wade would**
17 **have any information to support your**
18 **allegations in this case?**
19 A    I believe so.
20 **Q    What information would she have?**
21 A    This would probably be regarded as
22 hearsay, but I'll state it anyway. There
23 was a co-worker, Kim -- I can't recall her

Page 241

1  last name now. But she worked in outside
2  sales. Kim commented to me that Sharon
3  Wade had told her that Kathryn Mount had
4  commented to her that she wanted me gone,
5  that she didn't like me and wanted me
6  gone. And I understand that that is
7  hearsay, but that was told to me. Hated me
8  and wanted me gone. That was the exact
9  terminology, she hated me and wanted me
10 gone.
11 **Q    Have you discussed your termination**
12 **of your employment with LaShawnda Harris?**
13 A    LaShawnda Harris? No.
14 **Q    Do you believe that Ms. Harris has**
15 **information that would support your**
16 **allegations in this case?**
17 A    I don't know.
18 **Q    Have you discussed the termination**
19 **of your employment with Cornelius Jones?**
20 A    No.
21 **Q    Do you believe that Mr. Jones would**
22 **have information that would support your**
23 **allegations in this case?**

Page 242

1    A    He likely would.
2    Q    What information would he have?
3    A    I'm not sure which aspects we may be
4    talking about. But I know that I had the
5    issues with the salesperson of the year
6    award where it was given to Joe Howard.
7    And I know that a similar situation arose
8    with them this past year where they -- I
9    don't know if it was erroneously or what.
10   But that -- just from talking to some
11   people -- I still have contact with all of
12   these people that I supposedly didn't get
13   along with.
14        I have continuing contact with
15   several of them because they were friends.
16   But I did come to know that they had an
17   occasion to issue two salesperson of the
18   year awards this year to Cornelius as well
19   as Margie Robinson. Because there was some
20   problems with the one. And I believe
21   Cornelius complained. And he was given a
22   $2,500 award as well as I was informed.
23   Q    Is there any other information that

Page 243

1    Mr. Jones would have that you believe would
2    support your allegations in this case?
3    A    Other than to say that on that one
4    occasion that we had the confrontation that
5    it was not such.
6    Q    Have you discussed the termination
7    of your employment with Thomas Taylor?
8    A    Some aspects.
9    Q    What aspects?
10   A    Just basically along the way he
11   was -- he, along with Brenda Jackson, they
12   just kind of knew that they were on me.
13   And I think I may have just said things to
14   them in frustration from time to time about
15   how I couldn't afford any kind of missteps.
16        And I generally always tried to
17   follow the rules because I knew that if I
18   made a misstep that anybody else might have
19   made that I probably would be terminated on
20   the spot. Whereas somebody else would have
21   been given a second -- thought about what
22   that action was. That was what I felt.
23   And that was what I lived under as I worked

Page 244

1    there.
2    Q    Do you believe that Mr. Taylor has
3    information that would support your
4    allegations in this case?
5    A    Probably some of them, yes.
6    Q    What information would he have?
7    A    He would have knowledge of the
8    incident with Laura Lynn and what
9    transpired that day, and how my behavior
10   was totally innocuous and was later
11   built to be something totally out of
12   whack. You know, it just wasn't that. He
13   would know that he, in turn, had behaved
14   badly and a word was never spoken to him
15   about it.
16   Q    Have you discussed the termination
17   of your employment with Frank Crook?
18   A    No.
19   Q    Do you believe that Mr. Crook would
20   have any information that would support
21   your allegations in this case?
22   A    No.
23   Q    Have you discussed the termination

Page 245

1    of your employment with Sandra Williams
2    Cobb?
3    A    No.
4    Q    Do you believe that Ms. Cobb would
5    have any information that would support
6    your allegations in this case?
7    A    No.
8    Q    Have you discussed the termination
9    of your employment with Joe Howard?
10   A    No.
11   Q    Do you believe that Mr. Howard would
12   have information that would support your
13   allegations in this case?
14   A    I doubt it.
15   Q    Have you discussed the termination
16   of your employment with Ken Roach?
17   A    No.
18   Q    Do you believe that he would have
19   information that would support your
20   allegations in this case?
21   A    No.
22   Q    Have you discussed your termination
23   with April Kelly?

