## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **PATRICIA A. CAMPBELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | |
| | ) | **2:05-cv-615-MEF-CSC** |
| **GANNETT CO., INC., d/b/a** | ) | |
| **MONTGOMERY ADVERTISER,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW** the Plaintiff, Patricia A. Campbell, by and through her attorneys of record, and, in opposition to Defendant's motion for summary judgment (doc. 12), states as follows:

## I.    STATEMENT OF THE CASE.

### A.    Procedural History.

Plaintiff, Patricia A. Campbell ("Campbell"), filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission on or about December 14, 2004, alleging discrimination based on race, gender, and retaliation.  (*See* Compl., Ex. A.)  On June 29, 2005, she timely instituted this lawsuit against the Defendant, *Montgomery Advertiser* ("*Advertiser*"), alleging

claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e, *et seq*., on the basis of race (count I), gender (count II), and retaliation

(count III), as well as claims under 42 U.S.C. § 1981 on the basis of race (count

IV) and retaliation (count V).  (*Id*.)  The *Advertiser* filed an answer (doc. 5) on

July 28, 2005, and the parties commenced discovery thereafter.  On April 18,

2006, before the close of discovery, the *Advertiser* filed a motion for summary

judgment (doc. 12), a brief (doc. 13), and evidence in support thereof (doc. 14).

**B.    Statement of Facts.**

Campbell, a black female, was hired by the *Advertiser* in July of 1998 as a

transient sales representative.  (Pl.'s Depo., 43:6-8, 55:1-6.)  Her duties included

taking incoming telephone calls for advertisement sales at the paper and to sell

advertising space on sale specials, such as for a Halloween page or a Christmas

page.  (*Id*., 55:7-16.)  After approximately one year, the *Advertiser* gave her the

position of contract sales representative.  (*Id*., 56:4-16.)  As a contract sales

representative, Campbell was assigned a set of customers, whereas before in her

transient position she did not have a set of assigned customers.  (*Id*., 57:18-23,

58:1-3.)  For this set of assigned customers, Campbell handled incoming

advertisement orders, performed customer service, called back customers for

advertisement renewals, and sold advertising space for sale specials (e.g, a

2

Halloween or Christmas page). (*Id.*, 56:21-23, 57:1-17.) With one interruption, Campbell held the position of contract sales representative until the end of her employment with the *Advertiser*. (*Id.*, 58:4-8.)

In her position as contract sales representative, Campbell reported to the inside sales supervisor, Ms. Jennifer Jensen, a white female. (*Id.*, 61:17-23, 62:1-2.) Ms. Jensen then reported to the classified manager, Ms. Kathryn Mount, a white female. (*Id.*, 62:9-11, 19-20.) There were six other contract sales representatives working for the *Advertiser* at the time of Campbell's termination: Ms. Billie Jackson (black female), Mr. Cornelius Jones (black male), Mr. Thomas Taylor (black male), Ms. Margie Robinson (black female), Mr. Ed Smith (black male), and Mr. Joe Howard (black male). (*Id.*, 63:18-23, 17:1-23, 18:1-15.)

In February 2000, Campbell brought to the attention of her supervisors, Ms. Mount and Mr. Fred Villacampa (the *Advertiser's* human resources director at the time), several matters regarding the *Advertiser's* treatment of employees that Campbell deemed racist.[1] (*Id.*, 80:16-23, 81:1-14.) Campbell informed Ms. Mount that she believed there were different standards for white and black

---

[1]Campbell is aware that this discrete incident falls outside the statute of limitations period for claims even under 42 U.S.C. § 1981. If, however, the *Advertiser* deems relevant Campbell's disciplinary history as early as the same month of the same year (*see infra* and *Advertiser* Brief at 7), then likewise Campbell can certainly bring forward evidence of her protected activity and alleged retaliatory actions at such an early date also.

3

employees. (*Id*., 82:11-23, 83:1-8.) According to Campbell, Ms. Mount "wasn't happy" with the complaints. (*Id*., 83:2-8.) Campbell made these complaints on a Thursday, *and then the following week*, she received a written warning from Ms. Mount regarding several alleged customer service incidents. (*Id*., Ex. 18.) Campbell disagreed with the allegations made by each bullet-point in the written warning, offered her own explanations for the incidents therein, and refused to sign it. (*Id*., Ex. 18; *id.*, 81–88.) Campbell later made complaints to both Terry Sullivan and Ron Davidson, human resource managers, regarding unequal treatment based on race, the former in or around 2002. (*Id*., 215:8-13, objection therein.)

