IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| PATRICIA A. CAMPBELL,  ) | |
|     An Individual,  ) | |
| ) | |
|     Plaintiff,  ) | |
| ) | |
| v.  ) | Civil Action No.: 2:05cv615-F |
| ) | |
| GANNETT CO., INC., d/b/a THE  ) | |
| MONTGOMERY ADVERTISER,  ) | |
| ) | |
|     Defendant.  ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

The plaintiff's opposition to the defendant's motion for summary judgment provides mere speculation and hollow personal opinions about both the plaintiff's job performance and how The Advertiser should operate its business. The plaintiff does not, however, demonstrate genuine issues of material fact that preclude summary judgment in The Advertiser's favor.

**I.  CAMPBELL CONCEDES THAT HER RACE DISCRIMINATION CLAIM IS WITHOUT MERIT**

The plaintiff acknowledged that "the evidence supporting her claim of race discrimination under Title VII and Section 1981, *as developed through discovery*, is not compelling, and [she] will not argue for its continuation in this matter." Plaintiff's Opposition, p. 26 n.4 (emphasis in original). Accordingly, The

Advertiser is entitled to summary judgment on the plaintiff's race discrimination claims.

## II. CAMPBELL FAILED TO ESTABLISH A GENUINE ISSUE OF MATERIAL FACT WITH RESPECT TO HER RETALIATION CLAIM

### A. Campbell Relies on Untimely Acts

In an effort to create a genuine issue of material fact where none exists, Campbell suggests that a write-up she received in 2000 indicates a retaliatory motive. She notes, however, that "this discrete incident falls outside the statute of limitations." Plaintiff's Opposition, p. 17. Therefore, it is untimely and should not be considered. 42 U.S.C. § 2000e-5(e)(1)("A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred."). In any event, such allegations demonstrate neither retaliation nor pretext. She points to nothing more than an assertion that she submitted a complaint and that she received a write-up thereafter. The write-up was based on a series of similar complaints from customers, and was discussed with the plaintiff four days after the final complaint. (Campbell Ex. 18). Campbell cites no further action taken against her at that time and, in fact, the next event she identifies occurred in November 2003, three years and nine months *after* any alleged protected activity in February 2000.

### B. Campbell Cannot Establish a Causal Connection For Her Retaliation Claim

Attempting to overcome The Advertiser's strong argument regarding a lack of causation, Campbell relies heavily on a November 11, 2003 email that was issued approximately two months after she submitted a packet of information to The Advertiser that contained protected complaints. See Plaintiff's Opposition at 18-19. In her argument, Campbell neglects to mention a key fact that she highlighted in the fact section of her brief: "[t]his November 11th email was boilerplate, however, as it was sent to several other employees in the same or slightly modified form." Plaintiff's Opposition at 8; Plaintiff's Exhibit 1. The fact that this warning email was sent to several employees, not just Campbell, belies her allegations of being singled out in retaliation for her alleged complaints and precludes her from establishing a *prima facie* case of retaliation. See, e.g., Jackson v. City of Killeen, 654 F.2d 1181, 1186 (5th Cir. 1981)(stating, in a case in which plaintiff and her co-workers were treated similarly, that "[i]t scarce need be said that Title VII is not a shield against harsh treatment at the workplace; it protects only in instances of harshness disparately distributed").

### C. The Advertiser's Reasons for Terminating the Plaintiff Are Legitimate, Non-Retaliatory And Not Pretextual

Campbell has done nothing more than question The Advertiser's business decision to terminate her employment after repeated warnings and a performance

improvement plan.  She does not dispute that, on numerous occasions, she committed the misconduct, failure to split ads across billing periods, on which The Advertiser based her termination. [1]  Campbell's poor performance is a legitimate, non-discriminatory, non-retaliatory reason for her termination.  See Cooper v. Southern Co., 390 F.3d 695, 740 (11th Cir. 2004)(holding poor performance as legitimate, non-discriminatory reason for termination); Holifield, 115 F.3d at 1564 (same); Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (1993) ("An employer's good faith belief that an employee's performance is unsatisfactory constitutes a legitimate, nondiscriminatory reason for termination. ").

Campbell's assertions of pretext are equally weak.  "A reason is not pretext for discrimination 'unless it is shown both that the reason is false, and that discrimination was the real reason.'"  Brooks v. County Comm'n of Jefferson County, 2006 U.S. App. LEXIS 9636, *5 (11th Cir. April 18, 2006)(emphasis in original)(citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).  There is no evidence that The Advertiser's reasons for terminating Campbell were false or that discrimination was the real reason.