Page 246

1  A    No.
2  Q    Do you believe that Ms. Kelly would
3  have information supporting your
4  allegations in this case?
5  A    No.
6  Q    Have you discussed your termination
7  with Fred Villacamfa?
8  A    No.
9  Q    Do you believe that Mr. Villacamfa
10  would have information that would support
11  your allegations in this case?
12  A    I doubt it.
13  Q    Have you discussed the termination
14  of your employment with Bonita Dennis?
15  A    No.
16  Q    Do you believe that Ms. Dennis would
17  have information that would support your
18  allegations in this case?
19  A    Yes.
20  Q    What information would Ms. Dennis
21  have?
22  A    She would be able to affirm that she
23  was assistant HR personnel at one point.

Page 247

1  And I spoke with her on a few occasions
2  about Kathryn Mount. And, you know, the
3  things that she did in our department. And
4  she indicated that there had been numerous
5  exit interviews that were unfavorable to
6  Ms. Mount and they were stuck away in a
7  drawer somewhere. And eventually I
8  probably -- they probably came up missing
9  when we made a move. But she had
10  apparently seen those at some point and
11  knew that they existed.
12  Q    Have you discussed the termination
13  of your employment with Janene Spencer?
14  A    No.
15  Q    Do you believe that Ms. Spencer has
16  information that would support --
17  A    She is now deceased, but she would
18  have had some information.
19  Q    What information?
20  A    I have an e-mail from her that might
21  lend something -- some credence to it.
22  Things that I said formally.
23  Q    Have you discussed your termination

Page 248

1  of your employment with Terry Sullivan?
2  A    I have not.
3  Q    Is there any information that
4  Mr. Sullivan might have that would support
5  your allegations in this case?
6  A    He likely could.
7  Q    What would he have?
8  A    The information about my having gone
9  to him about the raises and having been
10  paid the check for that. Also I complained
11  to him that positions within the classified
12  department were not -- were rarely, if
13  ever, posted. And that they simply hired
14  somebody without announcing positions were
15  open or transferred somebody who was
16  already working there into a position
17  without them having been advertised as open
18  positions.
19  Q    Have you discussed the termination
20  of your employment with Valerie Adams?
21  A    I have not.
22  Q    Do you believe that Ms. Adams would
23  have information supporting your

Page 249

1  allegations in this case?
2  A    She may have.
3  Q    What information would Ms. Adams
4  have?
5  A    I don't know. I said she may. Just
6  by virtue of the fact that they were all
7  there and privy to the goings on. So, a
8  number of any of them may have something up
9  to say.
10  Q    Have you discussed the termination
11  of your employment with Yolanda Franklin?
12  A    I have not.
13  Q    Do you believe that Ms. Franklin
14  would have information that might support
15  your allegations in this case?
16  A    Yes, I do. Likely so.
17  Q    Is that the same as Valerie Adams,
18  just because she was there?
19  A    Well, Yolanda was not there at this
20  time. But just that some of these same
21  things were going on back during her time
22  there. And she, you know, probably
23  experienced some of the same retribution

Page 250

1  that I did from Kathryn Mount.
2  Q    Do you know if she ever complained
3  about discrimination or harassment?
4  A    I don't know. I don't know if she
5  appealed to anyone in a management capacity
6  or not. I don't know.
7  Q    Have you discussed the termination
8  of your employment with Jonathan
9  Villacamfa?
10 A    I have not.
11 Q    Do you believe that Mr. Villacamfa
12 would have any information that might
13 support your allegations in this case?
14 A    Not really. That was kind of long
15 ago.
16 Q    Have you personally contacted anyone
17 to be a witness for you in this case?
18 A    I have not -- well, let me think
19 now. Let me just think. About being a
20 witness? Kim -- I'm sorry, but Kim's last
21 name just escapes me right now. It will
22 come to me, but I don't know. I don't even
23 know if I had filed a case at that point.

Page 251

1  But she gave the impression that if I ever
2  needed her that she would be willing to --
3  you know, if I went through anything
4  legally that she would be willing to
5  testify on my behalf.
6  Q    Are there people that you have not
7  contacted and that we have not already
8  mentioned who you believe would support
9  your allegations in this case?
10      MR. AUSTIN: Object to the form.
11 You can answer.
12 A    Can I ask to leave that open to
13 maybe supply at a later date? Is that
14 possible to do that?
15 Q    I think your lawyer will have to
16 supplement the information that he has
17 already provided to me, so if you think of
18 someone let him know. Don't contact me.
19 A    Well, I didn't mean that. I meant
20 through him.
21      MR. AUSTIN: Or don't do like one of
22 my clients did and contact the Court
23 itself.