On July 11, 2003, the *Advertiser* gave Campbell another written warning (styled a "Performance Notice"). (*Id*., Ex. 20.) One or both of Campbell's supervisors – Ms. Jensen and Ms. Mount – reviewed this Performance Notice with Campbell. (*Id*., 91:18-22.) This Performance Notice detailed several alleged incidents with which the *Advertiser* sought to justify Campbell's discipline. (*Id*.) The first alleged incident regarded a verbal exchange with a co-worker, Shalawn Williams. (*Id*. Ex. 20; *id.*, 92:1-23; 93:1-13.) Both with her supervisor and in her deposition, Campbell strongly disputed the allegation that she had a "loud" altercation with Williams, specifically testifying in her deposition that "there was

no profanity, there were no raised voices.   There was just an exchange." (*Id.*, 93:6-13.)  The next day, Campbell explained the events to Ms. Jensen and disagreed with Ms. Jensen's characterization of same. (*Id.*, 93:14-21.)  The second alleged incident regarded a verbal exchange with Cornelius Jones, who had at the time implicitly stated to Campbell that he could do a better job than she with her customers. (*Id.*, 95:1-4.)  Again, the exchange that followed was not a loud outburst, particularly as the two were sitting right across from each other and had worked together closely for some time, and in fact Jones laughed at Campbell's comments, fairly implying that he took no offense to them. (*Id.*, 94:1-7, 96:2-23.) Nevertheless, in its Performance Notice of July 11, 2003, the *Advertiser* warned Campbell that such behavior "could not be tolerated." (*Id.*, Ex. 20.)  The third and fourth allegations regarded following *Advertiser* procedure for placing the ads of customers assigned to other contract sales representatives and her interaction with another *Advertiser* employee, Beth Hatchett. (*Id.*, Ex. 20.)

Campbell did, in fact, place the ad that gave rise to the fourth allegation: in her deposition, she recalled that it was a retail ad for Alabama Orthopaedic. (*Id.*, 97:1-12.)  She placed that retail ad because she handled that customer on the classified side; Campbell was a sales representative for the classified department, not for retail. (*Id.*, 97: 13-23.)  She had done this before with the permission of

5

*Advertiser* human resources, and another sales representative in the classified department, Mr. Thomas Taylor, had also run a retail ad for his classified customer, Air Flow Awning. (*Id.*, 97:13-23, 98: 17-23, 99:1-3.) Campbell characterized *Advertiser* policy on that issue as "depend[ing] on who you were and what day it was," essentially that the policy "was not adhered to across the board." (*Id.*, 98:4-5, 102:1-5.) Campbell also strictly denied in her deposition that she was threatening in any manner to Beth Hatchett in her telephone conversation with her, which gave rise to part of the Performance Notice. (*Id.*, 105:19-20.) Again, Campbell believed that the *Advertiser's* characterization of the events was wholly inaccurate because the statements and actions were taken completely out of context, particularly since Ms. Jensen – the disciplining authority – did not actually hear the telephone conversation. (*Id.*, 106:18-20, 107:2-4.) Campbell also testified in her deposition that Mr. Taylor had "lit into" a visitor, Laura Lynn, who was apparently on *Advertiser* property for a sales call. (*Id.*, 157:11-23, 159:10-23.) Campbell testified that Taylor was "extremely rude to her and even admitted that later," and that Taylor "really waylayed into her . . ." (*Id.*) There is no evidence that Taylor was disciplined for this conduct.

On September 14, 2003, Campbell submitted a packet of documents to the *Advertiser* that included several complaints of discrimination. (*Id.*, Ex. 33.) On

page ten of this exhibit to Campbell's deposition, the typewritten document by

Campbell states:

> I also refuse to reside in the "place" that some want blacks to stay in, a place that is comfortable for them.  Numerous of those (people) are relics of the past who suffer from what I term WPS (white privilege syndrome) and chose to call my demand for respect as a person "confrontational."