---

[1] Campbell disputes two of the instances of failure to split ads that were included in her June 2004 performance evaluation.  Even if Campbell's assertions are correct regarding these two ads, Campbell nevertheless had **eight** other ads in April and May 2004 that she failed to split, thus justifying the performance notice. (Campbell Ex. 24). The objective evidence indicates that the plaintiff failed to split ten separate ads during April and May 2004. (Campbell Ex. 24).  The inclusion in her performance notice of two ads that were not split, even if done with justification, cannot negate the plaintiff's failure to split ads that required splitting on eight other occasions and, therefore, does not demonstrate pretext.  Furthermore, as discussed below, the plaintiff's June 2004 discipline is time-barred from inclusion in this case.

4

Campbell repeatedly asserts her disagreement with The Advertiser's characterizations of her conduct and, thus, with the issuance of discipline based on that conduct. See Plaintiff's Opposition pp. 5, 6, 11, 12. Campbell's mere disagreement with her supervisor's assessment of her performance, however, is irrelevant and insufficient to establish pretext. See Wilson v. B/E Aero., Inc., 376 F.3d 1079, 1088 (11th Cir. 2004)("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason, but must meet it head on and rebut it. . . . Quarrelling with that reason is not sufficient."); Alexander v. Fulton County, 207 F.3d 1303, 1339 (11th Cir. 2000)("a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where . . . the reason is one that might motivate a reasonable employer"); Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997)("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance").

Campbell erroneously claims that her July 11, 2003 warning for placing a retail ad is evidence of pretext.[2] Plaintiff's Opposition pp. 19-20. First, this write-up took place more than three years *after* her first complaint in February 2000 and several months *before* the submission of her September 2003 packet, thereby

---

[2] The relationship between customers and employees of The Advertiser is specific, not arbitrary. Campbell's department did not typically service retail advertisers; there was a separate department that handled such accounts.

5

negating any casual connection. Further, the issuance of this performance notice in July 11, 2003 places it well outside of the 180-day period prior to the plaintiff's December 14, 2004 EEOC charge and, thus, is time-barred. See 42 U.S.C. § 2000e-5(e)(1). Moreover, Campbell admitted that she placed the retail ad. (Campbell 97, ll. 2-9, 99, ll. 18-21). Although she asserts that a co-worker, Thomas Taylor, ran a retail ad without discipline, she omits the undisputed fact that Taylor had permission to run the retail ad, while Campbell did not. (Campbell 99, ll. 4-6, 11-21). The fact that The Advertiser disciplined an employee who acted without permission and did not discipline an employee who acted with permission does not even remotely suggest pretext.

Campbell deems "suspect" a performance notice that she received on June 4, 2004 for failing to split ads across billing periods,[3] stating that two of the ads should not have qualified for discipline.[4] Plaintiff's Opposition p. 21. Like many of her other allegations, her June 4, 2004 performance notice is untimely; it occurred 193 days prior to her EEOC charge. See 42 U.S.C. § 2000e-5(e)(1).

Campbell identifies two factors she deems "objective measurements [that] detract from the credibility of the *Advertiser's* explanations": (1) Campbell's sales figures for 2003 and 2004, and (2) her cross-over ad rate during the time of her Performance Improvement Plan. Neither fact demonstrates pretext, and

---

[3] Cross-over ads are ads that were not split across billing periods. The Advertiser's policy regarding ad splitting is covered more fully in its principal brief.
[4] See footnote 1.

6

Campbell's description of both excludes key, relevant facts.  First, The Advertiser admits that Campbell met her monthly sales goals in the majority of months in 2003 and 2004.  (Campbell Ex. 23, p. 3).  She simply ignores the fact that meeting goal was only part of her overall expectations at The Advertiser.  She struggled continuously with making her online goals, an objective criteria that was covered with the plaintiff during her 2004 performance appraisal and again with her performance improvement plan.  (Campbell Ex. 23, pp. 3, 6; Campbell Ex. 27, p. 1).  Her assertion that "it is unbelievable to a significant degree that a for-profit entity such as the *Advertiser* would terminate Campbell for the reasons proffered" constitutes nothing more than a disgruntled former employee questioning her former employer's business judgments.  It is not for this Court or for a jury to question The Advertiser's business decisions.  See Laosebikan v. Coca-Cola Co., NO. 05-13174, 2006 U.S. App. LEXIS 2419, * 13 (11th Cir. Jan. 31, 2006)("It is not the job of the federal courts to second-guess employer decisions as a kind of super-personnel department. . . . Courts are not concerned with whether an employment decision is prudent or fair, but only with whether it was motivated by unlawful animus.").