Page 252

1  Q    Let me go back to Kim for just a
2  second.
3  A    Okay.
4  Q    Do you know where she works?
5  A    I don't know. I don't know.
6  Q    Do you know if she still lives in
7  Montgomery?
8  A    She does.
9  Q    Do you know where she lives?
10 A    I do not.
11 Q    Do you have any contact information
12 for her?
13 A    I could get that.
14 Q    I will mark these documents as
15 Defendant's Exhibit 41. Do you recognize
16 these documents?
17      (Defendant's Exhibit No.
18      41 was marked for
19      identification).
20 A    I do.
21 Q    Did you solicit recommendation
22 letters from individuals who placed ads
23 with you at The Montgomery Advertiser?

Page 253

1  A    I did.
2  Q    Did you do this after your
3  termination?
4  A    Yes.
5  Q    Do you recall when you contacted
6  these individuals?
7  A    No, I don't.
8  Q    Other than the individuals whose
9  letters are contained in this exhibit, did
10 you contact any other customers?
11 A    Not that I recall.
12 Q    Did you contact these individuals in
13 person?
14 A    Probably via e-mail. It wasn't in
15 person. Most of them I've not met really.
16 Q    What did you tell them about the end
17 of your employment with The Montgomery
18 Advertiser?
19 A    It didn't come up. I just indicated
20 that I was not there anymore.
21 Q    Following your termination from The
22 Montgomery Advertiser, you applied for
23 unemployment compensation benefits,

Page 254

1  correct?
2  A    Yes.
3  Q      Did you receive unemployment
4  compensation benefits?
5  A    No.
6  Q      Did you appeal that decision?
7  A    I did.
8  Q      What was the result of that appeal?
9  A    Denied.
10  Q      Did you appeal that decision to the
11  circuit court?
12  A    No.
13  Q      Other than your application for
14  unemployment compensation benefits after
15  you worked at The Montgomery Advertiser,
16  have you ever applied for unemployment
17  compensation benefits before?
18  A    No.
19              (Defendant's Exhibit
20              No. 42 was marked
21              for identification).
22  Q      I marked this as Defendant's Exhibit
23  42. These are documents that I received

Page 255

1  yesterday from your lawyer.
2  A    Yes.
3  Q      Are these the only documents that
4  you have relating to your job search after
5  your termination from The Montgomery
6  Advertiser?
7  A    Well, this is only one.
8  Q      Is this a front and back?
9  A    Yeah.
10  Q      Okay.
11  A    There was one from Rhodes. I think
12  I submitted -- there was an e-mail, a
13  return e-mail from Rhodes. I think I
14  submitted that to my attorneys.
15  Q      Is there anything else that you can
16  think of?
17  A    Those were the only -- the only
18  three things and the one I mentioned to you
19  earlier.
20  Q      Do you have a resume that you
21  typically submit when you're seeking a job?
22  A    Kinda, sorta. Well, you know,
23  depending on the job you may change. Of

Page 256

1  course your information -- basic
2  information stays the same, but you may
3  have different, you know, opening
4  statements or things you might be seeking
5  from a particular job.
6  Q      I'm going to ask that you provide a
7  copy of the resume. So if you could get
8  that to your lawyer, I would appreciate
9  it.
10  A    Okay.
11  Q      Do you have cover letters that you
12  have sent to different potential employers?
13  A    I don't believe so.
14  Q      Other than in September of 2004, had
15  you ever been terminated from The
16  Montgomery Advertiser?
17  A    For one day, I believe. I don't
18  know if that was ever even in the record or
19  not.
20  Q      Do you recall when that was?
21  A    Way back. It was a dismissal, but
22  it was -- I was hired back -- I never -- I
23  don't know if I was actually fired. But I