(*Id.*, Ex. 33, page 10.) (Quotations and parenthetical in original.)  With this packet,

Campbell produced a handwritten note by her, dated several years earlier, that

stated:

> Learned that Kathryn [Mount] had adjusted goal for Laura Hicks, who had come back to Classified after having failed in position in Retail [Advertising].  This is the 3rd incident of goals being changed for whites.

(*Id.*, Ex. 33, page 16.)  Laura Hicks is a white female.  (*Id.*, 185:14-19.)  Also, this

packet contained a typewritten note regarding an email sent by Campbell to Ms.

Mount that addressed the Salesperson of the Month:

> Email to Kathryn regarding the Salesperson of the Month award.  This after Cornelius Jones had won the award for the 5th or 6th time in a row.  My concern was that I had made goal every month for the year as well as 8 times on last year and never once got [Salesperson of the Month].  It just seemed really strange.  The very same thing had gone on last year with Joe Howard.  In my heart I felt that she [Kathryn Mount] was skewing the numbers to fall any way but my way.  The monthly results were rarely put on the board for us to see unless someone repeatedly requested them.  That remains the same.  August is nearly over and we still don't have the [Salesperson of the Month] results posted for July.

(*Id.*, Ex. 33, page 28.)  In her deposition, Campbell stated that she believed Cornelius Jones and Joe Howard were being treated differently because of their gender.  (*Id.*, 192:9-15, objections therein.)  Finally, Campbell explicitly complained of "favors" that were administered "along racial lines" (Campbell's words), presumably regarding sales goals from the context of the note.  (*Id.*, Ex. 33, page 37.)

The next item relied upon by the *Advertiser* is the November 11, 2003 email sent by Ms. Jensen to Campbell regarding their November 5th one-on-one meeting.  (*Id.*, Ex. 22.)  That meeting was less than two months after Campbell submitted her packet complaining of discrimination.  (*See id.*)  The email addressed four issues: splitting of ads across billing periods, transferring calls, being on time for work ("[g]enerally, this is not an issue for [Campbell]"), and whether Campbell was interested in an open position.  (*Id.*)  This November 11th email was boilerplate, however, as it was sent to several other employees in the same or slightly modified form.  (Plaintiff's Exhibit 1, Emails from Jennifer Jensen to Jean Robinson Smith, Thomas Taylor, Brenda Jackson, Cornelius Jones, and Joe Howard.)  Nevertheless, it appears the *Advertiser* relied upon this meeting to justify its actions against Campbell.

"Splitting of ads across billing periods" is a term commonly referred to in the arguments and documents in this matter. The ads referred to herein were often sold by Campbell and other employees in a package, such as a Sunday-and-Monday package. (*Id.*, 121:7-23.) A customer of one of the inside sales representatives would not run an advertisement only on Sunday; the customer had to run the ad on both Sunday and Monday. (*Id.*) All of the billing periods, however, ended on a Sunday. (*Id.*, 121:16-17.) Therefore, if a $500 ad ran on Sunday and Monday, then $250 would be allocated to the billing period ending on Sunday and $250 would go to the billing period beginning on Monday. (*Id.*) Given that the inside sales representatives had sales goals per billing period, it was important to correctly designate ad sales for the respective billing period.

In the face of the *Advertiser's* actions against her, Campbell's sales during 2003 nonetheless exceeded the *Advertiser's* expectations, as follows:

| Month | Goal | Actual Sales | Month | Goal | Actual Sales |
|---|---|---|---|---|---|
| January | $23,914 | $28,808 | July | $34,103 | $44,601 |
| February | $23,177 | $33,083 | August | $28,602 | $39,067 |
| March | $30,697 | $34,793 | September | unknown | unknown |
| April | $31,803 | $36,979 | October | $40,424 | $37,479 |
| May | $27,779 | $32,926 | November | $31,906 | $34,587 |
| June | $25,519 | $35,175 | December | $23,180 | $34,000 |

(*Id.*, 266-70.) Of the sales figures available for eleven months out of 2003,

Campbell exceeded her goal in ten of those months, and by a great amount in several of those, e.g., February, June, July, August, and December. (*Id*.) Also, the *Advertiser* gave to Joe Howard (male) the "Salesperson of the Year" Award for 2003, which had a cash value of $2,500. (Plaintiff's Exhibit 2, 2003 Salesperson of the Year Points for Campbell and Joe Howard.) It did so notwithstanding that Campbell achieved more Salesperson of the Year points than Howard (Campbell's 1,374 versus Howard's 1,246), as demonstrated by the aforementioned exhibit, a chart drafted by Campbell. (*Id*.) Campbell complained about this disparity to Ms. Mount, but the award was not reversed. (*Id*.)