Campbell's second objective point misses the mark and likewise omits important information.  Her faulty argument is that, during the months of her performance improvement plan (the end of July, August and September 2004), her

7

crossover ads were not significantly different from others in her department. Plaintiff's Opposition p. 22. While this argument might have some merit had her performance been spotless prior to July 2004, it is fatally flawed here because, as evidenced by Plaintiff's Exhibit 3, the plaintiff was the only one in her department whose high volume of cross-over ads had necessitated a verbal warning, a written warning, and a final written warning, ultimately leading to a performance improvement plan. See Plaintiff's Exhibit 3.

An examination of the plaintiff's problems with cross-over ads in 2004 reveals her pattern of poor performance. In January 2004, the plaintiff had 13 cross-over ads, 11.82% of her total ads taken, while none of her co-workers exceeded 1.91%. Id. She was given a verbal warning. Id. In February 2004, the plaintiff had 9 cross-over ads, 10.98% of her total ads taken, while none of her co-workers exceeded 1.58%. Id. The two individuals with the next highest amounts of cross-over ads (1.58% and 1.53%, respectively) were both issued warnings. Id. In March 2004, the plaintiff had 1 cross-over ad, 0.91% of her total ads taken. Id. During the same period, a co-worker had 6 cross-over ads, 3.39% of the total ads taken, and the co-worker was issued a verbal warning. Id. In April 2004, the plaintiff had 3 cross-over ads, 1.71% of her total ads taken. Id. No one received a performance notice during April 2004. Id. In May 2004, the plaintiff had 5 cross-over ads, 3.45% of her total ads taken, and she received a final written warning.

8

Id. Her two co-workers with the next highest percentages of cross-over ads, 3.23% and 2.19%, respectively, were both warned (one a verbal warning and one, who had previously received a verbal warning, a written warning). Id. In June 2004, only one person in the department had a statistically significant cross-over rate (3.17%), and that individual received a verbal warning. Id. During the months leading up to her performance improvement plan, therefore, the plaintiff consistently had more problems with cross-over ads than her co-workers and, as a result, received more discipline. Co-workers with similar, though less pronounced, problems with cross-billing, were also disciplined.

The plaintiff's argument that her performance was average during the months of July, August and September 2004, therefore, is not only presented out-of-context with her prior performance deficiencies, but is also inaccurate. By July 2004, the plaintiff had a total of 32 ads that she had failed to split for the year. See Plaintiff's Exhibit 3. For the same time period (January through July 2004) her co-workers had failed to split ads 11, 9, 8, 8, and 20 times, respectively. Id. The two individuals with the highest numbers of cross-over ads had been issued a verbal warning and a written warning, respectively. Id. Objectively, the plaintiff's cross-over rate was much higher than that of her co-workers and, therefore, she received progressive discipline steps until a performance improvement plan was warranted in July 2004. Id. The performance improvement plan, issued July 26, 2004,

clearly stated, "Pat must not have more than (2) ads (considered acceptable) that cross the billing period in the next 60 days." (Campbell Ex. 27, p. 2). The very next month, August 2004, however, the plaintiff had **five** cross-over ads, thus exceeding the acceptable limit established under her performance improvement plan. See Plaintiff's Exhibit 3. Consequently, she was terminated on September 27, 2004, at the conclusion of her performance improvement plan. (Campbell Ex. 38). The plaintiff's termination for failure to split ads after repeated warnings is a far cry from pretext. Although she was the only individual terminated as a result of this problem, she was also the only individual whose continued problems with cross-over ads necessitated a verbal warning, a written warning, a final written warning and a performance improvement plan.[5]

### III. THERE IS NO GENUINE ISSUE OF MATERIAL FACT AS TO CAMPBELL'S GENDER DISCRIMINATION CLAIM

The plaintiff's allegations of gender discrimination are similarly flawed and due to be dismissed. She cannot point to a single male comparator who was similarly situated and treated more favorably than she during the relevant time frame.

Campbell asserts that Joe Howard and Cornelius Jones were awarded Salesperson of the Month Awards for several months in 2003, that Mr. Howard

---

[5] It is important to note that The Advertiser did not single out the plaintiff for discipline. It disciplined other individuals in the plaintiff's department for similar errors, consistent with their number of cross-over ads.

10

won the Salesperson of the Year award in 2003, and that Campbell had more points than either of them. See Plaintiff's Opposition p. 24. Although The Advertiser contends that there are legitimate, non-discriminatory reasons for the plaintiff's failure to win these awards and disputes the plaintiff's calculations regarding the number of points she and Mr. Howard earned, these discrete incidents are nevertheless time-barred, as none of them fall within the 180-day period preceding the plaintiff's December 14, 2004 EEOC charge. (Complaint Ex. A). Campbell's allegations of gender discrimination relating to the 2003 Salesperson Awards, therefore, are untimely and due to be dismissed. See 42 U.S.C. § 2000e-5(e)(1).