Page 257

1  came back the next day, and it was undone.
2  So, I really don't know if it was
3  technically listed as a termination or
4  not. To be perfectly honest, I don't
5  know.
6  Q      Do you recall what that dismissal
7  was for?
8  A    Yeah.
9  Q      What was that?
10  A    There was a customer from -- that
11  was shortly -- not long after I was hired.
12  But there was a customer from one of the
13  employment agencies. And actually, the
14  call was for one of my co-workers. And I
15  didn't have anybody at the time. I told
16  her I would help -- it was nearing
17  getting-off time. But I told her I would
18  help the customer for her. Volunteered to
19  help the customer.
20       Well, we went past getting-off
21  time. And the customer was still
22  submitting ads. And I told her that I had
23  a ride, you know, to catch. I had really

Page 258

1   extended myself far beyond I should have
2   because the customer had called in at
3   closing time. And like I said, I was
4   really helping one of my co-workers out.
5          And I went on and on. And I had --
6   this was when I was at the work release
7   center. I had a bus to catch. And if you
8   didn't catch that van when it came, then
9   you were in trouble. So, I just told the
10  lady, I thought ever so politely, that I
11  couldn't take anymore ads.
12         And, of course, she was in a tizzy
13  as people are when they sometimes don't get
14  what they want. But when I explained that
15  to the publisher I think the following day
16  or the day after then, he immediately
17  reinstated me.
18         So, I think it was the next day. I
19  don't really know if it ever went through
20  the whole whatever. But I was sent home
21  and went back the next day. So. It was
22  kind of a mischaracterization. And when I
23  told him what happened, he immediately

Page 259

1   reinstated me. That's the best
2   recollection I have of that.
3   Q      Way back at the beginning of the day
4   we talked about when you had plead not
5   guilty by reason of mental defect or
6   disease to the murder charge against you.
7   A      Uh-huh.
8   Q      Did you have any counseling for that
9   mental defect or disease while you were in
10  prison?
11  A      No.
12  Q      Did you have any counseling
13  immediately after Ms. Green's death prior
14  to the time of your trial?
15  A      I think I indicated to you that
16  there was -- Betty somebody, but I don't
17  remember her last name. So, yeah, there
18  was.
19  Q      You told me earlier about forwarding
20  some of your e-mails to your home work
21  account.
22  A      Uh-huh.
23  Q      Or home e-mail account.

Page 260

1   A      Right.
2   Q      Did you save all of the e-mails that
3   you forwarded from your Montgomery
4   Advertiser account to your home e-mail
5   account?
6   A      Did I save all of them? I don't
7   know. Probably the majority.
8   Q      Have you provided all of those to
9   your lawyer?
10  A      As best I recall.
11  Q      Do you recall when you started
12  forwarding e-mails to your home e-mail
13  account?
14  A      Not right off.
15  Q      Do you recall what year it was?
16  A      Oh, yeah. It was in 2004. I do
17  recall the year, yes.
18  Q      Was there something that happened in
19  2004 that made you want to start forwarding
20  them at that time?
21  A      Yes. I felt that, as I stated to
22  you, I had the concerns that I was going to
23  be terminated. And felt at that time that

Page 261

1   if, in fact, that came to pass that it was
2   wrong because all of the things that were
3   being done to me, you know, in that period
4   of several months it was like they were,
5   you know, just closing in for the kill with
6   insignificant write-ups. So, yeah, that
7   got my attention and I wanted to have
8   records of those things.
9   Q      When Gannett purchased the company
10  in 1995, did they change anyone's pay at
11  that time? Did they change your pay at
12  that time?
13  A      As I recall, we, on that team, all
14  started out again at an hourly wage of
15  $8.50 with the contract team. My best
16  understanding was that regardless of --
17  there was no seniority or whatever else.
18  That we all started out at the same flat
19  $8.50 per hour at that point.
20         I don't know if it was '95 or '96.
21  Whenever they started making, you know,
22  some changes along those lines.
23         MS. PALMER: That's all I have.