On June 4, 2004, the *Advertiser* gave Campbell another Performance Notice for splitting ads across billing periods. (Pl.'s Depo., Ex. 24.) One of the ads that the Performance Notice discussed was for Avon. (*Id*., 132:23, 133:1-6.) The reason that ad was split was because the customer had trouble understanding the billing cycle, and therefore Campbell and the *Advertiser* billed her thirty days from the ad. (*Id*.) **Such billing was set up with Ms. Jensen's knowledge to accommodate the customer**. (*Id*.) Another ad that was split was for Jani King, which was a business opportunity ad, not an employment ad, and therefore did not even qualify for an ad that must be split, i.e., it had no Monday run and was Sunday-only. (*Id*., 133:12-23.) Any write-up based on that ad is unwarranted and

10

suspect.

On June 7, 2004, the *Advertiser* issued Campbell another Performance Notice. (*Id.*, Ex. 25.) Speaking frankly during her deposition, Campbell characterized this write up's purpose: "To try to get a paper trail to eventually terminate me." (*Id.*, 138:3-6.) This June 7th Performance Notice concerned Campbell taking an advertisement sale call at the end of the day, about five minutes to 5:00 p.m. on a Friday. (*Id.*, 138:9-15.) The *Advertiser* generally had a cut-off time of 3:30 p.m. (*Id.*) Technically that was the deadline, but this was rarely adhered to by the sales staff for weekend ads. (*Id.*, 138:16-19.) In this incident, a customer called the *Advertiser* to place a late ad for the weekend. (*Id.*, 139:3-11.) Campbell informed him of the deadline, but nonetheless offered to place the ad if the customer would fax or e-mail the advertisement. (*Id.*, 139: 12-17.) According to Campbell, most of her other colleagues would not have even taken the ad, and she wholeheartedly denied that she was rude. (*Id.*, 139:18-23, 140:1-8.) Similarly, Campbell disagreed with the *Advertiser's* characterization of her speaking with a customer about a quote, mentioned later in the Performance Notice. (*Id.*, Ex. 25.) A customer had, in fact, called about a quote for an ad, and Campbell told the customer that she would get back with them soon. (*Id.*, 141:15-20.) According to Campbell, her handling of the situation was "customary,"

11

"[s]omething [all the sales representatives] did." (*Id.*) Campbell testified in her deposition that the *Advertiser's* characterization of this was "not an accurate assessment or portrayal of the truth." (*Id.*, 143:7-9.)

The next item offered by the *Advertiser* is Campbell's performance evaluation of July 2004. (*Id.*, Ex 26.) Overlooked by the *Advertiser* in its summary judgment brief is the fact that Campbell sold *122%* of her total revenue goal for the year, yet, in the evaluation, the *Advertiser* minimizes Campbell's overall sales and focuses on particular categories in which Campbell was allegedly deficient. (*Id.*) The *Advertiser* then placed her on a Performance Improvement Plan, despite her outstanding overall sales performance. (*Id.*, Ex. 27.) Thereafter, nothing was initiated by the *Advertiser* to keep up with Campbell's progress regarding the Performance Improvement Plan. (*Id.*, 163: 6-19.) Per the direction of a human resources manager, Campbell also participated in anger management therapy with Ms. Linda Cates. (*Id.*, 154:5-23.) Campbell told her counselor that she did not know why she was there, that she did not need anger management, and that she believed the *Advertiser* was building a case against her to fire her. (*Id.*, 155:1-23.) Campbell attended only two or three sessions with Ms. Cates – hardly indicative of an anger management problem. (*Id.*, 157:5-7.) Indeed, it appears the alleged incidents that gave rise to the anger management requirement were remote

in time, and her supervisors waited a considerable period before sending Campbell to anger management.  (*Id*., 161:14-23.)