Campbell also points to Thomas Taylor's lack of discipline for running of a retail ad as "evidence" of alleged discrimination. It is undisputed that Taylor had permission to run this ad and that Campbell did not have permission to run the retail ad for which she was disciplined, thereby preventing the two from being similarly situated. (Campbell p. 99). Again, however, this action is untimely, as the performance notice for this incident was issued July 11, 2003, well outside the 180-day period. See 42 U.S.C. § 2000e-5(e)(1).

Campbell also argues that Taylor was, in her opinion, rude toward a visitor at The Advertiser and was not disciplined, while she was issued performance notices for rude behavior. See Plaintiff's Opposition p. 6. There is no evidence

11

that anyone in management at The Advertiser was aware of any exchange between Taylor and the visitor.  In contrast, The Advertiser received numerous complaints about the plaintiff and her rude behavior, and Campbell's supervisors witnessed at least one exchange with a customer that they considered rude.  (Campbell Ex. 18, 20, 25).   There is no evidence here that The Advertiser disciplined Campbell for rude behavior while consciously overlooking allegedly similar behavior by Taylor.  See Amos v. Tyson Foods, Inc., 153 Fed. Appx. 637, 648 (11th Cir. 2005)("if actions that would violate a company policy are not brought to the attention of the company, then that evidence would not be useful in proving whether the company unlawfully discriminated in the application of its policies"); Jones v. Gerwens, 874 F.2d 1534, 1541-42 (11th Cir. 1989) (explaining that the relevant decision maker in the plaintiff's case must have known of similar incidents of misconduct and consciously overlooked them).

 Finally, Campbell contends that her "total number of crossover ads did not significantly vary from those of Howard, Taylor and Jones," all of whom are male; "[n]one of them were terminated; Campbell was."  Plaintiff's Opposition p. 24.  The plaintiff neglects to mention several key facts: (1) Howard, Taylor and Jones all received at least verbal warnings for their failure to split ads across billing periods; and (2) none of the other females in her department were terminated either.  Of the six people in the department, there were three females and three

males. Members of both genders received either verbal or written performance notices when they failed to split ads. See Plaintiff's Exhibit 3.[6] None of the individuals in the department had as many cross-over problems as the plaintiff, but they were disciplined consistent with their number of cross-over ads. Id. Consequently, there is no evidence of gender discrimination. See Bush v. Commonwealth Edison Co., 990 F.2d 928, 931 (7th Cir. 1993)(noting, in a race discrimination context, that a pattern of discipline among those inside and outside a protected class is not evidence of discrimination). The cross-over policy was administered consistently with respect to both male and female employees, varying only by the number of ads that the employee failed to split. Id.

## IV. CONCLUSION

The plaintiff has simply offered no evidence to create a triable issue of fact. It is undisputed that she repeatedly failed to split ads across billing periods. It is undisputed that she was repeatedly warned about her need to improve in this area. It is undisputed that her failure to split ads across billing periods continued after each of these warnings. It is undisputed that she was informed at the end of July 2004 that she should not have more than two cross-over ads per month. It is

---

[6] When examining Plaintiff's Exhibit 3 with respect to Campbell's gender discrimination claim, it is important to know the genders of the individuals listed. The Advertiser identified these individuals by gender in its principal brief and, for ease of reference, does so again here: B. Jackson (female) (issued verbal warning during period 5); P. Campbell (female)(issued verbal warning during period 1, written warning during period 2, final warning during period 5); C. Jones (male)(issued verbal warning during period 2); J. Howard (male)(issued written warning during period 2); T. Taylor (male)(issued verbal warning during period 6); J. Robinson-Smith (female)(issued verbal warning during period 3, written warning during period 5).

undisputed that the very next month, she had five cross-over ads. The undisputed evidence, therefore, indicates that The Advertiser's actions were legitimate, non-discriminatory, non-retaliatory and non-pretextual. There are no genuine issues of material fact, and The Advertiser is entitled to summary judgment as a matter of law.

s/John W. Sheffield
John W. Sheffield (ASB-7423-D62J)

s/Lynlee Wells Palmer
Lynlee Wells Palmer (ASB-4367-T82P)
Attorneys for Defendant
The Advertiser Company
d/b/a The Montgomery Advertiser

**OF COUNSEL:**

**JOHNSTON BARTON PROCTOR & POWELL LLP**
2900 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2618
Telephone:  (205) 458-9400
Facsimile:  (205) 458-9500

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 24, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

John D. Saxon, Esq.
Stephen J. Austin, Esq.
JOHN D. SAXON P.C.
2119 3rd Avenue North
Birmingham, AL 35203


                                        s/Lynlee Wells Palmer
                                        OF COUNSEL