Page 262

```
 1       MR. AUSTIN: I'll be brief.
 2  EXAMINATION BY MR. AUSTIN:
 3  Q    Pat, let me show you what's been
 4  marked as Defendant's Exhibit 41 to your
 5  deposition. It appears to be seven sheets
 6  of paper. Each of which appears to be some
 7  sort of correspondence regarding you and
 8  your work performance. The first sheet
 9  reads, "Don Juan Auto Part Technology
10  Alabama, LLC."
11  A    Uh-huh.
12  Q    Were they a customer of yours?
13  A    Yes.
14  Q    Based on your personal knowledge,
15  how did they view you as an employee of The
16  Montgomery Advertiser?
17  A    Well, the guy who was in this
18  position, Charlie Harball, I had worked
19  with a number of years at one other
20  business. And when he moved to this
21  business, he, you know, made contact with
22  me as well.
23  Q    Okay.
```

Page 263

```
 1  A    So we had a history -- you know,
 2  some history of several years of working
 3  together.
 4  Q    Was he -- I mean to ask did he view
 5  you in a positive light?
 6  A    Absolutely, yes.
 7  Q    Okay. Is that why he wrote this
 8  letter?
 9       MS. PALMER: Object to the form.
10  You can answer.
11  A    Can I answer?
12  Q    Absolutely.
13  A    Yes.
14  Q    The second page appears to be from a
15  Ms. Debbie Boone.
16  A    Yes.
17  Q    Was she the human resources manager
18  or person from Chattahooche Valley
19  Community College?
20  A    Yes, she was.
21  Q    Based on your personal knowledge,
22  how did she view you as an employee?
23  A    I think very favorably.
```

Page 264

```
 1  Q    The next sheet appears to be from
 2  Kenneth C. Owen that says on here he's the
 3  executive director of Resurrection of
 4  Catholic Missions of the South, Inc.
 5  A    Yes.
 6  Q    Based on your personal knowledge,
 7  how did he view you as an employee of
 8  Gannett and your working relationship with
 9  him?
10  A    Very favorably. We had a good
11  working relationship. I'll save you some
12  time. I think he is from the same
13  company. I worked with both of them.
14  Q    And based on your personal
15  knowledge, how did Ms. Tyus view you as an
16  employee and your service abilities?
17  A    Very favorably.
18  Q    Skipping on to what appears to be an
19  e-mail from Montez Vickers?
20  A    Uh-huh.
21  Q    Who is Montez Vickers?
22  A    The person who placed the ads for
23  Enterprise State Community College. I'm
```

Page 265

```
 1  not sure if it was an HR person or not, but
 2  that was the person who did the ad.
 3  Q    And based on your personal
 4  knowledge, how did he view your ability as
 5  an employee?
 6  A    Very favorably.
 7  Q    The next is from Dorothy J. Dixon?
 8  A    Uh-huh.
 9  Q    Who is she?
10  A    Former customer.
11  Q    Okay. Based on your personal
12  knowledge, how did she view you as an
13  employee?
14  A    Very favorably.
15  Q    And the next is from what appears to
16  be Ann S. Scheeren, S-C-H-E-E-R-E-N.
17  A    Scheeren.
18  Q    That would be S-C-H-E-E-R-E-N.
19  A    Correct.
20  Q    Based on your personal knowledge,
21  how did she view you as an employee of The
22  Montgomery Advertiser?
23  A    Very favorably.
```



Page 266

1 Q    Were all of these people customers
2 of yours?
3 A    Yes.
4           (Plaintiff's Exhibit
5           No. 1 was marked for
6           identification).
7 Q    I'll show you what I have marked as
8 Plaintiff's Exhibit 1. These are documents
9 that appear to reflect inside sales for the
10 year 2003. The top page of the first
11 document says period 1/03. That would be
12 January '03 I take it.
13 A    Correct.
14 Q    For January '03, what does it
15 reflect in terms of revenue goals, which is
16 the top portion, what was your actual
17 individual goal?
18 A    $23,914 -- oh, I'm sorry. Actual.
19 Q    Yes. Actual.
20 A    This was -- well, this was the goal
21 $23,900.
22 Q    Excuse me. I misunderstood your
23 answer. And I asked a poor question. Your

Page 267

1 goal was $23,914?
2 A    Right.
3 Q    What were your actual sales?
4 A    $28,088.
5 Q    So, you exceeded your goal that
6 month?
7 A    Yes.
8 Q    Turn to the next page, please.
9 A    (Witness complies.)
10 Q    What was your goal for January 2003?
11 A    February?
12 Q    February. Sorry.
13 A    $23,177.
14 Q    What were your actual sales?
15 A    $33,083.
16 Q    Would you turn the page?
17 A    (Witness complies.)
18 Q    For March 2003, what was your goal?
19 A    $30,697.
20 Q    What was your actual sales?
21 A    $34,753.
22 Q    For April of 2003, what was your
23 goal?