On September 27, 2004, two months after Campbell was placed on the Performance Improvement Plan, the *Advertiser* terminated her.  (*Id*., Ex. 38.)  Ms. Jensen and Ron Davidson (human resources manager) went over exhibit 38 with Campbell in a face-to-face meeting, and the reasons given for her termination were: splitting of recruitment ads ("most significant"), filling out daily call reports, and making weekly target call lists.  (*Id*., 205:1-9; *id.*, Ex. 38.)

Between the time Campbell was placed on the Performance Improvement Plan (July 22, 2004) and her termination (September 27, 2004), Campbell's cross-overs had improved to the point that the numbers were no different than any other contract sales representatives':

*July 2004 Cross-Over Ads*

|  | Crossovers | No. of Ads Taken | % of Ads |
|---|---|---|---|
| Brenda Jackson | 2 | 169 | 1.18 |
| Patricia Campbell | 2 | 180 | 1.11 |
| Cornelius Jones | 1 | 205 | 0.49 |
| Joe Howard | 1 | 158 | 0.63 |
| Thomas Taylor | 1 | 132 | 0.76 |
| Jean Robinson-Smith | 1 | 161 | 0.62 |

*August 2004 Cross-Over Ads*

|  | Crossovers | No. of Ads Taken | % of Ads |
|---|---|---|---|
| Brenda Jackson | 3 | 180 | 1.67 |
| Patricia Campbell | 5 | 123 | 4.07 |
| Cornelius Jones | 5 | 203 | 2.46 |
| Joe Howard | 1 | 89 | 1.12 |
| Thomas Taylor | 0 | 98 | 0.00 |
| Jean Robinson-Smith | 3 | 150 | 2.00 |

*September 2004 Cross-Over Ads*

|  | Crossovers | No. of Ads Taken | % of Ads |
|---|---|---|---|
| Brenda Jackson | 2 | 124 | 1.61 |
| Patricia Campbell | 1 | 113 | 0.88 |
| Cornelius Jones | 2 | 140 | 1.43 |
| Joe Howard | 1 | 88 | 1.14 |
| Thomas Taylor | 0 | 103 | 0.00 |
| Jean Robinson-Smith | 2 | 127 | 1.57 |

(Plaintiff's Exhibit 3, 2004 Recruitment Cross-Over Ads.)  As for Campbell's

sales in 2004,her performance exceeded the *Advertiser's* goals for yet another

year: her sales amounted to $414,650, and her goal was $359,764.  (Plaintiff's

Exhibit 4, 2004 Inside Sales Bonus Worksheet for Campbell.)[2]

---

[2]The sales reports for August and September 2004 were not produced by the *Advertiser* during discovery, and therefore were not figured into these final numbers.

As a final note, during her employment with the *Advertiser*, Campbell heard from a co-worker, Kim LNU (last name unknown), that Kathryn Mount had told another co-worker, Sharon Wade, that Kathryn Mount did not like Campbell and wanted Campbell "gone." (Pl.'s Depo., 241:1-10.)[3]  It is unclear when this conversation took place.  In contrast, Campbell testified in her deposition that Joe Howard received preferential treatment from Mount and Jensen.  (*Id*., 198:23, 199:1-4.)  Campbell testified that on two occasions, instead of Howard being written up for his mis-steps, the situation was addressed in a group meeting.  (Id., 199:5-16.)  In another instance, Howard had been untruthful to a customer of the *Advertiser* when he represented to that customer that another employee no longer worked there, and that he (Howard) would instead handle the account.  (*Id*., 199:23-23, 200:1-9.)  Again, a group meeting was held rather than Howard receiving a write-up.  (*Id*.)

## C.    Standard of Review.

Summary judgment may be rendered only when the court finds that the papers supporting and opposing the motion reveal that no issue of material fact

---

[3]Campbell offers this hearsay statement under Fed. R. Evid. 801(d)(2)(D) ("a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship") and 805 (Hearsay Within Hearsay). In any event, this evidence is reducible to an admissible form at trial, and therefore should be considered for the purposes of summary judgment.  *United States v. Four Parcels of Real Property in Green & Tuscaloosa Counties*, 941 F.2d 1428, 1444 (11th Cir. 1991).

exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

"As the moving party, [the defendant] has the burden of showing the absence of a genuine issue of material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14 (1986); *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 918, 919 (11th Cir. 1993).   The district court cannot weigh conflicting evidence or make credibility determinations; instead, "'the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  *Hairston*, 9 F.3d at 919, quoting *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513-14.