Page 268

1 A    $30,697.
2 Q    And what was your actual sales?
3 A    $34,686.
4     MS. PALMER: That actually says
5 March at the top.
6     MR. AUSTIN: What did I say April?
7     MS. PALMER: April.
8     MR. AUSTIN: Okay. March.
9     MS. PALMER: It looks like there are
10 two Marches in here.
11 A    This is the one that we talked about
12 earlier that Kathryn Mount amended.
13 Q    Okay. It's late in the day.
14     For April, which is the next page,
15 which says 4/03, what was your goal?
16 A    $31,803.
17 Q    What were your actual sales?
18 A    $36,979.
19 Q    Okay. And for the next page that's
20 marked 5/03, what was your goal?
21 A    $27,779.
22 Q    And your actual sales?
23 A    $32,926.

Page 269

1 Q    The next page marked 6/03, what was
2 your goal?
3 A    $25,519.
4 Q    What were your actual sales?
5 A    $35,175.
6 Q    For the next page, July of '03, what
7 was your goal?
8 A    $34,103.
9 Q    What were your actual sales?
10 A    $44,601.
11 Q    And for the next page, August 2003,
12 what was your goal?
13 A    $28,602.
14 Q    And your actual sales?
15 A    $39,067.
16 Q    Okay. Turn the page. You are
17 skipping to 10 of '03 and I don't know
18 where September of 2003 is. But for 10 of
19 '03, what was your goal?
20 A    $40,424.
21 Q    And your actual sales?
22 A    $37,479
23 Q    So, you didn't make it that month?



Page 270

1   A    No.
2   Q    For the next page, November of 2003,
3   what was your goal?
4   A    $31,906.
5   Q    And what were your actual sales?
6   A    $34,587.
7   Q    Okay.  And then for December of
8   2003, what was your goal?
9   A    $23,180.
10  Q    And your actual sales?
11  A    $34,000.
12  Q    What is your opinion of your self-
13  performance that year?
14  A    I think it was close to exemplary.
15  Q    For the most part what we have gone
16  over, you have exceeded your goals; is that
17  correct?
18  A    Correct, yes.
19  Q    Let me ask you a few questions about
20  some of the names we've had.  If you would,
21  tell me the race and gender of these
22  people.  Fred Villacamfa?
23  A    Hispanic male.

Page 272

1   being treated differently and I didn't feel
2   that was fair."
3        Were you making a complaint of race
4   discrimination at this point?
5   A    I was.
6        MR. AUSTIN:  That's all I have.
7        MS. PALMER:  Nothing further.
8        (END OF DEPOSITION.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 271

1   Q    Sherry Herring?
2   A    White female.
3   Q    Shalawn Williams?
4   A    Black female.
5   Q    Laura Lynn?
6   A    White female.
7   Q    Grace Boyd?
8   A    White female.
9   Q    Linda Browder?
10  A    White female.
11  Q    Pam Portis?
12  A    Black female.
13  Q    Let me show you what has been marked
14  as Defendant's Exhibit 33, which is a stack
15  of papers defense counsel questioned you on
16  earlier.  The page I'm going to show you is
17  typewritten.  And it begins, "As far back
18  as that, I've had problems with the way
19  Kathryn was abusing her authority.  At that
20  time, most of the instances of questionable
21  behavior came along racial lines.  I very
22  pointedly told her several instances where
23  it was the perception that people were

Page 273

1
2        C E R T I F I C A T E
3
4   STATE OF ALABAMA )
5   JEFFERSON COUNTY )
6
7        I hereby certify that the above
8   and foregoing deposition was taken down
9   by me in stenotype, and the questions and
10  answers thereto were reduced to computer
11  print under my supervision, and that the
12  foregoing represents a true and correct
13  transcript of the deposition given by
14  said witness upon said hearing.
15
16        I further certify that I am
17  neither of counsel nor of kin to the
18  parties to the action, nor am I in
19  anywise interested in the result of said
20  cause.
21
22        _____
23        Cathy A. DeBardeleben, Commissioner