When viewing the evidence in a light most favorable to Campbell, genuine issues of material fact exist, and the *Advertiser* is not entitled to judgment as a matter of law.  Campbell's claims should await the evaluation of a fair-minded jury.

## II.    ARGUMENT.

### A.    Campbell Has Established a *Prima Facie* Case of Retaliation under Title VII and Section 1981.

To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in statutorily protected activity; (2) there was a subsequent adverse employment action; and (3) that some causal relationship exists between the protected expression and the adverse action. *Meeks v. Computer Associates Intern.*, 15 F.3d 1013, 1021 (11th Cir. 1994). In its brief, the *Advertiser* does not dispute the first two elements: that Campbell engaged in protected activity and that there was a subsequent adverse employment action. The *Advertiser* does, however, dispute that there is a causal relationship between Campbell's protected activity and, ultimately, her termination. The causation element of a *prima facie* case of retaliation is construed broadly so that a plaintiff must merely prove that the protected activity and the negative employment action are not completely unrelated. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

The first relevant incident that demonstrates a retaliatory mind-set on the part of the *Advertiser* is Campbell's complaint in February 2000. While this discrete incident falls outside the statute of limitations, the event is nevertheless instructive. *One week* after Campbell complained to her supervisor, Ms. Mount,

17

about what Campbell perceived to be race-biased treatment, she was given a written warning. (Pl.'s Depo., 83:1-8; *id.*, Ex. 18.) Close temporal proximity between protected activity and adverse employment actions may be sufficient to demonstrate that the two were not wholly unrelated. *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002). In Campbell's case, the span of merely a week is circumstantial, persuasive evidence that Campbell's supervisors harbor a retaliatory motive. Standing alone, the February 2000 complaint probably does not suffice as a matter of law, but that was not the only time Campbell made complaints regarding racial and gender bias.

On September 14, 2003, Campbell submitted a packet to the *Advertiser* that contained several explicit complaints regarding race and gender bias. (Pl.'s Depo., Ex. 33, pages 10, 16, 28, and 37.) Two of these complaints concerned race, and two concerned gender. On November 11, 2003, the *Advertiser* sent Campbell an email that recounted a one-on-one meeting between her and her supervisor. (Id., Ex. 22.) Because the *Advertiser* uses this email as evidentiary support for its decision to terminate Campbell, likewise Campbell will use its close temporal proximity to her September complaints to demonstrate a causal connection. This two month lapse meets in the middle of Eleventh Circuit precedent that has held that a span of one month is sufficient – *Donnellon v. Fruehauf Corp.*, 794 F.2d

18

598, 601 (11th Cir. 1986) – and Supreme Court precedent that has held that three months was too protracted. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct 1508, 1511 (2001), citing *Richmond v. ONEOK*, 120 F.3d 205, 209 (10th Cir. 1997.)

Considering the foregoing, a jury may reasonably deduce, first, that the *Advertiser's* reaction to complaints of discrimination sound in retaliation because of their uncomfortably close temporal proximity: it waits very little to hammer the nails that stick up. Complaints and actions are not completely unrelated. Not once, but on two discrete occasions has the *Advertiser* demonstrated its proclivity for retribution. Second, a jury may reasonably deduce that Campbell's complaints of discrimination set in motion a chain of events that set her up for termination. A jury could arrive at this second point because the *Advertiser's* reasons for its subsequent actions are pretextual.

### B.    The *Advertiser's* Reasons for its Actions Are Pretextual.

A plaintiff may demonstrate pretext in a retaliation case by showing directly that a retaliatory motive more likely motivated the conduct, or indirectly by demonstrating that the employer's proffered explanation is not worthy of credence. *See U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983). It is also permissible for the trier of fact to infer the ultimate fact of retaliation from

the falsity of the employer's explanation.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147, 120 S. Ct. 2097, 2108 (2001).

It almost goes without saying that the *Advertiser* rejected each explanation offered by Campbell regarding her write ups from 2003 forward, but this does not negate the truthfulness of Campbell's explanations in the least.  Campbell adamantly maintained throughout her employment, and throughout her deposition in this matter, that the *Advertiser's* alleged position that she had an anger problem, in large or small degree and in whatever form expressed, was not only false but absurd.  Campbell testified repeatedly that she never used profanity in the workplace and that she was never loud with other employees; her frustration during her deposition testimony with the *Advertiser's* position is apparent from the citations to same, *supra*.  Nevertheless, the *Advertiser* repeated its mantra of accusing Campbell of being disruptive and incorporated same into written discipline, stating that such behavior "could not be tolerated."  (Pl.'s Depo., Ex. 20.)

The July 11, 2003 warning issued by the *Advertiser* to Campbell for placing the retail ad of another salesperson's customer is also evidence of pretext.  As testified by Campbell in her deposition, she had performed this task before without adverse consequence as a classified ad salesperson, and another classified

20

salesperson – Thomas Taylor, a male – had also run a retail ad without adverse effect. Pretext is bolstered by Campbell's testimony that *Advertiser* policy on this issue varies with which way the wind was blowing that day, and that, at best, supervisors administered the policy inconsistently. Likewise, the June 4, 2004 write up for splitting advertisements across billing periods is suspect. Campbell testified in her deposition that two of those ads should clearly have not qualified for any discipline whatsoever, as one of them was set up intentionally to cross-bill (Avon), and another could not cross-bill because it had no Monday run (Jani King). This was followed by the June 7, 2004 discipline regarding a Friday, late-in-the-day transaction for which her co-workers would not likely have even been available, the performance of which Campbell characterized as "customary," and the discipline resulting from which Campbell categorically denounced.

Two objective measurements detract from the credibility of the *Advertiser's* explanations: first, Campbell's sales figures for both 2003 and 2004, and second, her cross-over ads during the time she was supposedly on a Performance Improvement Plan. As recounted above in the "Statement of Facts," Campbell's sales figures for 2003 were exemplary: she exceeded her monthly sales goals ten out of eleven months, and several by a large margin (e.g., February, June, July, August, and December 2003). In 2004, she likewise exceeded the *Advertiser's*

goals overall by no small margin.  These facts beg the argument that it is

unbelievable to a significant degree that a for-profit entity such as the *Advertiser*

would terminate Campbell for the reasons proffered.  Even petty misconduct,

which is disputed by Campbell, is not a persuasive reason to terminate a consistent

money-maker, or so it should be argued to a jury.  And even when the *Advertiser*

placed Campbell on her Performance Improvement Plan, true to its name,

Campbell's performance improved.  Her cross-billed ads for the months

subsequent to being placed on the plan were no different than the other contract

salespersons.  For the *Advertiser* to then take the position that the "most

significant" reason for Campbell's termination was cross-billing should entitle

Campbell to present her claims to a fair-minded jury.

Taken as a whole, Campbell has demonstrated sufficient evidence of pretext

for a jury to evaluate the reasons for the *Advertiser's* conduct.  It is a jury which

should determine whether retaliation played a role in Campbell's termination,

whether the *Advertiser's* reasons are unworthy of belief, and who is telling the

truth.  The *Advertiser's* motion for summary judgment in this regard should be

denied.

### C.    Campbell Has Established a *Prima Facie* Case of Gender Discrimination under Title VII.

Under the *McDonnell Douglas* and *Burdine* framework, absent direct evidence of discrimination, the plaintiff can establish her *prima facie* case of disparate treatment by demonstrating: (1) she was a member of a protected group; (2) an adverse employment action took place; (2) she and a similarly-situated non-protected person received dissimilar treatment; and (4) sufficient evidence exists to create a causal connection between gender and the disparate treatment. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093-94 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824 (1973).

Once the plaintiff satisfies her burden of production, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824. If the defendant satisfies this burden of production, the plaintiff must put forth evidence to establish that defendant's proffered reasons were a pretext for discrimination. *Id.* at 804, 93 S. Ct. at 1825. The *Advertiser* does not dispute that Campbell belongs to a protected class – female – and that an adverse employment action occurred – her termination.

23

Taken together, the employment histories of Joe Howard, Thomas Taylor, and Cornelius Jones give rise to an inference of discrimination based on gender. Much that they did was met with indifference or praise, yet the same by Campbell was met with discipline. Exhibit 33 to Campbell's deposition recounts how both Howard and Jones were awarded Salesperson of the Month Awards for several months in a row in 2003, despite Campbell having also made her goals for the same months. The differential treatment regarding sales is especially pronounced by Howard winning the 2003 Salesperson of the Year Award, despite Campbell having more points than him. In discipline, too, differences are pronounced: after running a retail advertisement, Thomas Taylor was not written up; Campbell, however, was issued a disciplinary notice. The inappropriate work behavior of Joe Howard, including telling a falsehood, warranted only group meetings, not individual scorn, as with Campbell. Likewise, the extremely rude behavior of Thomas Taylor toward a visitor at the *Advertiser*, Ms. Laura Lynn, which behavior was met without discipline, is further evidence of discriminatory animus. Finally, during her last three months of employment, Campbell's total number of crossover ads did not significantly vary from those of Howard, Taylor, and Jones. None of them were terminated; Campbell was. Finally, the *Advertiser* contends in its brief that Campbell was not qualified for her job. This is factually incorrect.

Campbell's performance was on-par with male employees regarding cross-billing

for July, August, and September 2003 (hers are the same as theirs), and her sales

were excellent for both 2003 and 2004.

### D.    The *Advertiser's* Reasons for its Actions Are Pretextual.

A plaintiff may demonstrate pretext by persuading the court that a

discriminatory reason more likely motivated the employer or, alternatively, by

indirectly showing that the employer's proffered explanation is unworthy of

credence. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

The trier of fact may also infer the ultimate fact of discrimination from the falsity

of the employer's explanation. *Reeves*, 530 U.S. at 147, 120 S. Ct. at 2108.

Campbell has already addressed the pretextual actions of the *Advertiser* in

her retaliation arguments herein. The same arguments can be transposed to

support with equal force her arguments for gender-based discrimination. The

believability of the *Advertiser's* actions remains the same: its actions are unworthy

of credence. The evidence introduced to support her *prima facie* case may also be

used to demonstrate pretext. *Combs*, 106 F.3d at 1528. Here, the disbelief of the

*Advertiser's* reasons for its actions combined with the evidence of disparate

treatment for Howard, Jones, and Thomas produces a "substantial conflict to

support a jury question," particularly when, under the summary judgment

standard, the evidence of disparity and pretext must be viewed in a light most favorable to Campbell. *Id.* at 1526 (internal citation omitted). A reasonable jury could find that the *Advertiser* discriminated against Campbell on the basis of her gender. Its motion for summary judgment should therefore be denied on this basis.

## III.    CONCLUSION.

Viewing the evidence in a light most favorable to her, Campbell has established a *prima facie* case of retaliation and gender discrimination under Title VII and Section 1981. The *Advertiser's* reasons for its actions do not withstand scrutiny, and issues of credibility abound. A fair-minded jury should be given the opportunity to evaluate the *Advertiser's* alleged reasons for terminating Campbell, and its motion for summary judgment should be denied.[4]

**Respectfully submitted,**


**/s/ Stephen J. Austin**
**John D. Saxon**
**Alabama Bar No. ASB-3258-071J**
**Stephen J. Austin**
**Alabama Bar No. ASB-4527-H57A**
**Attorneys for Plaintiff**

---

[4]Campbell's counsel conclude that the evidence supporting her claim of race discrimination under Title VII and Section 1981, *as developed through discovery*, is not compelling, and will not argue for its continuation in this matter.

**OF COUNSEL:**

**JOHN D. SAXON, P.C.**
**2119 Third Avenue North**
**Birmingham, AL 35203**
**Telephone: (205) 324-0223**
**Facsimile:  (205) 323-1583**
**Email:      saustin@saxonattorneys.com**

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment by filing same with the CM/ECF system, which will send electronic notice to:

Lynlee Wells Palmer, Esq.

John W. Sheffield, Esq.

**JOHNSTON, BARTON, PROCTOR & POWELL, LLP**

2900 AmSouth/Harbert Plaza

1901 Sixth Avenue North

Birmingham, AL 35203

**DONE** this the 17th day of May, 2006.

/s/ Stephen J. Austin
**OF COUNSEL**